IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAMONT BRYANT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 07 C 5909 |
| v. ) | |
| ) | Judge Ruben Castillo |
| JUAN GARDNER, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Lamont Bryant ("Plaintiff") brought this suit under 42 U.S.C. § 1983 following his termination as boys' varsity basketball coach at John Marshall High School ("Marshall"). Plaintiff raises claims against Marshall; Marshall's interim principal, Juan Gardner ("Gardner"); Marshall's athletic director and girls' varsity basketball coach, Dorothy Gaters ("Gaters"); and the Board of Education of the City of Chicago ("the Board") (collectively "Defendants"). (R. 1, Compl.) Presently before the Court is Gaters' motion to dismiss Count III, a Fourteenth Amendment occupational liberty claim, for failure to state a claim. (R. 47, Def. Gaters' Mot. to Dismiss.) For the following reasons, the motion is denied.

## RELEVANT FACTS[1]

Marshall has a rich tradition of high school basketball, and since the 1960s its girls' and boys' teams have won numerous tournaments and championships. (R. 18, Am. Compl. ¶ 10.) In

---

[1] In determining whether to grant a motion to dismiss, the Court assumes all well-pleaded allegations in the complaint to be true and draws all reasonable inferences in the Plaintiff's favor. Fed. R. Civ. P. 12(b)(6); *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 457 (7th Cir. 2007).

1

the early 1990s, one of Marshall's basketball players, Arthur Agee, was featured in the movie "Hoop Dreams." (*Id.* ¶ 11.) A decade later, while the girls' basketball program was still "soaring," the boys' program was at an all-time low. (*Id.* ¶ 13.) During the 2001-02 season, the boys' team won only two games. (*Id.* ¶ 14.) In the 2002-03 season, the team's record was three wins and 24 losses. (*Id.*)

In 2003, Plaintiff was recruited by then athletic director Luther Bedford ("Bedford") "to return Marshall's boys' basketball program to its traditional place among the most competitive programs in Illinois." (*Id.* ¶ 15.) Plaintiff was hired to be head coach of the boys' basketball team, and also to teach gym class at Marshall. (*Id.* ¶ 16.) From Plaintiff's first season as the boys' head coach, he led the team to several winning records: in the 2003-2004 season, for example, the team had a record of 24 wins—the same number of games it lost during the prior season—and six losses. (*Id.* ¶¶ 14, 17.) For the four seasons that Plaintiff coached the boys' varsity team, the team consistently placed in the conference, regional, sectional, and state championships. (*Id.* ¶¶ 17-21.) In the pre-season rankings for the 2007-2008 season, the team was ranked number one in its class in the state, and twenty-second in the country. (*Id.* ¶ 22). During this same five-year period, the girls' team "struggled" and did not reach the state tournament, or win a league or sectional championship. (*Id.* ¶ 24).

In 2004, Gaters became Marshall's athletic director when Bedford retired. (*Id.* ¶ 18.) She retained her position as head coach of the girls' basketball team. (*Id.*) According to Plaintiff, Gaters gradually began to "undermine Plaintiff's accomplishments and assume control of the boys' basketball program in order to ensure that the girls' basketball team would regain its previous status as the dominant force in Marshall high school athletics as it had been prior to

2

Plaintiff's assuming leadership of the boys' program." (*Id.* ¶ 25.) Examples of these efforts included: awarding scholarships only to girls' basketball players and male athletes in sports other than basketball; providing lower quality travel arrangements to the boys' team; and denying the boys' team the same access to practice facilities given to the girls' team. (*Id.* ¶¶ 25, 32-33, 42-48.) For example, Plaintiff alleges that in the summer and fall of 2007, the boys' team was forbidden to participate in pre-season conditioning and "open gym," while the girls' team was not given this same prohibition. (*Id.* ¶¶ 45-48.)

