# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LAMONT BRYANT, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 5909 |
| vs. | ) | |
| | ) | |
| JUAN GARDNER, DOROTHY GATERS, and | ) | Judge Ruben Castillo |
| BOARD OF EDUCATION OF THE CITY | ) | Magistrate Judge Susan E. Cox |
| OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RULE 56.1(a)(3)
## JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants Board of Education of the City of Chicago, Juan Gardner, and Dorothy Gaters (collectively "Defendants"), by their respective attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submit their Joint Statement of Undisputed Material Facts:

### DESCRIPTION OF THE PARTIES

1.      Plaintiff Lamont Bryant ("Plaintiff") is currently a full-time physical education teacher at the John Marshall Metropolitan High School ("Marshall"), a Chicago public school. (Plaintiff's Second Verified Amended Complaint ("SAC") at ¶ 2, a copy of which is attached hereto as **Exhibit A**; Lamont Bryant's Deposition (February) ("Bryant Dep. (Feb.)") at 6:15-22, a copy of which is attached as **Exhibit B**).

2.      Defendant Juan Gardner is currently the interim principal at Marshall and has served in this position since August 2006. (Exhibit A, SAC at ¶ 3; Juan Gardner's Deposition ("Gardner Dep.") 13:1-6, a copy of which is attached hereto as **Exhibit F**).

3.      Defendant Dorothy Gaters is currently the Athletic Director at Marshall and has served in this position since 2004, and has served as the head coach of the girls' basketball team

at Marshall since 1975. (Exhibit A, SAC at ¶ 4; Dorothy Gaters' Deposition ("Gaters Dep.") at 13:8-14, 18:16-21, a copy of which is attached hereto as **Exhibit G**).

4.      Defendant Board of Education of the City of Chicago, is a body politic and corporate organized to maintain a system of free schools commonly know as the Chicago Public Schools District 299. 105 ILCS 5/34-2.

**VENUE AND JURISDICTION**

5.      This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367. (Exhibit A, SAC at ¶ 8).

6.      Venue is proper because the acts complained of occurred in the Northern District of Illinois. (Exhibit A, SAC at ¶ 9).

**PLAINTIFF'S TERMINATION FROM PREVIOUS COACHING JOB**

7.      Plaintiff was relieved of his previous coaching position at Whitney Young High School when the Principal Dr. Joyce Kenner asked plaintiff to resign in 2002. (Exhibit B, Bryant Dep. (Feb.) at 48:14-17; 49:13-20).

8.      Plaintiff felt "undermined" at his previous coaching position at Whitney Young High School. (Exhibit B, Bryant Dep. (Feb.) at 52:4-10).

9.      Plaintiff felt that his previous boss, Dr. Kenner, was trying to "take control" of plaintiff's basketball program at Whitney Young. (Exhibit B, Bryant Dep. (Feb.) at 51:10-13).

**PLAINTIFF SUFFERED NO TANGIBLE EFFECT ON EMPLOYMENT OPPORTUNITIES**

10.     Plaintiff lives south-west of the city of Chicago, at 15204 South Diekman, Dolton, Illinois. (Exhibit B, Bryant Dep. (Feb.) at 8:3).

11.     There are seventy seven (77) high schools in the Chicago Public School system which are located on the far south and south-west side of Chicago. *See* *http://www.cps.edu/Schools/Find_a_school/Pages/SchoolSearchResults*.

12.     In addition to the 77 CPS high schools on the far south and south-west side of Chicago, there are over 50 high schools near plaintiff's home in Dolton, Illinois, which are not part of the CPS system. *See* http://maps.google.com.

13.     In the seven months following his termination as Marshall coach, plaintiff inquired as to another coaching position at only one high school, Thorn Ridge. (Lamont Bryant's Deposition (April) ("Bryant Dep. (Apr.)") at 23:18-20, 159:18-22, a copy of which is attached hereto as **Exhibit C**).

14.     Plaintiff who remains a teacher at Marshall, stopped reporting for work as of March 4, 2008. *See* Kronos Time Detail, attached as **Exhibit T**.

15.     Plaintiff did not get any response to his one high school coaching application. (Exhibit C, Bryant Dep. (Apr.) at 23:14-17).

16.     Following his termination as coach at Marshall, plaintiff did sent applications to colleges, but did not check to see if they had any coaching positions open first. (Exhibit C, Bryant Dep. (Apr.) at 159:23-24; 160:1-11).

17.     In April, 2003, plaintiff did not want to coach for CPS, because he believed the CPS system "messed up." (Exhibit C, Bryant Dep. (Apr.) at 59:11-13).

18.     Plaintiff and his counsel have published this case to the media and have spoken to television news crews about it on at least two occasions. *See* http://abclocal.go.com/wls/story?section=news; (July 1, 2008); http://abclocal.go.com (October 17, 2007).

19. Plaintiff earns over $60,000 per year on his teacher's salary and earned around $2,900.00 for coaching the boys' basketball team. (Exhibit B, Bryant Dep. (Feb.) at 25:16-17, 26:14:17).