During this period of tension between Plaintiff and the Marshall administration, Plaintiff received offers to teach and coach basketball at other high schools and universities. (*Id.* ¶¶ 26, 35) After the 2005-2006 season, Plaintiff advised Defendant Gardner that "he was considering taking a position with another high school because Marshall's athletic director, Defendant Gaters, was not supporting the boys' program." (*Id.* ¶ 28). Defendant Gardner assured Plaintiff that if he stayed at Marshall, Gardner would "make sure things were different" and would support the boys' program; Plaintiff alleges that he remained at Marshall in reliance on Gardner's assurances. (*Id.* ¶¶ 29, 30).

In March 2007, following the end of 2006-2007 season, Plaintiff was again recruited by other high schools and "major universities" for teaching and coaching positions. (*Id.* ¶ 35.) Upon learning that Plaintiff was being recruited by other schools, Gardner began searching for potential candidates to interview for Plaintiff's position. (*Id.* ¶¶ 35-36.) Plaintiff was upset to learn that Gardner was searching for his replacement, because he had not yet decided whether to leave Marshall. (*Id.* ¶¶ 37-38) Plaintiff met with Gardner to convey his concerns. (*Id.* ¶ 37.) At the meeting, the two agreed that Plaintiff would decline other opportunities for one year and

coach at Marshall for the 2007-2008 season. (*Id.* ¶ 38.) Gardner required Plaintiff to agree in writing to adhere to certain conditions: wear a shirt and tie at all "high profile" games; honor the school's commitment for the boys' team to play in two tournaments scheduled in December 2007 and January 2008; allow his players to participate in other sports; refrain from demeaning other coaches; and ensure that his assistant coaches were board-certified. (*Id.* ¶ 38.) Plaintiff agreed to these conditions. (*Id.*)

In September 2007, prior to the start of the 2007-08 basketball season, Plaintiff and his coaching staff voiced their concerns to Gardner regarding pre-season open gym restrictions that had been placed on the boys' team. (*Id.* ¶¶ 55-58) Plaintiff alleges that these same restrictions were not placed on the girls' team. (*Id.* ¶ 58.) According to Plaintiff, open gym provides an opportunity for athletes to stay in shape, hone their skills, and "stay off the streets where trouble all too often awaits teenage students in the surrounding Garfield Park community." (*Id.* ¶ 43.) Open gym also provides college coaches an opportunity to evaluate players in an informal setting. (*Id.* ¶ 55.) On September 13, 2007, Plaintiff requested that Gardner provide him with a date when the boys' team could begin open gym. (*Id.* ¶ 55.) Gardner never did so. (*Id.*) Frustrated with Gardner's lack of a response, Plaintiff spoke with his union delegate about what he perceived as disparate treatment of the boys' and girls' teams, and the union delegate raised the issue directly with Gardner. (*Id.* ¶¶ 56-57.) The following week, one of Plaintiff's assistant coaches also complained to Gardner about the restriction on open gym for the boys' team members. (*Id.* ¶ 58.)

On October 2, 2007, Plaintiff was called to a meeting at Gardner's office. (*Id.* ¶ 59.) Present were Gardner, Marshall's "mentoring" principal, and two assistant principals. (*Id.* ¶ 59.)

At the meeting, Gardner accused Plaintiff of violating the conditions to which he had previously agreed to adhere. (*Id.* ¶ 60.) Plaintiff responded that Gardner's accusations were false. (*Id.* ¶ 61.) Plaintiff asserted that there had been no games since the contract had been entered; that three of the assistant coaches had been board-certified and the remaining two would be certified before the start of the season; and that he had every intention of honoring the commitment to play in the two tournaments scheduled in December and January. (*Id.* ¶ 61.) According to Plaintiff, Gardner told him that his explanations were "unimportant," and that he was being relieved of his duties as head coach, but could continue at Marshall as a gym teacher. (*Id.*)

Immediately following Plaintiff's termination as head coach, Gaters made public statements, printed in the news media, that "Plaintiff breached a code of conduct expected of Marshall coaches, that Plaintiff was guiding the boys' basketball program under his own agenda, and that the program had ceased to become Marshall's program, and was now functioning as Plaintiff's program." (*Id.* ¶ 63.) Following Plaintiff's dismissal, Marshall students circulated a petition and organized a pep rally in support of Plaintiff. (*Id.* ¶ 64.)