## PLAINTIFF'S "PRIVATE" ACCOUNT AT MARSHALL

20. After plaintiff was asked to resign as coach at Whitney Young, he started as coach at Marshall for the 2003-2004 season. (Exhibit B, Bryant Dep. (Feb.) at 68:11-14).

21. When he came to Marshall, plaintiff believed he had "stipulations" that he would "run" his "own" basketball program and have his "own account" at Marshall. (Exhibit B, Bryant Dep. (Feb.) at 62:8-16).

22. The person who manages the financial accounts at Marshall is plaintiff's wife, Tytrice Bryant. (Exhibit B, Bryant Dep. (Feb.) at 12:7).

23. Neither Gardner nor Gaters knew that plaintiff had his "own account." (Exhibit B, Bryant Dep. (Feb.) at 11:17-18).

24. In April or May, 2007, plaintiff lost his "own account" at Marshall when Gardner and Gaters found out about him having his "own account." (Exhibit B, Bryant Dep. (Feb.) at 11:11-18).

25. Plaintiff believed that since Gaters, the Athletic Director, had her own account, that he, the basketball coach, should have his own account. Plaintiff did not know if other coaches had their own accounts. (Exhibit C, Bryant Dep. (Apr.) at 83:11-21).

26. Plaintiff advised Gardner that he was considering leaving Marshall prior to Gardner's decision to relieve him of his coaching duties. (Exhibit C, Bryant Dep. (Apr.) at 82:8-24, 97: 2-7; Exhibit A, SAC at ¶¶ 60, 61, 62).

27. Plaintiff believed it was inappropriate for Gaters to require plaintiff to explain how plaintiff was spending school money; he referred to the boys' basketball money as "his money," and believed that it was inappropriate for the Athletic Director to be the money custodian for "any trip" by the boys' basketball team. (Exhibit B, Bryant Dep. (Feb.) at 170:1-23).

28. Plaintiff's claim that Gaters withheld necessary funds needed for the boys' travel (Exhibit A, SAC at ¶ 25(c)) is based on his belief that Gaters always gave him less cash than he wanted, and always required him to "bring back receipts" proving his expenses. (Exhibit B, Bryant Dep. (Feb.) at 174:3-22).

## ISSUES WITH BRYANT'S PERFORMANCE

29. Plaintiff believed he did not have a good relationship with Gaters from the beginning. (Exhibit B, Bryant Dep. (Feb.) at 180:10-14).

30. Whenever Plaintiff had an issue with Gaters, because they did not have a good relationship, plaintiff "wouldn't let stuff go" and would always bring it to the attention of Foley and Gardner, and always "raised issues" about Gaters. (Exhibit B, Bryant Dep. (Feb.) at 187:13-22.

31. Gardner gave plaintiff a form requiring assistant volunteer coaches, who were not Board employees, to go through background checks, in August 2007. (Exhibit B, Bryant Dep. (Feb.) at 95:1-23).

32. Gulliver Washington, a volunteer coach with plaintiff for three years, had a criminal record that included a felony conviction for money laundering and conspiracy to distribute a controlled substance. (Exhibit B, Bryant Dep. (Feb.) at 93:4-6, 95:24, 96:1-10;

Gulliver Washington's Deposition ("Washington Dep.") at 35:24, 36:1-7, a copy of which is attached hereto as **Exhibit I**).

33.     A copy of all contracts with games should have been submitted to Gaters, the Athletic Director. However, these contracts were only inconsistently submitted to her, and she did not receive paperwork for some games. Gaters believed this could cause a scheduling problem. (Exhibit G, Gaters Dep. at 262:15-24, 263:4-11).

34.     Plaintiff oversaw the Boy's Freshman League for the 4 years that he coached at Marshall, and received compensation for it. Another coach, Gerald Richardson, also worked for the Freshman League, who should have been compensated by Cyrus McGinnis. Plaintiff did not know whether Gerald Richardson actually got paid. (Exhibit B, Bryant Dep. (Feb.) at 80:16-17, 81:20-24, 82:1-5).

35.     Plaintiff quite often received complimentary tickets for tournament games, as well as a pass list for regular games. The purpose of these tickets was to provide free admission for family, friends, coaches, and players. (Exhibit B, Bryant Dep. (Feb.) at 77:5-10, 77:15-19, 78:1-9). Gaters would give plaintiff 100 tickets, and three or four of his coaches, as well as members of the lower level teams did not receive their tickets from plaintiff, and sometimes they would ask her for tickets, and have to purchase them from her. (Exhibit G, Gaters Dep. at 269:2-13, 270:4-12).

36.     As the Athletic Director, Gaters was required to hold at least 3 meetings with the coaches. Plaintiff missed all of them in his last year as coach. (Exhibit G, Gaters Dep. at 271:3-10, 271:14-15).

37.     Anytime that the coaches need funds to go on a trip, the coaches are asked to fill out a requisition, which is generated by Gaters. Contrary to the protocol, plaintiff never turned

them in, but would request the money directly from his wife instead. (Exhibit G, Gaters Dep. at 272:6-13).