On October 15, 2007, Gardner and Gaters met with the boys' basketball players, their parents, and alumni to discuss the appointment of a new head coach. (*Id.* ¶ 68.) At that meeting, Gaters allegedly made further statements about Plaintiff, which Plaintiff claims were "intended to discredit Plaintiff and destroy his reputation in the eyes of the Marshall basketball community." (*Id.* ¶ 69). Though Plaintiff has retained his position as a gym teacher at Marshall, Gardner and Gaters have appointed one of the assistant coaches from the girls' basketball team to replace him as head coach of the boys' team. (*Id.* ¶ 68.)

## PROCEDURAL HISTORY

On October 18, 2007, Plaintiff filed this action in federal court under Section 1983 against Marshall, the Board, Gardner, and Gaters. (R. 1, Compl.) On October 26, 2007, Plaintiff filed an Amended Complaint raising the following claims: a First Amendment retaliation claim alleging that Defendants fired Plaintiff from his coaching position because he spoke out about the alleged disparate treatment of the boys' and girls' basketball teams (Count I); a Title IX claim alleging that the Defendants denied male student athletes access to the same activities, facilities, and funding provided to female athletes (Count II); a Fourteenth Amendment claim alleging that Gaters deprived Plaintiff of his occupational liberty when she publicly slandered him in the context of his termination (Count III); and pendent state law claims for breach of contract (Count IV), promissory estoppel (Count V), tortious interference with contract (Count VI), and defamation (Count VII). (R. 18, Am. Compl.) By stipulation of the parties, Court II against the Board has been dismissed, and Marshall has been dismissed as a Defendant. (R. 61, Minute Entry.) Gaters now moves to dismiss Count III, arguing that Plaintiff has not sufficiently alleged a violation of the Fourteenth Amendment. (R. 48, Def. Gaters' Mem. in Supp. of Mot. to Dismiss at 2-4.)

## LEGAL STANDARDS

In ruling on a motion to dismiss, the Court accepts all well-pleaded facts in a complaint as true, and draws all reasonable inferences from those facts in the plaintiff's favor. Fed. R. Civ. P. 12(b)(6); *Christensen*, 483 F.3d at 457. Although the Court is generally limited to the allegations in the complaint, the Court can also consider public records, such as the newspaper articles submitted by Plaintiff in response to the motion to dismiss, and any documents attached

to the complaint. Fed. R. Civ. P. 10(c); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

In order to survive a motion to dismiss, a plaintiff must plead enough to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Although notice pleading is not required in federal court, "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). Further, "it is not enough for a complaint to avoid foreclosing possible bases for relief; it must actually suggest that the plaintiff has a right to relief." *EEOC v. Concentra Health Serv., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007).

## ANALYSIS

In Count III of the Amended Complaint, Plaintiff raises a Fourteenth Amendment claim, alleging a deprivation of his occupational liberty interest in his career as a coach. (R. 18, Am. Compl. ¶¶ 81-85.) Specifically, Plaintiff contends that Gaters injured his reputation in the coaching field and foreclosed other coaching opportunities by making disparaging public comments about him in the context of his termination. (*Id.* ¶ 84.) As a result, Plaintiff claims that it is "unlikely" he will "ever be able to land a coaching position commensurate with the success he had achieved at Marshall high school. . . ." (R. 66, Pl.'s Resp. to Mot. to Dismiss at 10.)