38.     D. G. and M. S., members of the basketball team, informed Gaters that plaintiff would not let them participate on sports other than basketball. Both wanted to play football. (Exhibit G, Gaters Dep. at 160:6-16, 161:16-18).

39.     Before football season in 2005, D. D. and R. P., members of the basketball team asked William Gray, the head football coach, if they could play football. Gray told them they could participate. Later, they told Gray that plaintiff would not allow them to play football. If they saw plaintiff in the gym room, they would not come to weight conditioning, because they did not want plaintiff to see them in there because he could suspect that they were playing football. (William Gray's Deposition ("Gray Dep.") at 15:2-11, 21:12-17, 21:21-22, 22:6-9, 25:9-13, a copy of which is attached hereto as **Exhibit J**).

40.     Another student recruited from Westinghouse for basketball wanted to play football, in addition to basketball. When the student asked plaintiff, he replied, "Man, what the hell, I told you to play no damn football; your ass is playing basketball; don't ask me no more." (Exhibit J, Gray Dep. at 73:4-9, 74:1-5).

41.     Marshall was a regional site for the state basketball playoffs, which included participation in a three-point shooting contest. For two years, plaintiff did not enter the boys' basketball team in the contest. The players informed Gaters that plaintiff would not allow them to participate. (Exhibit G, Gaters Dep. at 273:22-24, 274:10-14).

42.     In 2005-2006 State tournaments, for at least two and possibly three of games that the boy's basketball team played in, plaintiff believes that he likely wore AND 1 sweat outfits. (Exhibit B, Bryant's Dep. (Feb.) at 112:24, 113:1-6). Gaters received a call from either Dr.

Pittman or the Sports Administration advising her that the coaching staff should not be wearing athletic apparel on the bench. When Gaters conveyed this request to plaintiff, he responded, that he would "wear whatever he wants to as long as he's clean." (Exhibit G, Gaters Dep. at 274:17-24, 275:1-2).

43.     Plaintiff was aware that the press conferences after the State tournament games were mandatory. Yet he missed the press conference after the semi-final game against Simeon in either the 2006 or 2007 tournament. (Exhibit B, Bryant's Dep. (Feb.) at 113:19-22, 114:17-22). Plaintiff missed both press conferences in 2006 and 2007, after losing the third place game. After he missed the first one in 2006, Gaters received a call from IHSA urging her to let him know they would like his attendance in 2007. (Exhibit G, Gaters Dep. at 275:16-24, 276:14-16, 277:4-7, 277:13-15).

44.     Plaintiff admits that during the State tournament in 2007, there was a great possibility that he had cursed at the bus driver. (Exhibit B, Bryant's Dep. (Feb.) at 114:23-24, 115:1-11). Gaters was informed by the bus company that he had cursed at the bus driver. (Exhibit G, Gaters Dep. at 278:8-10, 278:15-16). Gaters was also informed by the cheerleader sponsor, Kim Kirksey, that plaintiff had cursed the cheerleaders out when they were placed on the same floor of the hotel as the basketball players at the State tournament. (Exhibit G, Gaters Dep. at 279:6-9, 280:7-8).

45.     In late August 2007, while plaintiff and Coach Gray were in the gym room, plaintiff received a call on his cell phone. Plaintiff was upset that E. H., a player on the basketball team, went on a recruiting trip with an AAU coach without letting plaintiff know. Afterwards, plaintiff said to Gray "man, they don't do that shit. This is my program. And don't nobody do that shit without letting me know." "…this motherfucker, I told this motherfucker he

is going to get it. Don't nobody do that without letting me know." "...I told him when these college coaches come here,...I am going to sit his ass down like I did M. S." Gray sent Gardner a letter complaining that plaintiff threatened players with "verbal tactics". (Exhibit B, Bryant Dep. (Feb.) at 142:16-24, 143:1-4; Exhibit J, Gray Dep. at 39:6-9, 39:12-13, 39:13-15, 39:23-24, 40:1-4; Exhibit F, Gardner Dep. at 50:9-18).

46.    Plaintiff saw the girls playing basketball. He brought a camera to the school, and he called his wife to request they get proof that "they're practicing, because I know they're going to say they're not practicing." Tytrice Bryant, plaintiff's wife, asked a student, B. D., to take pictures of the practice around 4pm. (Exhibit B, Bryant Dep. (Feb.) at 222:9-24, 223:1-3, 223:8-12; Exhibit C, Bryant Dep. (Apr.) at 68:16-19).

47.    Gaters received a call from a parent who was upset that Bryant called her house to tell her son he would not be able to play at Marshall again. Gardner met with the parents, and asked plaintiff to join the meeting as well. Plaintiff became offended with the questions and left the meeting. (Exhibit G, Gaters Dep. at 282:5-10, 282: 23-24, 283:1-5).

48.    Gardner received a formal complaint regarding plaintiff's conduct in his conversation with an official at the Martin Luther King game tournament in 2007. The letter stated that plaintiff was using certain language that plaintiff denied using when asked by Gardner. Gardner then gave plaintiff a verbal reprimand. (Exhibit F, Gardner Dep. at 101:20-24,102:1-5, 102:7-9; Verbal Reprimand dated January 22, 2007, a copy of which is attached hereto as **Exhibit O**).