The Fourteenth Amendment imposes constraints on government actions which deprive an individual of "liberty" or "property" interests within the meaning of the Due Process Clause. U.S. Const. XIV; *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The concept of liberty

7

protected by the Due Process Clause includes one's occupational liberty, or "the liberty to follow a trade, profession, or other calling." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992). The government violates an employee's occupational liberty interest when, in the course of a discharge, failure to rehire, or other adverse employment action, the employer stigmatizes the employee by making public comments that impugn "the individual's good name, reputation, honor, or integrity" or impose a "stigma or other disability on the individual which forecloses other opportunities." *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). The Fourteenth Amendment protects only the individual's liberty to pursue a particular occupation, however, and not the individual's right to any one job. *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001); *Meer v. Graham*, 524 F. Supp. 2d 1044, 1052 (N.D. Ill. 2007). Thus, the critical issue for purposes of an occupational liberty claim is whether the defendants' actions will prevent the employee from pursuing other opportunities in their chosen profession. *Townsend*, 256 F.3d at 670; *Wroblewski*, 965 F.2d at 455.

To sufficiently plead the deprivation of an occupational liberty interest, the plaintiff must allege: (1) the employer made stigmatizing comments; (2) the comments were publicly disclosed; and (3) the plaintiff suffered a tangible loss of other employment opportunities as a result. *Townsend*, 256 F.3d at 669-70. If all the elements necessary to make out an occupational liberty claim are met, the remedy is an opportunity to refute the charge, which allows the person an opportunity to "clear his name." *Roth*, 408 U.S. at 573 & n.12; *see also Strasburger v. Bd. of Educ. Comm. Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998) ("[T]he remedy available to a discharged employee who proves all the elements of the cause of action is a name-clearing hearing.").

As an initial matter, Gaters argues that Plaintiff cannot possibly state an occupational liberty interest claim because he is still employed at Marshall as a gym teacher. (R. 48, Gaters' Mem. in Supp. of Mot. to Dismiss at 1-4.) Gaters is correct that to implicate an occupational liberty interest, the employer's stigmatizing comments must be accompanied by an "alteration of legal status," such as a discharge, failure to rehire, failure to grant tenure, or similar adverse employment action. *Paul v. Davis*, 424 U.S. 693, 708-10 (1976); *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 730 (7th Cir. 2006). Gaters is also correct that Plaintiff does not possess a protected property interest in his coaching position, which, unlike his teaching position, is not tenured under Illinois law. *See Smith v. Bd. of Educ. of Urbana Sch. Dist. No. 116*, 708 F.2d 258, 261 (7th Cir. 1983) (coaches do not fit within definition of tenured positions under Illinois law); *Bd. of Educ. of Danville Comm. Consol. Sch. Dist. No. 118 v. Ill. Educ. Labor Relations Bd.*, 529 N.E.2d 1110, 1113 (Ill. App. Ct. 1988) (coaches have no tenure rights under Illinois School Code).

Nevertheless, an individual can state an occupational liberty claim even if the adverse employment action involves a job in which the individual has no property interest. *Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853, 859 (7th Cir. 1999); *Guy v. State of Illinois*, 958 F. Supp. 1300, 1311 (N.D. Ill. 1997). As stated above, the issue for purposes of an occupational liberty claim is not whether the defendants have fired plaintiff from a particular position in which he possessed a property interest, but whether a discharge or other adverse employment action was carried out in such a manner that it will significantly impinge on the plaintiff's ability to pursue his chosen occupation. *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 531 (7th Cir. 2000); *Wroblewski*, 965 F.2d 452, 456 (7th Cir. 1992).

9

In the Amended Complaint, Plaintiff alleges that although he is still serving as a gym teacher at Marshall, he has been relieved of his duties as head coach, and another employee has been appointed to serve in that position. (R. 18, Am. Compl. ¶¶ 61-69.) According to Plaintiff, coaching is his chosen profession, and he was allegedly recruited by Marshall based on his skills as a coach; it is apparent from the Amended Complaint that the gym teacher position was secondary to Plaintiff's primary position as head coach. (*Id.* ¶¶ 15-16, 81-85.) Plaintiff further alleges that Gaters' public comments made in connection with his termination as head coach will significantly impact his ability to find a comparable coaching position in the future. (*Id.* ¶¶ 84-85.) Plaintiff has thus adequately alleged an alteration in legal status sufficient to trigger a protectible occupational liberty interest.