49.    Plaintiff failed to treat assistant coaches professionally in the presence of others. Gaters witnessed plaintiff using profanity at his uncle during a game, and speaking

unprofessionally to Danny Little, another coach at Marshall. (Exhibit G, Gaters Dep. at 285:8-18).

50.　　Roy Baldon, a staff person from the attendance office, had confiscated an ID from one of the players due to an attendance issue. Plaintiff went to his office and cursed him out, in front of parents and other students. (Exhibit G, Gaters Dep. at 286:14-24).

51.　　During the State tournament in 2005-2006, plaintiff made the players get off the bus and walk to the hotel, for approximately half a mile to a mile. (Exhibit B, Bryant Dep. (Feb.) at 96:15-18, 96:21-24, 97:11-12, 97:21-22, 98:1-2).

52.　　All coaches that have spectators at their games are asked to make sure that the spectators are cleared out before they leave the building. (Exhibit G, Gaters Dep. at 288:20-24, 289:1-2).

53.　　The school's colors were maroon and gold, but plaintiff's basketball team did not wear uniforms with these colors. Gaters asked that plaintiff comply with the school colors, even if the uniforms had to be purchased. (Exhibit G, Gaters Dep. at 289:7-9, 289:16-18, 290:1-6).

54.　　Gardner had told Gaters that plaintiff had violated the terms and conditions established by the principal. (Exhibit G, Gaters Dep. at 290:15-19).

### PLAINTIFF'S RETURN AS COACH FOR 2007-2008 SEASON

55.　　While a full-time physical education teacher at Marshall, plaintiff served as the head coach for the boys' basketball team from 2003 until his dismissal as coach on October 2, 2007. (Exhibit A, SAC at ¶ 2; Exhibit B, Bryant Dep. (Feb.) at 7:4-9).

56.　　Following the 2006 basketball season, plaintiff advised Gardner that plaintiff was considering taking a position with another high school for the 2006-2007 academic year. (Exhibit A, SAC at ¶¶ 26-28).

57.     After spring break 2007, plaintiff and Gardner met again and plaintiff told Gardner that he would agree to return to Marshall and coach for the 2007/2008 season. (Exhibit B, Bryant Dep. (Apr.) at 100:18-22).

58.     Plaintiff testified that during the meeting referenced in the preceding paragraph, Gardner presented to him a document entitled "2007-2008 Boys Basketball Agreement" ("List of Conditions"), a copy of which is attached hereto as **Exhibit P**[1]; Exhibit C, Bryant Dep. (Apr.) at 100:23-24, 101:9-17).

59.     Plaintiff testified Gardner stated that if he met the conditions, he would coach one final year (2007-2008), and plaintiff agreed to meet these conditions. No other promises were made by Gardner or plaintiff during this conversation. (Exhibit C, Bryant Dep. (Apr.) at 103:10-23, 104:1-4).

60.     The list of agreement stated as follows:

2007-08 Boys Basketball Agreement

1.     Wear a shirt and tie to all high profile basketball games,
2.     Honor the MLK Shoot Out agreement,
3.     Honor the Proviso West Christmas Tournament agreement,
4.     Allow basketball players to participate in other sports,
5.     Not demean other coaches,
6.     Make certain all coaches are Board certified.

If all of the above items are agreed upon, I see no reason for you not to return and coach your final season at Marshall High School.

s/Lamont Bryant
Lamont Bryant

(Exhibit P, List of Conditions).

---

[1] Although there is a dispute between the parties regarding Exhibit P, for purposes of this motion only, Defendants will defer to plaintiff's testimony regarding Exhibit P.

61. On the same day plaintiff signed Exhibit P, plaintiff also complained to Gardner that he was not receiving any benefit from the Martin Luther King tournament. (Exhibit C, Bryant Dep. (Apr.) at 104:5-8, 181:20-24, 182:1-10).

62. Plaintiff believed the requirement that the above-listed conditions of coaching was a "power move" on the part of Gardner. (Exhibit C, Bryant Dep. (Apr.) at 102:1-5).

## PLAINTIFF'S SPEECH INCIDENTAL TO JOB DUTIES AS COACH

63. Plaintiff, as the boys' basketball coach, was responsible for preparing his players for the basketball season, and his duties included scheduling practices, selecting assistant coaches and attending games. He was also responsible for the conditioning of his players in open gym in the beginning of the school year. (Exhibit B, Bryant Dep. (Feb.) at 68:16-24, 69:1; Exhibit C, Bryant Dep. (Apr.) at 39:8-11).

64. At the time of the incidents that are the subject of this action, plaintiff was both the boys' basketball coach and a Chicago Public School teacher. (Exhibit B, Bryant Dep. (Feb.) at 25:4-6; Exhibit A, SAC at ¶ 2).

65. Plaintiff complained that the boys' team did not get to practice on the regulation size "boys" basketball court all the time, but rather had to use the girls' "inferior" smaller court for some practice sessions. (Exhibit B, Bryant Dep. (Feb.) at 177:20-24, 178:1-24).