The two cases cited by Gaters do not change this conclusion. (R. 48, Gaters' Mem. in Supp. of Mot. to Dismiss at 3-4.) In *Klug*, the Seventh Circuit held that the plaintiff did not have a cognizable claim for deprivation of her occupational liberty when she was transferred from a position as dean of incoming freshman at a high school to a position as an elementary school teacher. *Klug*, 197 F.3d at 860. Prior to serving as dean, plaintiff had worked as a teacher within the district, and held a certificate to teach kindergarten through ninth grade. *Id.* at 860. The Court reasoned that, despite the transfer, the plaintiff was still employed by the school district as an educator; was serving in the same sort of position she had held before she became dean; and was earning the same hourly wage. *Id.* at 859.

The facts of *Klug* are not directly analogous to the instant case because, unlike Plaintiff, the teacher in *Klug* held only one position within the school district; the Court emphasized that she was not terminated from any position, but rather was transferred from one position to

10

another. *Id.* at 859-60. Plaintiff, on the other hand, held two distinct positions at Marshall—gym teacher and head coach of the boys' basketball team—and he has been terminated from one of those positions. Further, in *Klug* the Court found that the position to which the plaintiff was transferred was not "far beneath" her position as dean of incoming freshman. *Id.* at 860. Here, Plaintiff has alleged that his chosen profession is coaching, not teaching gym, and that he was recruited by Marshall based on his experience as a coach to revive the boys' basketball team. (R. 18, Am. Compl. ¶¶ 15-16, 81-85.) His demotion exclusively to the role of gym teacher could be characterized as "far beneath" his prior position as both head coach and gym teacher. Because of these critical distinctions, the Court's analysis in *Klug* is inapplicable.

Gaters also relies on *Smith*, which is factually more analogous to this case, but also does not support her argument that Plaintiff has failed to allege the deprivation of his occupational liberty. *Smith*, 708 F.2d at 260. Like Plaintiff, the plaintiffs in *Smith* served as both gym teachers and coaches. *Id.* Though kept on staff in their teaching capacity, the *Smith* plaintiffs were dismissed from their coaching positions, at which time several members of the school board made public comments that plaintiffs alleged were stigmatizing. *Id.* at 265. In affirming the dismissal of the complaint, the Seventh Circuit found that the plaintiffs failed to adequately allege a deprivation of their occupational liberty. *Id.* at 266. Contrary to Gaters' argument, however, the Seventh Circuit did not conclude that the plaintiffs lacked a protectible liberty interest in their coaching careers; rather, the Court found that the alleged statements made by the school board at the time of the plaintiffs' termination were not sufficiently stigmatizing to trigger the protections of the Due Process Clause. *Id.* ("defendants' alleged statements were too trivial to infringe plaintiffs' liberty interests"). Thus, *Smith* does not defeat Plaintiff's claim.

11

Based on the case law, Plaintiff has sufficiently alleged that he has suffered an alteration of legal status sufficient to trigger his occupational liberty. Accordingly, the Court turns to the specific elements of the occupational liberty claim.

A. **Stigmatizing Comments**

To be actionable, statements made by a public official must be false assertions of fact; neither "true but stigmatizing" statements or "statements of opinion, even stigmatizing ones" will suffice to meet this standard. *Strasburger*, 143 F.3d at 356. Because the remedy available to a discharged employee who proves all the elements of an occupational liberty claim is a name-clearing hearing, "the statements must be of a kind such that the discharged employee could refute them and clear his name, given the opportunity." *Id.* Further, "not every remark which may arguably affect one's reputation" is actionable; the Fourteenth Amendment protects only against "charges that might seriously damage one's standing and associations in the community." *Ulichny v. Merton Comm. Sch. Dist.*, 249 F.3d 686, 705 (7th Cir. 2001).