66. Plaintiff had no knowledge of the conditions of the girls' bus. (Exhibit B, Bryant Dep. (Feb.) at 181:15-21, 182:9-10).

67. Plaintiff complained that the boys had older uniforms than the girls. (Exhibit C, Bryant Dep. (Apr.) at 86:18-22).

68. The boys' basketball team had new uniforms, sweat outfits, socks, headbands, sweatbands and gym shoes every year. (Exhibit B, Bryant Dep. (Feb.) at 14:12-23).

69. The girls' uniforms were eight years old. (Exhibit H, Gaters Decl. at ¶ 4).

70. Plaintiff disliked that Gaters used the hotel suite at the State tournament in March, 2007, because he believed the suite should have gone to him. (Exhibit B, Bryant Dep. (Feb.), 196:12-17).

71. There is no evidence that the girls' academic performance merited the suspension of open gym for them. (Exhibit F, Gardner Dep. at 180:6-11).

72. It was plaintiff's job to make sure his team members practiced, stayed conditioned, and were recruited by the appropriate colleges. (Exhibit C, Bryant Dep. (Apr.) at 39:9-13).

73. Plaintiff was directly involved in procuring merchandise and resources for the boys' team as part of his coaching duties. (Exhibit B, Bryant Dep. (Feb.) 15:1-24).

## USE OF FACILITIES AND RESOURCES

74. Open gym, which was not open to the public and limited to Marshall basketball players, was from 4:00 p.m. to 6:00 p.m. Plaintiff's players went to only one hour of academic study table from 3:00 p.m. to 4:00 p.m. before open gym. (Exhibit B, Bryant Dep. (Feb.) at 200-202, 214-215; Deposition of James Williams ("Williams Dep.") at 16-18, a copy of which is attached as **Exhibit K**).

75. "Open gym" was a way to contain the members of the basketball team after class until actual team practice started, although academic performance was a longstanding concern. Open gym ran from the second week of school in September to no later than the first full week of November, according to IHSA bylaws took place after class and before practice started. (IHSA Standardized Calendar and Bylaws, Bates Nos. 2029, 2089, a copy of which is attached hereto as **Exhibit Q**; Exhibit K, Williams Dep. at 16-19).

76. Plaintiff does not know if "open gym" was mandatory or not. (Exhibit B, Bryant Dep. (Feb.) at 201, 209-210).

77. On September 4, 2007, plaintiff saw the girls' basketball team running outside, around the Marshall School Building. (Exhibit B, Bryant Dep. (Feb.) at 220-221).

78. On September 5, 2007, plaintiff observed, for only about five minutes, girls doing drills in gym 12. (Exhibit B, Bryant Dep. (Feb.) at 221).

79. Plaintiff did not know if he had observed girl's cross-country practice or open gym, but he felt that any time students had basketballs, it was "open gym". (Exhibit B, Bryant Dep. (Feb.) at 221-226).

80. Plaintiff's team practices were occasionally switched from the larger gym to the two other gyms that were regulation length, but not width. (Exhibit B, Bryant Dep. (Feb.) at 177-181).

81. Plaintiff has no knowledge about what the eligibility requirements for "Hoop Dreams" Scholarships were, who the recipients were supposed to be, or who made the decisions as to who received the scholarships. (Exhibit B, Bryant Dep. (Feb.) at 164-169).

82. The only time of he year that plaintiff's players took off from basketball was during August. (Exhibit C, Bryant Dep. (Apr.) at 59-60).

83. Plaintiff knows of no activities or facilities that were allowed for girls' basketball players that he thinks were denied to boys other than "open gym". (Exhibit C, Bryant Dep. (Apr.) at 80-81).

84. Plaintiff has no knowledge as to whether other coaches had individual accounts for team purchases when plaintiff's individual basketball account was included in the general

athletic accounts in May 2007, or how Gaters paid for uniforms for the girls' team. (Exhibit C, Bryant Dep. (Apr.) at 81-87, 189-193).

85.     Plaintiff complained to Gardner about Gaters three to four times a month beginning in 2006. (Exhibit C, Bryant Dep. (Apr.) at 89:2-24, 89-95, 90:1-2.

86.     Plaintiff complained about buses, travel expenses, Gaters' taking control of disbursements, and "Hoop Dreams" Scholarships. (Exhibit C, Bryant Dep. (Apr.) at 89-98).

87.     Plaintiff had complained to Gardner since the 2005-2006 school year. (Exhibit C, Bryant Dep. (Apr.) at 54-56).

88.     Gaters had her girls' basketball team also participate in cross-country running. Gaters' eighth period class included her basketball/cross-country girls, as well as a few other students. The eighth period class would sometimes train for cross-country, sometimes play basketball, and also work on test preparation and life skills. (Exhibit G, Gaters Dep. at 89-98, 107-110, 124).