Here, most of Gaters' alleged statements can be categorized as opinion, such as that Plaintiff was "guiding the team under his own agenda" and "running the program as though it belonged to him." (R. 18, Am. Compl. ¶ 63; R. 66-3, Pl.'s Resp. to Mot. to Dismiss, Group Ex. B.) Since the statements are highly subjective, they are not the type that Plaintiff could refute if given the opportunity. *See Strasburger*, 143 F.3d at 356 (employer's statement, "We need to get rid of that SOB Strasburger before he hurts one of those girls," was not assertion of fact that could be refuted). Nor does the Court find these statements so stigmatizing that they would affect Plaintiff's standing in the community. *Ulichny*, 249 F.3d at 705. At most, these statements demonstrate a difference of opinion over Plaintiff's management of the team. Claims

12

of mismanagement or inability to meet the employer's expectations are not sufficiently stigmatizing to implicate the Fourteenth Amendment. *Head v. Chi. Sch. Reform Bd. of Trustees*, 225 F.3d 794, 802 (7th Cir. 2000); *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir. 1995).

Plaintiff also alleges that Gaters accused him of "breach[ing] a code of conduct expected of Marshall coaches." (R. 18, Am. Compl. ¶ 63.) Although this statement is arguably an assertion of fact, the statement is vague and, in the Court's view, not the type of severe criticism that would be actionable under the Fourteenth Amendment. *See Ulichny*, 249 F.3d at 705 (school administrator's vague statement that he had a "lack of trust" in plaintiff was not sufficiently stigmatizing); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984) (occupational liberty claim arises only where employer accuses employee of some type of "dishonesty or other job-related moral turpitude"); *Smith*, 708 F.2d at 260 (school board's statement that "a change in coaches would be good for the school's athletic program" was too trivial to infringe on plaintiffs' liberty interest).

Plaintiff also contends that Gaters made a second round of false statements impugning his reputation during the October 15, 2007, meeting with students, parents, and alumni. (R. 18, Am. Compl. ¶ 69.) The Amended Complaint does not contain any detail about these statements, but Plaintiff has provided additional detail in response to the motion to dismiss.[2] According to

---

[2] The Court can consider additional factual assertions made in response to a motion to dismiss as long as they do not conflict with the complaint. *Albiero v. Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997). If the supplementary information makes out the claim, the claim should not be dismissed. *Id.* Here, the supplementary information does not conflict with the allegations in the Amended Complaint, and simply provides additional details regarding Gaters' alleged statements during the October 15, 2007, meeting. (*See* R. 18, Am. Compl. ¶ 69 ("During the October 15th meeting, Defendant Gaters attempted to justify the termination of Plaintiff by slandering Plaintiff with a litany of false statements and misleading half-truths, intended to discredit Plaintiff and destroy his reputation in the eyes of the Marshall basketball community.").)

13

Plaintiff, Gaters stated that Plaintiff had cursed at bus drivers, threatened and failed to protect players, disrespected fellow coaches, and failed to follow protocol regarding money. (R. 66, Pl.'s Resp. to Mot. to Dismiss at 6.) These are assertions of fact (as they could potentially be refuted by Plaintiff), and Plaintiff alleges that they are false. (*Id.*; R. 18, Am. Compl. ¶¶ 63-68.) The Court also finds that these statements, particularly the statements about the alleged mistreatment of players and fellow coaches, are sufficiently stigmatizing to a person in the coaching profession to implicate Plaintiff's liberty interests. *See Ulichny*, 249 F.3d at 705; *see also Burke v. Chicago Sch. Reform Bd. of Trustees*, 169 F. Supp.2d 843, 847-48 (N.D. Ill. 2001) (allegations that teacher engaged in attendance book fraud, stole grade book, and fabricated crimes were sufficiently stigmatizing to someone in teaching profession).