89.     One reason Gardner closed open gym for boys was because the boys needed to study. (Exhibit B, Bryant Dep. (Feb.) at 215:6). The reason that Gardner closed open gym for the boys and not the girls was to encourage more boys to try out for cross-country. Danny Little, the cross-country coach, had expressed concerns that boys suitable for cross-country, were instead diverting their time to open gym. (Exhibit F, Gardner Dep. at 165-169, 179-181).

90.     The boys had two team camps and participated in four summer leagues in summer of 2007. The girls, while they did have the CPS Summer League, only had one tournament in the summer. (Exhibit H, Gaters Decl. at ¶ 6).

91.     Plaintiff has no idea how girls' team uniforms were paid for. (Exhibit C, Bryant Dep. (Apr.) at 86-87).

92.    Gaters used coach buses only once or twice a year, and only for travel out of the area. Otherwise, school buses were used. Gaters' only criteria was which of three approved vendors was cheapest for the particular trip needed, and Gaters made no distinction between boys and girls in selecting a company. (Exhibit G, Gaters Dep. at 63-67).

93.    Plaintiff does not know if other buses were available on those occasions in which he complained of sub-par buses. (Exhibit B, Bryant Dep. (Feb.) at 186).

94.    The Illinois State Championship eluded plaintiff in 2004-2005, 2005-2006, and 2006-2007. (Exhibit A, SAC at ¶19-21). In 2007-2008, the boys' basketball team won the Illinois State Championship. (Exhibit H, Gaters Decl. at ¶ 3).

## COMPLAINTS TO GARDNER ABOUT OPEN GYM

95.    On August 31, 2007, during a meeting with plaintiff and one of his assistant basketball coaches, Gardner told plaintiff that he was closing open gym. (Exhibit C, Bryant Dep. (Apr.) at 44:4-6; Plaintiff's Answer to Interrogatories ("Answers") at ¶ 4, a copy of which is attached hereto as **Exhibit L**).

96.    Plaintiff objected to Gardner's decision to close open gym. (Exhibit C, Bryant Dep. (Apr.) at 44:11-21).

97.    Gardner told plaintiff that he wanted the players to study and focus on academics. (Exhibit C, Bryant Dep. (Apr.) at 44:22-24, 45:5-7; Exhibit F, Gardner Dep. at 178:24, 179:1).

98.    The closing of open gym would also give students the opportunity to participate in cross-country. (Exhibit F, Gardner Dep. at 178:22-24, 179:1-24).

99.    Keith Foley, assigned by the Board to be a mentor to Gardner, agreed with Gardner's decision to close open gym in order to encourage participation in other activities such

as running cross-country. (Deposition of Keith Foley ("Foley Dep.") at 6-7, 90-97, a copy of which is attached hereto as **Exhibit M**).

100. Rosalind Lewis is the union delegate for Marshall and is responsible for representing members of the Chicago Teachers Union, including teachers and certain educational support personnel ("ESP"). (Rosalind Lewis's Deposition ("Lewis Dep.") at 10:8-24, a copy of which is attached hereto as **Exhibit N**).

101. On September 6, 2007, plaintiff spoke to Lewis, in her capacity as the union delegate, about his disagreement with Gardner's decision to close open gym. (Exhibit C, Bryant Dep. (Apr.) at 58:16-19, 59:1-19; Exhibit L, Answers at ¶ 4).

102. Lewis's written summaries (attached as exhibits to plaintiff's Second Amended Verified Complaint) of her conversation with plaintiff were typed by plaintiff's wife, Tytrice Bryant, and prepared at plaintiff's direction. (Exhibit N, Lewis Dep. at 26:19-20, 28: 7-9, 48:5-7, 49:4-12; Exhibit C, Bryant Dep. (Apr.) at 71:7-24; 72:1-2, 73:12-16).

103. Lewis spoke to Towanna Butler, the assistant principal, about her conversation with plaintiff, who in turn told Gardner, but Lewis did not talk to Gardner directly about her conversation with plaintiff or give Gardner a copy of her written summaries. (Exhibit N, Lewis Dep. at 41:23-24, 42:13-16, 43:1-2, 43:4-10, 47:3-5, 49:19-24).

## PLAINTIFF'S REMOVAL AS COACH

104.    Gardner, as principal, had the authority to remove plaintiff as coach under the Athletic Association Executive Committee bylaws. (Exhibit F, Gardner Dep. at 48:15-18, 52:7-15).

105.    Gaters stated that plaintiff needed to tone down his style, and that a high profile coach should act like one. (Exhibit C, Bryant Dep. (Apr.) at 189:19, 190:11-13).

106.    On October 2, 2007, Gardner, along with Mentor Principal Keith Foley, Assistant Principal Ronald Bellamy and Assistant Principal Towanna Butler, met with plaintiff. Gardner informed plaintiff that he would no longer coach the boys' basketball team. (Exhibit A, SAC at ¶ 2, ¶ 59).

107.    Plaintiff was dismissed as Marshall's boys' basketball team on October 2, 2007. (Exhibit A, SAC at ¶ 2; Exhibit B, Bryant Dep. (Feb.) at 7:4-6.