Plaintiff has also submitted a newspaper article in which Gaters allegedly called Plaintiff a "liar" in connection with his assertion that male athletes had been denied the same amenities as female athletes. (R. 66, Pl.'s Resp. to Mot. to Dismiss, Ex. C.) Gaters' statement is an assertion of fact, which Plaintiff alleges is false, and directly relates to Plaintiff's job-related integrity. *Roth*, 408 U.S. at 573; *Lawson*, 725 F.2d at 1139. Based on these alleged statements, Plaintiff has satisfied the first prong of the analysis.

### B. Public Disclosure

Next, the plaintiff must allege that the defendant's statements were publicly disclosed. *Townsend*, 256 F.3d at 669-70. Here, Plaintiff has alleged that Gaters publicly slandered him in the press and to a group of parents, students, and alumni from the Marshall community. (R. 18, Am. Compl. ¶¶ 63-69; R. 66-3, Pl.'s Resp. to Mot. to Dismiss, Group Ex. B.) At this stage, the Court accepts these allegations as true.

14

C.  **Tangible Loss of Employment Opportunities**

Finally, the plaintiff must allege that he suffered a tangible loss of employment opportunities as a result of the defendant's actions. *Townsend*, 256 F.3d at 669-70. To demonstrate a loss of employment opportunities, the plaintiff must allege a "permanent exclusion" or "protracted interruption" from the individual's chosen field because of the defendant's actions. *Wroblenski*, 965 F.2d at 456. This is a high standard; the government's allegedly stigmatizing comments must have "the effect of blacklisting the employee from employment in comparable jobs." *Townsend*, 256 F.3d at 670.

Here, the Court finds it irrelevant that Plaintiff may have been passed over for a spot on a television reality show after being terminated. (R. 66-2, Pl.'s Resp. at 4.) Plaintiff's chosen profession is basketball coach, not television star, and the mere loss of economic opportunities does not trigger an occupational liberty claim. *Guy*, 958 F. Supp. at 1311. Further, Plaintiff's focus on the job opportunities he claims to have passed up in order to stay at Marshall during the 2007-08 is misdirected, since the issue is whether Gaters' allegedly stigmatizing comments had some effect on Plaintiff's *subsequent* job opportunities. *Townsend*, 256 F.3d at 670; *Wroblewski*, 965 F.2d at 455. Nevertheless, Plaintiff does allege that Gaters' comments had the effect of "stigmatizing Plaintiff in his chosen profession and substantially interfering with Plaintiff's ability to pursue and secure another job in the basketball coaching profession commensurate with his experience, success, and until having been publicly smeared by Defendant Gaters, his reputation in the basketball community." (R. 18, Am. Compl. ¶ 84.) At this stage, this is sufficient to satisfy the third prong of the analysis. (R. 18, Am. Compl. ¶¶ 35-40.)

15

Eventually, Plaintiff will be required to demonstrate that Gaters' comments had some tangible effect on his job opportunities. If it turns out that Plaintiff has been offered or has accepted a comparable coaching position since being terminated by Marshall, he would not be able to show that he has been "blacklisted" from the coaching profession. *Townsend*, 256 F.3d at 670 (plaintiff failed to show that prospective employment had been foreclosed to him where he did not seek other employment opportunities following his discharge); *Lawson*, 725 F.2d at 1139 (an offer of re-employment at an equivalent level would negate occupational liberty claim). At this stage, Plaintiff has pled enough to state a plausible claim for deprivation of his occupational liberty, which is all that is required under *Bell Atlantic*.

## CONCLUSION

For these reasons, Gaters' motion to dismiss (R. 47) is denied. The parties are directed to reevaluate their respective settlement positions in light of this opinion and to undertake new efforts to settle this case.

Enter:

_____
**Judge Ruben Castillo**

Dated: **March 7, 2008**