108.    Plaintiff's removal as the boys' basketball coach was Gardner's decision alone, and was based primarily on three instances of plaintiff's unprofessional conduct just prior to October 2, 2007. (Exhibit F, Gardner Dep. at 45:8-14, 47:9-24, 48:10-23, 49:10-24, 50:1-24, 51:1-2).

109.    The Motor City Roundball Classic ("Roundball Classic") is a four day high school basketball tournament that is held in Detroit, Michigan, at the end of December. (Exhibit C, Bryant Dep. (Apr.) at 131:12-18).

110.    Kurt Keener is the Athletic Director of the Detroit County Day School and the director of the Roundball Classic. (Deposition of Kurt Keener ("Keener Dep.") at 17:11-17; 19:18-23, 20:1-15, a copy of which is attached hereto as **Exhibit D**).

111.    The Roundball Classic conflicted with the Proviso West Christmas Tournament ("Proviso West"), played in Bellwood, Illinois. (Exhibit C, Bryant Dep. (Apr.) at 132:5-23).

112.    Gardner wanted Marshall to play in Proviso West because he wanted the players to be closer to their families and the Marshall student body, staff, alumni and community during the holidays. (Exhibit F, Gardner Dep. at 59:7-24, 60:1, 83:12-22, 84:3-6).

113.    Marshall did not pay a penalty for withdrawing from the Roundball Classic. (Exhibit F, Gardner Dep. at 55:21-24, 56: 1-24, 57:1-16; Exhibit G, Gaters Dep. at 176:3-15, 177: 4-6; Exhibit D, Keener Dep., 52:19-22).

114.    On September 27, 2007, Gardner spoke on the telephone with Kurt Keener, who indicated to Gardner that he was uncomfortable about information he obtained about plaintiff's actions. (Exhibit D, Keener Dep. at 60:18-25, 61:1-3; 82:13-16, 84:17-25, 85:1-3; Exhibit F, Gardner Dep. at 62:15-24, 63:1-16, Email from Kurt Keener ("Keener Email"), a copy of which is attached hereto as **Exhibit R**).

115.    Keener indicated to Gardner that Marshall signed a two-year contract to play in the Roundball Classic in 2006 and 2007, and that he (Keener) had spoken to Gaters in late August and she informed him that she had already made arrangements for the team to play in Proviso West at the end of December. (Exhibit G, Gaters Dep. at 176:4-10; Exhibit F, Gardner Dep. at 62:15-24, 63:1-16; Exhibit D, Keener Dep. at 76:5, 82:22-25; Exhibit R, Keener Email).

116.    Keener told Gaters that he understood and that he could find a team to replace Marshall in the Roundball Classic. (Exhibit G, Gaters Dep. at 176:13-15; Exhibit D, Keener Dep. at 52:19-22; Exhibit R, Keener Email).

117.    Keener indicated to Gardner that after talking to Gaters, Keener received a phone call from Mal Parker, one of his associates who worked with him to organize the Roundball

Classic. Parker told him (Keener) that he had spoken to plaintiff and that plaintiff wanted to return to the Roundball Classic. (Exhibit F, Gardner Dep. at 62:21-24, 63:1-5; Exhibit D, Keener Dep. at 58:11-24).

118.   Parker told Keener that plaintiff wanted Keener to hold Marshall to the contract to play in the Roundball Classic. Parker told Keener that this was plaintiff's idea of leverage so that he did not have to play in Proviso West. (Exhibit D, Keener Dep. at 58:17-25, 59:1-7; 64: 8-9, 93:16-25; 84:1-3).

119.   Keener followed-up his telephone conversation with an email to Gardner. (Exhibit R, Keener Email; Exhibit F, Gardner Dep. at 63:11-19, 67:2-6; Exhibit D, Keener Dep. at 80:7-12).

120.   Sometime during the last week of September 2007, William Gray, a physical education teacher and the head football coach at Marshall, approached Gardner about a conversation he had with plaintiff a month prior. (Exhibit F, Gardner Dep. at 50:9-18, 200:4-22; Exhibit J, Gray Dep. at 61:1-6; 60:21-24).

121.   The conversation between Gray and plaintiff related to one of plaintiff's basketball players who went on a college visit with his parents without telling plaintiff, in which plaintiff use profanity to describe the player and threatened to bench him in front of college coaches. (Exhibit F, Gardner Dep. at 50:9-18, 201:9-24; Exhibit J, Gray Dep. at 59:5-9, 60:15-24, 61:1-23).

122.   The weekend of September 29, 2007, Gardner spoke to the mother of a basketball player while attending a football game, who expressed to Gardner that plaintiff told her son that he would reduce his playing time if he participated in other sports at Marshall. (Exhibit F,

Gardner Dep. at 49:19-24, 50:1-8, 212:14-17; Letter from Basketball Player's Mother, a copy of which is attached as **Exhibit S)**.

123. Gardner relied on his conversations with Keener, Gray and the basketball player's mother, in making his decision to remove plaintiff as coach of the boys' basketball team. (Exhibit F, Gardner Dep. at 51:24, 52:1-6, 67:9-13, 202:6-10).

124. Gaters is the Athletic Director over all sports at Marshall High School, including boys' basketball. (Exhibit G, Gaters Dep. at 35:1-3, 35:7-16, 36:8-10).

125. On October 15, 2007, Gaters spoke to staff at Marshall in response to repeated questions and inquiries from students and staff regarding plaintiff's press conference and media statements. (Exhibit M, Foley Dep. at 104: 11-16; Exhibit H, Gaters Decl. at ¶ 2).

126. The boys' basketball team at Marshall won the Illinois State Championship for 2007-2008, the first championship win for the boys' basketball team at Marshall since 1960. Plaintiff was not coach for the Illinois State Championship of 2007-2008. (Exhibit H, Gaters Decl. at ¶ 3).

127. From 1999 to 2007, the girls' basketball team at Marshall wore the same uniforms, which were eight years old by 2007. (Exhibit H, Gaters Decl. at ¶ 4).

128. In 2007, the girl's basketball team received a donation from Nike for new uniforms, which was the same year Nike gave a donation to the boys for new uniforms. Gaters requested new boys uniforms from Nike because plaintiff removed the new uniforms provided to the boys' team by AND 1 when he was removed as coach. (Exhibit H, Gaters Decl. at ¶ 5).

129. The Marshall boys' basketball team participated in two team camps and participated in four summer leagues during the summer of 2007. The Marshall girls' basketball team attended only one tournament in the summer of 2007. (Exhibit H, Gaters Decl. at ¶ 6).

130. The Martin Luther King Foundation is a not for profit organization whose sole purpose is to operate the basketball tournament known as the MLK Dream Classic. (Exhibit H, Gaters Decl. at ¶ 7).

131. Marshall High School is the host school of MLK and has been the host school of MLK since its inception in 2001. (Exhibit H, Gaters Decl. at ¶ 8).

132. Mentor Principal Keith Foley personally observed plaintiff being disrespectful toward his assistant coaches, and observed him being demeaning and derogatory toward them. (Exhibit M, Foley Dep. at 15:17, 17: 21).

133. The boys' basketball team at Marshall had academic performance problems. (Exhibit K, Williams Dep. at 18: 11-24, 19: 1-2).

134. Following the Proviso East Basketball Tournament in 2007, plaintiff ran over and confronted Mau M. Cason, the Coordinator of Tournament officials, regarding the "terrible officiating," which plaintiff said was the "worst officiating." Plaintiff argued with Mr. Cason and does not remember whether he cursed at Mr. Cason. (Exhibit B, Lamont Bryant Dep. (Feb.) at 105:20-24, 106:12-24, 107:1-4).

Dated: August 1, 2008

Respectfully submitted,

BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendant

By:   s/ James J. Seaberry
James J. Seaberry
Assistant General Counsel
Board of Education of the City of Chicago
125 South Clark Street, Suite 700
Chicago, Illinois 60603
(773) 553-1691

JUAN GARDNER, Defendant

By: s/ Jennifer Y. Wu
Jennifer Y. Wu
Assistant General Counsel
Board of Education of the City of Chicago
125 South Clark Street, Suite 700
Chicago, Illinois 60603
(773) 553-1720

DOROTHY GATERS, Defendant

By: s/ Sabrina L. Haake
s/ Mark A. Trent
Sabrina L. Haake, Assistant General Counsel
Mark A. Trent, Senior Assistant General Counsel
Board of Education of the City of Chicago
125 South Clark Street, Suite 700
Chicago, Illinois 60603
(773) 553-1673
(773) 553-1649

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAMONT BRYANT,      )
     )
         Plaintiff,      )    No. 07 C 5909
     )
    vs.      )
     )
JUAN GARDNER, DOROTHY GATERS, and      )    Judge Ruben Castillo
BOARD OF EDUCATION OF THE CITY      )    Magistrate Judge Susan E. Cox
OF CHICAGO,      )
     )
         Defendants.      )

**DEFENDANTS' JOINT STATEMENT OF UNDISPUTED FACTS**
**<u>INDEX OF EXHIBITS</u>**

| | |
|---|---|
| A | Second Verified Amended Complaint (filed March 18, 2008) |
| B | Lamont Bryant's Deposition (February 26, 2008) |
| C | Lamont Bryant's Deposition (April 17, 2008) |
| D | Kurt Keener's Deposition |
| E | Tytrice Bryant's Deposition |
| F | Juan Gardner's Deposition |
| G | Dorothy Gaters' Deposition |
| H | Dorothy Gaters' Declaration |
| I | Gulliver Washington's Deposition |
| J | William Gray's Deposition |
| K | James Williams' Deposition |
| L | Lamont Bryant's Answers to Interrogatories |
| M | Keith Foley's Deposition |
| N | Rosalind Lewis' Deposition |
| O | Verbal Reprimand [January 22, 2007] |
| P | 2007-08 Boys Basketball Agreement |
| Q | IHSA Standardized Calendar and Bylaws |
| R | September 27, 2007, Email from Kurt Kenner to Juan Gardner |
| S | Handwritten Letter from Sharon Smith |
| T | Time Detail Report for Lamont Bryant |