1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAMONT BRYANT,                        )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )   No. 07 C 5909
                                      )
JUAN GARDNER, DOROTHY GATERS,         )
JOHN MARSHALL HIGH SCHOOL,            )
and BOARD OF EDUCATION OF             )
THE CITY OF CHICAGO,                  )
                                      )
            Defendants.               )

            The deposition of JUAN GARDNER,

called by the Plaintiff for examination,

pursuant to notice and pursuant to the Federal

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions for the purpose of discovery,

taken before Maribeth Reilly, a Notary Public

in the State of Illinois and a Certified

Shorthand Reporter of the State of Illinois,

at 115 West 55th Street, Clarendon Hills,

Illinois, on January 15, 2008, commencing at

10:00 o'clock a.m.

**EXHIBIT**

tabbies®

F

**Page 2**

1  PRESENT:

2

3      MR. TERRY EKL

4      (Ekl & Williams, P.C.

5      115 West 55th Street, Suite 400

6      Clarendon Hills, Illinois  60514)

7

8      MR. JAMES G. SOTOS

9      MS. JULIE K. BISBEE

10     (James G. Sotos & Associates, Ltd.

11     550 East Devon, Suite 150

12     Itasca, IL  60143)

13

14     MR. KEVIN J. GOLDEN

15     (Dudley & Lake

16     30 North LaSalle Street, Suite 2800

17     Chicago, Illinois  60602)

18

19        Appeared on behalf of the Plaintiff;

20

21

22

23

24

**Page 3**

1  PRESENT:  (Continued)

2

3      MR. MARK TRENT

4      MS. JENNIFER Y. WU

5      MR. JAMES J. SEABERRY

6      (Board of Education of

7      the City of Chicago

8      125 South Clark Street, Suite 700

9      Chicago, Illinois  60603)

10

11        Appeared on behalf of the Defendants;

12

13     MR. LAMONT BRYANT,

14

15        Also present.

16

17

18

19

20

21

22

23  REPORTED BY:  MARIBETH REILLY, C.S.R.

24

**Page 4**

1          I N D E X

2

3  WITNESS        EXAMINATION BY        PAGE

4  JUAN GARDNER      Mr. Ekl      5

5              Mr. Ekl      118

6              Mr. Sotos    297

7              Ms. Wu       300

8              Mr. Sotos    302

9

10         E X H I B I T S

11  GARDNER DEPOSITION              MARKED

12  EXHIBIT NUMBER              FOR ID

13     1                    69

14     2                    109

15     3                    126

16     4                    156

17     5                    184

18     6                    189

19     7                    224

20     8                    244

21     9                    252

22     10                   255

23     11                   262

24      * * * * * * * *

**Page 5**

1      (Witness duly sworn.)

2          JUAN GARDNER,

3  called as a witness herein on behalf of the

4  Plaintiff, having been first duly sworn, was

5  examined and testified as follows:

6          DIRECT EXAMINATION

7              BY

8          MR. EKL:

9      Q.  Sir, would you state your name for

10  the record, please.

11      A.  Juan Gardner.

12      Q.  Do you have a middle initial?

13      A.  H.

14      Q.  Mr. Gardner, have you given a

15  deposition before?

16      A.  No.

17      Q.  Just a couple of ground rules so we

18  can move this as swiftly as we can today.  You

19  will need to make audible answers to all

20  questions asked.  You can't shake your head or

21  nod.

22          If you do not understand a

23  question or a question is confusing to you, let

24  the lawyer know and we will rephrase it for you

**Page 6**

1 so that we make it more understandable to you.
2 Fair enough?
3    A.  Fair enough.
4    Q.  And if you need to break at any time,
5 this is not a forced march, we will be happy to
6 take a break for as long as you need.  Okay?
7    A.  Very good.
8    Q.  All right.
9        Sir, just a little bit of
10 background information about you.  Where did you
11 graduate from high school?
12    A.  Matteson High School, Matteson,
13 Illinois.
14    Q.  What year did you graduate?
15    A.  1978.
16    Q.  Where did you go to college?
17    A.  University of Illinois,
18 Urbana-Champaign.
19    Q.  And what year did you graduate from
20 U of I?
21    A.  1983.
22    Q.  What was your degree in?
23    A.  LAS, Labor Econ.
24    Q.  What is LAS?

**Page 7**

1    A.  Liberal arts and science, labor
2 economics.
3    Q.  Did you do any post-graduate work?
4    A.  Yes, I did.
5    Q.  Where was that?
6    A.  Chicago State University.
7    Q.  And what years was that?
8    A.  1993 and 1999 -- or 1992, one of the
9 two.
10    Q.  Just your best estimate on times.
11        And what area was the
12 post-graduate work?
13    A.  Master's in counseling and guidance.
14    Q.  And did you get a Master's?
15    A.  Yes.
16    Q.  That would have been around 1999?
17    A.  No.  Both of them, the first Master's
18 was a counseling and guidance.  That's 1992,
19 '93.
20    Q.  Okay.
21    A.  In 1999, educational administration
22 Master's.
23    Q.  Any other post-graduate work?
24    A.  Some at Northwestern University in

**Page 8**

1 the launch program for aspiring principals, we
2 were in the graduate school of business, summer
3 of 2001.
4    Q.  Did you receive any degrees from that
5 program?
6    A.  No, no.
7    Q.  Have you done any teaching?
8    A.  Yes.
9    Q.  Where did you begin your teaching
10 career?
11    A.  In Chicago Public Schools.
12    Q.  In what year?
13    A.  Oh, before that.  Substitute
14 teaching, Matteson District, Matteson, Illinois.
15 That was 1984.
16    Q.  Was that your first job out of
17 college?
18    A.  Out of college, yes, as a substitute
19 teacher.
20    Q.  And that was in Matteson, Illinois?
21    A.  Yes.
22    Q.  How long were you a substitute
23 teacher down there?
24    A.  Roughly a year and a half.

**Page 9**

1    Q.  What was your next position?
2    A.  Ryerson Steel Company.  Ryerson is in
3 Chicago, Illinois.
4    Q.  What were you doing for them?
5    A.  I was an industrial sales rep.
6    Q.  How long did you hold that position?
7    A.  Roughly eight months.
8    Q.  What was your next job after that?
9    A.  The next job after that again was
10 substitute school teaching for Chicago Public
11 Schools in 1985.
12    Q.  How long were you a substitute
13 teacher for the Chicago Public Schools?
14    A.  Roughly a year and a half.
15    Q.  And then did you obtain a full-time
16 position?
17    A.  Then I obtained a full-time position.
18    Q.  Where was your first full-time
19 position?  What school?
20    A.  Chopin Elementary School,
21 C-h-o-p-i-n.
22    Q.  And what grades were you teaching?
23    A.  6th, 7th, 8th grade.
24    Q.  What subjects?

Page 10

1   A. Math, science, social studies,
2 English.
3   Q. How long did you hold that position,
4 your best approximation?
5   A. I am trying to add the numbers up
6 here. For about three years to 1990.
7   Q. Where did you go to work at that
8 point?
9   A. Then I went to Norwood Park as an
10 acting assistant principal for a year.
11   Q. Where did you work next?
12   A. And then back to Chopin in 1991.
13   Q. In what position?
14   A. As a teacher. And then after getting
15 the degree in counseling, I became counselor
16 case manager at Chopin in 1993. And from there,
17 I left in 1996 and went to Morgan Park as a
18 counselor.
19   Q. And how long were you a counselor at
20 Morgan Park?
21   A. Well, from 1996 until 2001.
22   Q. Where did you go then?
23   A. Then I went to Marshall as an
24 apprentice principal acting -- I mean, you were

Page 11

1 trained to be an aspiring principal for a half
2 semester. And then after that was done, I went
3 to Mason Elementary School. That was my first
4 full-time assistant principalship. That would
5 have been 2002.
6   Q. Again, sir, the years you were at
7 Marshall as an apprentice principal are what
8 years?
9   A. It was the fall of 2001 from August
10 until January.
11   Q. And that's where you were --
12   A. I'm sorry, yeah, August to January.
13   Q. That was like an internship to be a
14 principal?
15   A. Yes.
16   Q. Something like that?
17   A. Yes.
18   Q. So you went to Matteson Elementary
19 School in 2002?
20   A. No. Mason, M-a-s-o-n.
21   Q. That was Elementary School?
22   A. Yes.
23   Q. That was in about 2002?
24   A. Right.

Page 12

1   Q. How long were you principal there?
2   A. Assistant principal for one year.
3   Q. Okay. What was your next position?
4   A. Assistant principal at Marshall..
5   Q. So that would have been 2003?
6   A. Correct.
7   Q. Who was the principal at Marshall in
8 2003?
9   A. Dr. Gwendolyn Boyd.
10   Q. Had she been there a significant
11 period of time?
12   A. To my knowledge she had been there
13 for quite a bit of time. I can't tell you how
14 much time.
15   Q. So starting in 2003, you were the
16 assistant principal at Marshall. How long did
17 you hold that position?
18   A. Until I left to go to Morgan Park
19 High School in 2006.
20   Q. What position did you have at Morgan
21 Park?
22   A. Assistant principal.
23   Q. And where was your next position?
24   A. Marshall High School.

Page 13

1   Q. What year was that?
2   A. I think that was 2006.
3   Q. So a fair statement, in the fall of
4 2006 you returned to Marshall. Was it in the
5 position of principal or were you --
6   A. Interim principal.
7   Q. What does the term "interim" mean?
8   A. Well, to my understanding, interim is
9 that you have been placed in a position by the
10 Board of Education. In Chicago, the interim
11 position is not uncommon when a Local School
12 Council has been essentially shut down by the
13 Board of Ed because of low academic performance.
14   Marshall had been on academic
15 probation for a set of years and Arne Duncan,
16 the chief of our high schools, and their team
17 declared Marshall a school that was not
18 functioning well. Therefore, the Local School
19 Council has not a right to vote a principal in,
20 nor a vote went out. They don't have the final
21 say on budget, et cetera. That goes through
22 another process.
23   Q. Let me back up a second. You are
24 kind of giving me a lot.

Page 14

1    First of all, when you went back
2 to Marshall in 2006 as interim principal,
3 Marshall was on academic probation at that time?
4    A.  Had been on academic probation for
5 over ten years.
6    Q.  And that was because the students
7 were not doing well academically?
8    A.  That is correct.
9    Q.  And that condition had existed for
10 about ten years?
11    A.  Or more.
12    Q.  So that when you got the position as
13 principal there because the school was on
14 academic probation, they gave you the interim
15 tag, so to speak; is that a fair statement?
16    A.  Yes.
17    Q.  But your duties as interim principal
18 were identical to what they would have been if
19 you had been named the principal?
20    A.  Correct.
21    Q.  Correct?
22    A.  Yes.
23    Q.  Now the fact that they called you the
24 interim principal, did that mean your

Page 15

1 appointment was reviewed more frequently than it
2 would have been if you had been just named
3 principal?
4    A.  I am not sure about that.
5    Q.  What other restrictions were there on
6 Marshall as a result of the academic probation
7 they had been on for ten years?
8    You mentioned there were some
9 issues with budget.  Could you explain those a
10 little bit more thoroughly, please?
11    A.  Real quick, it's simply a matter of
12 one person having final say on budget.  That
13 person is the high school principal
14 developmental officer at Marshall.
15    Marshall is unique in that it is
16 called a turn-around project school.  It's a
17 turn-around project school, first of its kind,
18 in that a school that has not shown academic
19 performance and growth over a series of years.
20    Mr. Keith Foley was put in place
21 as the in-house, if you can imagine when you
22 were you in school, there was a regional
23 superintendent over schools over the entire
24 region.  Mr. Foley has jurisdiction, period,

Page 16

1 over Marshall High School.  He answers directly
2 to Arne Duncan's office concerning all matters
3 regarding school, particularly that of finance.
4    That is an area that the LSC --
5 that's how it differs between another school
6 that has a Local School Council where they would
7 vote a principal in and out.  Or the Local
8 School Council would approve the budget at the
9 end, and the SIPAAA, the SIPAAA is the school
10 improvement planning.  I don't -- let me just
11 say, I don't know what all of SIPAAA means, but
12 it's the plan, the four-year plan for the
13 school.  Mr. Foley has jurisdiction over that.
14    Q.  If you understand, during this
15 deposition, we are novices in your business, so
16 if you use an acronym with letters, we may very
17 well not know what you are talking about.  When
18 you said SIPAAA, what does that refer to?
19    A.  School Improvement Plan for Academic
20 Achievement.
21    Q.  And that SIPAAA plan was in place at
22 Marshall when you were interim principal?
23    A.  There was one that existed, yes.
24    Q.  And you said another acronym, L

Page 17

1 something?
2    MS. REPORTER: LSC.
3    MR. EKL: LSC.
4    THE WITNESS: Local School Council,
5 I'm sorry.
6 BY MR. EKL:
7    Q.  So because Marshall was on academic
8 probation, there was an individual at the school
9 who would report directly to Arne Duncan, as
10 opposed to reporting up the chain of command to
11 yourself as principal; is that correct?
12    A.  Actually there is a council, a
13 council of 11; 6 parents, 2 teacher reps, 2
14 community reps -- no, 1 community rep, and a
15 student rep and the principal.  I believe that
16 constitutes 11, an 11-member body that listens
17 to the goings-on of the school day.  Any kind of
18 concerns that individuals might have, they would
19 come to the monthly Local School Council
20 meeting, and the Local School Council at
21 Marshall serves as an advisory committee at this
22 point to Mr. Foley in making final decisions
23 concerning the school.
24    There is no need for a vote on

Page 22

1 Q. -- day to day, but you have the
2 ultimate responsibility for overseeing these
3 things are done correctly. Is that a fair
4 statement?
5 A. That's correct.
6 Q. So you have the oversight
7 responsibility of making sure that all the
8 expenses paid by the school are reasonable and
9 appropriate. Would that be a fair statement?
10 A. That would be a fair statement.
11 However, Mr. Foley is the end-all say-all.
12 Anything that regards budget due to our
13 turn-around structure, Mr. Foley, I reiterate
14 again, is the final end-all say-all on budget.
15 Q. For you to spend money on something
16 at Marshall, do you have to go to Mr. Foley for
17 approval?
18 A. That is correct.
19 Q. Does that include all expenses, or is
20 there some dollar amount under which you can
21 have -- you can go ahead and spend the money and
22 you don't need his approval?
23 A. Mr. Foley is the end-all say-all on
24 budget, period.

Page 23

1 Q. So anything that you spend money for
2 at Marshall has to go through him?
3 A. That's correct.
4 Q. Do you have the responsibility of
5 making sure that all of the teachers and staff
6 at Marshall are fulfilling their
7 responsibilities and their duties?
8 A. That is correct.
9 Q. So for teachers, for example, it is
10 your ultimate responsibility to make sure that
11 that teacher is teaching the requisite number of
12 classes, and really is teaching the classes
13 properly. Would that be a fair statement?
14 A. With my title. But again, I say, the
15 dynamics at Marshall are somewhat different than
16 other high schools, as with all grammar schools
17 for that matter. Marshall being a turn-around
18 'project, Mr. Foley and I spend a lot of time
19 during the day discussing many day-to-day
20 responsibilities, including even that of teacher
21 responsibilities.
22 I am the principal. I have the
23 ability to evaluate instruction, and to also
24 give ratings on teachers. And this is the thing

Page 24

1 that principals do. But Mr. Foley and I -- I
2 spend a lot of time getting advice from him.
3 That's a part of his job with me at Marshall.
4 Q. I am just trying to get a sense of
5 what it is that you can do on your own without
6 Mr. Foley's approval and what it is that you
7 can't do without getting his prior approval.
8 Can you give me any idea on how
9 those break down? Now you have had indicated
10 expense. Any expense no matter how small --
11 A. For example.
12 Q. Let me finish the question.
13 A. Okay.
14 Q. (Continuing) -- Mr. Foley has to
15 approve that, correct?
16 A. Yes.
17 Q. Could you give me an idea on the
18 breakdown of other duties? Teacher assignments,
19 for example, to teach classes, do you have to
20 get Mr. Foley's approval on that first?
21 A. I get Mr. Foley's advice. We
22 collaborate on a great deal of things. It's a
23 shared partnership when it comes to that so I
24 would caution that answer in that am I doing it

Page 25

1 exclusively on my own? No. It's a partnership
2 with Mr. Foley.
3 There were some things about our
4 class sizes at the beginning of the year that we
5 spent a heck of a lot of time on, so it required
6 Mr. Foley and other administrators to really
7 take a really good look at sizes so that our
8 teachers would be equitably placed in classes.
9 Q. If you and Mr. Foley disagree on a
10 subject relating to the academics of the school,
11 how do you go about resolving that situation, or
12 has that never come up?
13 A. That's not an issue for Mr. Foley and
14 I. There is no disagreement. After we
15 collaborate and we discuss, we have consensus.
16 Q. So when a subject comes up, the two
17 of you -- that affects Marshall, the two of you
18 will sit down, you will discuss it, and then
19 come to a resolution jointly as a team. Is that
20 a fair statement?
21 A. With the exception of budget.
22 Q. With the exception of budget where he
23 has complete authority over the budget?
24 A. That's correct.

Page 26

1    Q.  So any problem that comes up with the
2  exception of budget at the school, the process
3  that's in place at Marshall is you will talk
4  with Foley about it, and then come to a
5  resolution on the issue?
6    A.  But again, I do say that's my
7  immediate supervisor.  And when I am given a
8  directive, even in the area of consensus, yes,
9  we do spend a lot of time discussing issues, but
10  whenever there's been a directive given to me,
11  there is no argument on that.  That's a done
12  deal because that's my supervisor.
13    Q.  So if Mr. Foley would give you a
14  directive you, of course, would follow that
15  directive?
16    A.  And it would be expected that my
17  staff do likewise.  It should not be questioned.
18    Q.  So Foley really has the authority to
19  tell you what to do at Marshall; is that a fair
20  statement?
21    A.  That's right.
22    Q.  So if Mr. Foley said move this
23  teacher from this class over to this class, that
24  would be something you would have to do because

Page 27

1  Mr. Foley is, in fact, your superior?
2    A.  As a mentor principal to a going on
3  year two principal now, with his experience,
4  with his foresight and knowing what would be
5  best and ultimately, yes, I am responsible at
6  Marshall, but he has -- he has the
7  responsibility of reporting back to central
8  office, Arne Duncan, that that is something that
9  I would say to be true.
10    Q.  When you got the job as interim
11  principal at Marshall, did either Mr. Foley or
12  anyone else over at the school make any
13  statement to you about the status of Dorothy
14  Gaters?
15    A.  About the status of Dorothy Gaters?
16    Q.  Yes.
17    A.  Help me understand the question.
18    Q.  Did anybody ever make any statement
19  to you that if you wanted to continue as
20  principal at Marshall that you were going to
21  have to make Dorothy Gaters happy?
22    A.  Please say that question again.
23    Q.  Sure.  Did anyone tell you when you
24  became the interim principal at Marshall that to

Page 28

1  remain in that position, you were going to have
2  to make Dorothy Gaters happy?
3    A.  I would not say in terms of a
4  statement of in order to keep this job, I have
5  to make Dorothy happy.  There was a statement
6  around that of Ms. Gaters being in a quota, not
7  quota deseg position, which means that she
8  essentially had no classes that she had at the
9  beginning of the year.
10          But when it became obvious to us
11  that we had oversized classes, in order to
12  alleviate some of the bleed in our --
13  particularly our P.E. classes, we opened up an
14  additional section of gym classes.  So to that
15  end, she was given an additional class.
16    Q.  And when did this occur?  What year
17  was it?
18    A.  I don't -- this -- it happened fall
19  of 2007.  I want to frame it around September.
20    Q.  So in the fall of this current school
21  year, which would be 2007-2008, there was a need
22  to give Dorothy Gaters additional classes to
23  teach?  Is that what -- am I correct about that?
24    A.  That's correct.

Page 29

1    Q.  And the reason for that was why?
2    A.  Because when classes are oversize,
3  the teachers have the right through the CTU,
4  Chicago Teachers Union, to grieve, and rightly
5  so because their class is overcrowded.  So in
6  order to alleviate some of the bleed, she was
7  given an additional class.
8    Q.  Let's back up then.  In the school
9  year 2006-2007, how many classes was Dorothy
10  Gaters teaching?
11    A.  I don't recall.
12    Q.  Do you recall if it was one?
13    A.  I don't recall.
14    Q.  Have you ever discussed with anyone
15  the number of classes that Dorothy Gaters was
16  teaching in the calendar school year of
17  2006-2007?
18    A.  No.
19    Q.  Did you ever note that Dorothy Gaters
20  had a very small number of classes during that
21  calendar year?
22    A.  No.
23    Q.  Now because of the overcrowding in
24  2007, you say that there was the need to give

Page 30

1 her additional classes to teach?
2    A.  We are talking about this school
3 year?
4    Q.  Yes.
5    A.  '07-'08.
6    Q.  '07-'08.  That was the year that she
7 had to pick up another class because of
8 overcrowding?
9    A.  That's correct.
10    Q.  Did you discuss that with anyone?
11    A.  I discussed that with Mr. Foley and
12 my programmer.
13    Q.  And was --
14    A.  My programmer is a person who puts
15 kids in classes.  All right.
16    Q.  And when did this conversation take
17 place?
18    A.  Obviously, in September when we were
19 having problems with -- I can't put a date on
20 it, but near the end of September there was a
21 need.
22    Q.  And how was Dorothy Gaters selected
23 as a person who was going to get an additional
24 class?  Do you remember how the dynamics of that

Page 31

1 worked?
2    A.  With her being athletic director for
3 the '07-'08 season school year, I can say with
4 certainty she had zero classes assigned as an
5 athletic director.  We saw fit to give her an
6 additional class to help again alleviate the
7 overcrowding.
8    Q.  What year are we talking about now?
9    A.  '07-'08.
10    Q.  So as athletic director, she had no
11 classes for '07-'08, and then you added --
12    A.  No.  '06-'07 she had no classes.
13    Q.  She had no classes.
14    A.  As to my knowledge, I don't believe
15 that there were any classes.  I really can't be
16 sure without going back to that.
17    Q.  Okay.
18    A.  And looking and reviewing that with
19 the programmer.  But all I can say with
20 definitiveness is for '07-'08, she started the
21 school year with no classes.
22    Q.  Now again, I apologize because I
23 thought I asked you if you knew how many classes
24 she taught in 2006-2007.  Is your

Page 32

1 recollection as you are sitting here today, that
2 it's your recollection she had zero classes that
3 she taught during that calendar school year?
4    A.  While I can't -- let me just say
5 this.  I can't be clear and showing it without
6 going back and looking at the data at the
7 school.  My programmer would know for sure.
8         So I don't want to go on record to
9 say precisely what amount of classes she had or
10 not because I can't recall right now.
11         Is that fair enough?
12    Q.  That's fair enough.  All you can do,
13 Mr. Gardner, is just give us your best
14 recollection.
15    A.  Estimation.
16    Q.  And any question, if it's something
17 that you are not sure of, you have done a fine
18 job of explaining just now that you are unsure
19 of an answer.
20    A.  Okay.  But for this year '07-'08, I
21 know that we assigned her a class.
22    Q.  And was there a conversation with
23 Dorothy Gaters about assigning her that class
24 that you participated in?

Page 33

1    A.  Actually Mr. Foley, Ms. Gaters and
2 myself told her she would have to take an
3 additional class due to the high number of kids.
4 We have very few electives to offer, a school
5 like Marshall.  We are not Whitney Young.  We
6 are not North Prep.  These are some very high
7 functioning schools with an abundance of
8 electives, you know.
9         Our electives had to be in the
10 area of classes where there could be a III and
11 IV set, like Art III and IV, P.E. III and IV.
12 And even in the band classes or the music
13 classes, general music, that way we were able to
14 alleviate the overcrowding in our classes.
15    Q.  Dorothy Gaters in 2006-2007 as well
16 as 2007-2008 was the athletic director, correct?
17    A.  That's correct.
18    Q.  Is it your testimony that as athletic
19 director that she generally had no teaching
20 responsibility in terms of teaching students
21 classes?
22    A.  Again, with Mr. Foley being my direct
23 supervisor and with the experience base that he
24 brought in from his background, the question was

Page 34

1 what can we do to help in-house to alleviate the
2 bleed on classes. His recommendation and such
3 was that with the way he functioned at Lane
4 Tech, that was his old high school that he came
5 from, typically speaking, his athletic director
6 taught no classes.
7 However, we are looking to try to
8 resolve our problems, which were really, really
9 tough in the beginning of the fall to help lower
10 the numbers in the classrooms. So a decision
11 was made after consultation with Mr. Foley to
12 make sure that Ms. Gaters had an additional
13 class.
14 **Q. If I could just streamline this just**
15 **a little bit. I understand the problems you**
16 **were trying to work with with the overcrowding**
17 **this year.**
18 **But my question is in 2006-2007,**
19 **as the athletic director of Marshall High**
20 **School, is it your understanding that the**
21 **athletic director, Dorothy Gaters, was not**
22 **required as part of her employment to teach**
23 **classes?**
24 A. Rephrase that question.

Page 35

1 MR. EKL: Could we read that back.
2 If you are still confused after the court
3 reporter reads it back, just let me know.
4 (WHEREUPON, said record was
5 read back, as requested.)
6 THE WITNESS: Unlike a regular
7 classroom teacher where they have a minimum of
8 five classes to teach, while I can't be again
9 100 percent sure what the caseload for her would
10 have been, but as the athletic director,
11 typically, they don't have a full load of
12 classes. Full load in high school means five
13 classes.
14 BY MR. EKL:
15 **Q. Is that spelled out somewhere in some**
16 **rule or regulation of the Chicago Public School**
17 **District that the athletic --**
18 A. That I don't know to be sure. But I
19 know for regularly assigned teachers sitting
20 behind a desk every day assigned to children,
21 they have at least five classes a day. And
22 athletic director is not a, quote, unquote,
23 classroom teacher.
24 Again, under that special, I am

Page 36

1 not sure what the title is, either quota deseg,
2 that's a position in which those functions that
3 an A.D. carries on does, but I can't, again, go
4 on to say.
5 **Q. Isn't the athletic director paid a**
6 **stipend to perform those functions in addition**
7 **to what they are paid to be a teacher or another**
8 **staff member at Marshall?**
9 A. As the budget allows, that is to be
10 correct, and I know that to be the case for this
11 year.
12 **Q. So if we go back to 2006-2007 and**
13 **2007-2008, the athletic director is paid a**
14 **stipend to perform the duties of being an**
15 **athletic director, true?**
16 A. That's correct.
17 **Q. Isn't the athletic director also**
18 **required to teach classes as part of their**
19 **compensation from Chicago School District?**
20 A. Now that I can't be too sure on.
21 **Q. Is that spelled out in some rule or**
22 **regulation that you are familiar with from the**
23 **Chicago Public School District?**
24 A. Not that what I am familiar with it.

Page 37

1 **Q. Do you have any idea where we might**
2 **determine whether an athletic director who is**
3 **paid a stipend is also supposed to be teaching**
4 **classes at the same time?**
5 A. I can't be too sure about that. I
6 can only surmise perhaps through Chicago
7 teachers union agreement book or via law
8 department or labor relations, I am not sure.
9 **Q. Do you think Mr. Foley might know the**
10 **answer to that question?**
11 A. I can't speak for him.
12 **Q. Backing up for a moment, sir. When**
13 **you became the interim principal at Marshall in**
14 **2006, did anyone ever make a statement to you to**
15 **the effect or anything similar to this that**
16 **Dorothy Gaters ran Marshall High School?**
17 A. That Dorothy Gaters ran Marshall High
18 School?
19 **Q. Yes. Anything like that?**
20 A. I can't recall anybody saying
21 anything like that.
22 **Q. Did anyone ever tell you that if you**
23 **wanted to stay there as principal, you better**
24 **not make any waves as they relate to Dorothy**

Page 38

1  Gaters?
2      A.  There was a statement about
3  Ms. Gaters in terms of her track record at
4  Marshall and her obvious winning record, and her
5  success with the board, but just in general
6  conversation about her being tremendously
7  successful.  Certainly it had no bearing on my
8  becoming and remaining principal.
9      Q.  The statement you refer to, who made
10  the statement, if you recall?
11      A.  I was speaking with a person who no
12  longer works for the Board of Education.
13      Q.  Who was that?
14      A.  He stated -- Dr. Don Pittman.
15      Q.  When was this statement by Dr. Don
16  Pittman?  When did he make this statement to
17  you?
18      A.  Oh gosh, perhaps August '06.
19      Q.  And to the best of your recollection,
20  what did Mr. Pittman say to you about Dorothy
21  Gaters?
22      A.  That she was a great fabric of the
23  Marshall family, and that she is a terrific
24  coach that is one who will do great things

Page 39

1  continually at Marshall.
2      Q.  Anything else you recall?
3      A.  Not that I can recall right now.
4      Q.  Did anybody else -- has anyone else
5  at any time since you went to Marshall ever made
6  a statement to you about Dorothy Gaters being
7  untouchable or her running the school, or that
8  you better not make any waves with Dorothy, or
9  she will make your life miserable, anything like
10  that?
11      MR. TRENT:  I will object to the form
12  of the question.
13      MS. WU:  You can answer if you
14  understand his question.
15      THE WITNESS:  Okay.  Can you rephrase
16  the question.
17      MR. EKL:  Sure.
18  BY MR. EKL:
19      Q.  At any time since you came to
20  Marshall has anyone ever said to you that you
21  better not cross Dorothy Gaters or cause
22  problems for her or make waves for her, or that
23  she would make life difficult on you?  Did
24  anyone ever make a statement like that to you?

Page 40

1      A.  Absolutely not.  But the term
2  "untouchable" related to Dorothy being
3  untouchable in that she is in an athletic
4  director's position, and those classes typically
5  are not assigned to teachers.  So in terms of
6  her being an untouchable, that would be that of
7  not being able to have like a full caseload.
8  But in this case, we elected to use her as a
9  person assigned to classes to help with our
10  programmatic issues.
11      Q.  Did someone make a statement to you
12  about her being untouchable?
13      A.  I'm sorry, say that again.
14      Q.  You just used the word about
15  untouchable in the context of athletic
16  directorship.  Did you discuss with someone her
17  status as being untouchable?
18      A.  I believe I did discuss with Lamont
19  when we were coming back from Disney World with
20  my family.  We were excited when I first came
21  back to Marshall that I would be the principal.
22  For the record, Lamont and I were friends.  My
23  kids loved, adored him as coach.
24      And when he made mention to me

Page 41

1  that he'd like to come back for a final year, he
2  was kind of going back and forth, he had
3  concerns about his relationship with Ms. Gaters.
4  And I said, Lamont, look, don't worry about
5  Ms. Gaters.  I am back.  We are going to work
6  things out.  Things are going to be just fine.
7  And he seemingly had feelings that things were
8  not just so.
9      And I said, look, we are not going
10  to worry about that.  We are going to get
11  through this experience, and we are just all
12  going to be a family.  Things are going to work
13  out fine.
14      Q.  Mr. Gardner, when did this
15  conversation with Lamont Bryant take place?  You
16  said it was on the way back from Disney World?
17      A.  Yes, shortly before going to
18  Marshall.
19      Q.  Before you went to Marshall?
20      A.  Before I went back.  Sometime in the
21  late summer.
22      Q.  So the summer of '06?
23      A.  Of '06.
24      Q.  And you were coming back from Disney

Page 42

1  World. Were you driving back with him?
2      A.  Driving back.
3      Q.  It was your family and his family?
4      A.  No, no, no.  We were on the phone.
5  We were having a phone conversation, I'm sorry.
6      Q.  So you were driving back from Disney
7  World, and you are on the phone with Lamont?
8      A.  Yes.
9      Q.  And he called you or had you called
10  him, do you remember?
11      A.  I think I called him.  I am pretty
12  sure I called him.
13      Q.  What was the purpose for which you
14  called him?
15      A.  Again, being a friend at that point,
16  just to state that I was coming back, and I was
17  going to be the new principal at Marshall.
18      Q.  During that conversation he explained
19  to you that he was having some problems with
20  Dorothy Gaters.  Is that a fair statement?
21      A.  That's a fair statement.
22      Q.  Did he tell you what kind of problems
23  he was having with her?
24      A.  I don't recall in total, but just the

Page 43

1  fact that they -- he didn't feel like they got
2  along well.
3      Q.  Did he tell you that he felt she was
4  undermining the boys' basketball program?
5      A.  That I don't remember.
6      Q.  Did he say anything to you similar to
7  that?
8      A.  Again, I can't remember.
9      Q.  Essentially then, you told him not to
10  worry about it, you would try to make everything
11  work out between he and Gaters, and you wanted
12  him to stay at the school; correct?
13      A.  In '06, that's right.
14      Q.  Anything else that you recall about
15  that conversation?
16      A.  That was pretty much it.
17      Q.  You mentioned that you were friends
18  with Lamont Bryant at that point?
19      A.  Right.
20      Q.  How long had you known him?
21      A.  Only since '03.  I met him when he
22  was hired by Dr. Boyd.  I didn't know him before
23  that in 2003.
24      Q.  And did you socialize with him at

Page 44

1  all?
2      A.  Just through school and such.
3      Q.  You never went out socially outside
4  of school?
5      A.  No.  I mean, Lamont is the kind of
6  guy that like if and when tickets are available,
7  sometimes he would give me gratis tickets to --
8  for example, I remember this past summer, AndOne
9  had a basketball outdoor tournament in which I
10  brought my son to in the summer of this year,
11  '07.  We are in '08 now.  The summer of '07.
12      Q.  But you considered Lamont Bryant to
13  be a friend and a good person back in 2006; is
14  that correct?
15      A.  That's correct.
16      Q.  All through the school year of
17  2006-2007, you continued to look at him as a
18  friend and a good person, didn't you?
19      A.  Well, I saw him as a friend, but then
20  there became some issues that had us looking
21  at -- not us, me, had me looking at the
22  professional side a lot closer.
23          (WHEREUPON, there was a brief
24          interruption.)

Page 45

1          MR. EKL:  Mark, would you like us to
2  take a break while you are taking that phone
3  call?  Why don't we take a five-minute break.
4          (WHEREUPON, short break was had.)
5          (WHEREUPON, said record was
6          read back, as requested.)
7  BY MR. EKL:
8      Q.  Mr. Gardner, was it your decision to
9  terminate Lamont Bryant as head basketball coach
10  on October 2nd, 2007?
11      A.  That's correct.
12      Q.  And that's a decision you made
13  yourself, correct?
14      A.  Correct.
15      Q.  Did you consult with Mr. Foley about
16  that decision before you made it?
17      A.  Yes, I did.
18      Q.  When did you consult with him
19  regarding this?
20      A.  Regarding this in particular?
21      Q.  I am referring to the termination of
22  Lamont Bryant on October 2nd, when prior to that
23  did you consult with Mr. Foley?
24      A.  Over the weekend of the 2nd.

Page 46

1   Q.  Now the 2nd, I believe, was a
2 Tuesday.  October 1st, I believe, was a Monday?
3   A.  Right.
4   Q.  So it would have been that prior
5 weekend which would have been like the --
6   A.  Well, to pinpoint an exact time, I
7 don't want to get in that pickle.  But some time
8 in that week preceding the 2nd.  Is that fair
9 enough?
10   Q.  Was it the week preceding?
11   A.  Well, yes.  October 2nd was, you
12 said, a Tuesday?
13   Q.  Tuesday.
14   A.  Some time over the weekend, maybe
15 starting with the chain of events that occurred
16 that week.  But I talked to Mr. Foley daily.
17       But concerning the firing itself,
18 Mr. Foley and I spent a significant amount of
19 time talking about it on October 1st.
20   Q.  October 1st would have been the
21 Monday before you did the action on October 2nd?
22   A.  That's right, yes.
23   Q.  Is that a date during which you
24 discussed the termination with Mr. Foley?

Page 47

1   A.  Yes.
2   Q.  Was anybody else present at that
3 time?
4   A.  No.
5   Q.  What did you say to Mr. Foley and
6 what did he say to you during that conversation?
7   A.  Again, there were a chain of events
8 that occurred.
9   Q.  If I could stop you, sir.  I don't
10 want to interrupt you, but I am talking about
11 what was said during the conversation on October
12 1st?  What did you say to him, and what did he
13 say to you?
14   A.  Well, I can't remember all the facts.
15   Q.  Give us your best recollection of the
16 conversation, please.
17   A.  The best recollection was that
18 Mr. Bryant did breach several conditions of
19 coaching for the '07-'08 year.
20   Q.  This is something you said to
21 Mr. Foley that you concluded that Mr. Bryant
22 breached several conditions?
23   A.  The evidence was very clear to
24 Mr. Foley and I.

Page 48

1   Q.  Let me just stop for a second so
2 again we are on the same page.  What I am asking
3 you at this point is what you said to Mr. Foley,
4 and what Mr. Foley said to you.  So let's start
5 off with in that conversation with Mr. Foley on
6 October 1st, I want you to tell me what you said
7 to him?  Did you say to him, for example, that
8 you had conclusions?
9   A.  I got you.  I got you.
10       It was without question that I
11 made a decision to relieve Mr. Bryant of his
12 coaching duties.  I discussed those factors with
13 Mr. Foley, and Mr. Foley supported my decision.
14 Again there was consensus, but this particular
15 condition, as is outlined in the Athletic
16 Association Executive Committee's bylaws, the
17 right that a principal has to move on such,
18 given the conditions therein that were breached.
19   Q.  Again I am trying to pinpoint what
20 you said to Mr. Foley.  Did you tell Mr. Foley
21 that you had made a decision to remove Lamont
22 Bryant as head basketball coach?
23   A.  That's what I remember.
24   Q.  Did he tell you that he supported

Page 49

1 that decision?
2   A.  Yes, he did.
3   Q.  Did you tell him why you had reached
4 that decision?
5   A.  Mr. Foley had been aware as we had
6 been discussing the situation as it developed
7 throughout the week, that again there were a
8 chain of things that happened leading up to that
9 final decision.
10   Q.  In that conversation on October 1st,
11 did you tell Mr. Foley what the basis of your
12 decision to terminate Lamont Bryant was?
13   A.  Yes, I did.  But at that point, it
14 was a recap of things that had started occurring
15 earlier that week.
16   Q.  Please tell me.
17   A.  Specifically, there was a requirement
18 the students be allowed to participate in dual
19 sports, more than one sport.  There was a letter
20 from a parent of a basketball player, D▓▓▓
21 S▓▓▓, a letter received from Miss S▓▓▓ S▓▓▓
22 citing as such her child was not allowed to --
23 I am paraphrasing because I don't remember all
24 the contents of it.  That D▓▓▓ was facing a

Page 50

1 certain reprimand from Mr. Bryant for thinking
2 about playing a second sport.
3     Q. There was a letter from D█████?
4     A. Smith's mom.
5     Q. Mother?
6     A. Sharon Smith.
7     Q. Who was that letter sent to?
8     A. To me.
9         And also there was a letter from
10 Coach Will Gray stating that Mr. Bryant made a
11 remark about kids, again around that piece of
12 not playing -- if they don't do what I tell -- I
13 am just paraphrasing because I don't remember
14 exactly. If the kids don't do what I tell them
15 to do, I will do them like I did Mike Stovall,
16 which was to bench them, when they don't do what
17 he would want them to do, particularly when
18 scouts were coming from other schools.
19         And lastly, and the thing that really
20 started setting everything off, was the email
21 from Kurt Keener from Detroit Country Day School
22 stating that Mr. Bryant wanted back into a
23 tournament that he said and agreed to coming out
24 of around the Christmas holiday that conflicted

Page 51

1 with Proviso West Tournament, which he agreed to
2 be a part of.
3     Q. You are say "he," who are you
4 referring to?
5     A. Mr. Bryant, I'm sorry.
6     Q. You are saying Bryant agreed to play
7 in the Proviso West Tournament?
8     A. Yes.
9     Q. And did he make that statement to
10 you?
11     A. Yes, he did.
12     Q. When was that?
13     A. I don't exactly remember, but some
14 time -- some time during '07 -- over the summer,
15 may perhaps at the end of June, right before the
16 school year was over.
17     Q. Would it be a fair statement,
18 Mr. Gardner, what triggered these series of
19 events that led up to the termination began with
20 your perception that Lamont Bryant did not want
21 to give up playing in the Detroit tournament
22 over Christmas of 2007?
23     A. That would be fair.
24     Q. Now you have listed a number of

Page 52

1 factors; the email from Kurt Keener, the letter
2 from Gray, a letter from a parent. And were
3 those the bases upon which you decided to
4 terminate Lamont Bryant as the head basketball
5 coach at Marshall?
6     A. That is correct.
7     Q. And I think you have told us you
8 believe you had the power to do that as
9 principal?
10     A. Oh, I know I had the power to do
11 that.
12     Q. Where does that power come from?
13     A. The Athletic Association bylaws
14 state, and it is in writing, that a principal
15 does have that right.
16     Q. Do you have a right to terminate an
17 individual as basketball coach, in your opinion,
18 even if they don't do anything you perceive to
19 be wrong? Can you do it just for any reason
20 whatsoever?
21     A. I am governed by the bylaws.
22     Q. What do the bylaws say as what must
23 exist before you can terminate an existing
24 coach?

Page 53

1     A. I can't remember them all, but they
2 are in the hands of my attorney. There is a set
3 code of conditions for coaching for all sports
4 in Chicago Public Schools.
5     Q. But what was it that was contained in
6 the bylaws that caused you to believe that
7 Lamont Bryant had breached those bylaws and you
8 were justified in terminating him?
9     A. The issues as previously stated that
10 of the character of -- let me just put it this
11 way. I don't have them here in front of me
12 right now, and I can't remember them all. But I
13 had seen enough in my estimation given what a
14 coach has the -- I'm sorry, what a principal has
15 the right and the power to do when things are
16 not in place.
17         Going behind the back of
18 administration to make the school pay
19 additional -- there is a withdrawal fee that was
20 negotiated for the school not to be held up to,
21 and the phone conversation and the emails stated
22 by Kurt Keener was that Mr. Bryant going behind
23 our controls as the school to make the school
24 pay for a tournament that he wanted to play in

Page 54

1  when he agreed not to play in it.
2        That was then the basis along with
3  that -- the others that I mentioned with the
4  letter from the parent.
5     Q. Let me ask you this about the
6  tournament. Were you aware when you terminated
7  Lamont Bryant that Dorothy Gaters had signed a
8  contract for Marshall High School to play in
9  that Detroit tournament both in 2006 and 2007?
10    A. Let me state that it was Mr. Bryant
11  who brought to my --
12    Q. Would you answer my question, please.
13  My question is: When you terminated Lamont
14  Bryant on October 2nd, 2007, were you aware that
15  Dorothy Gaters had signed a contract requiring
16  Marshall to play in the Detroit Roundball
17  Classic both in 2006 and 2007?
18    A. I can say that I'm aware that there
19  was a contract for the Detroit Country Day
20  Tournament. I am also aware that there were
21  signatures on that. I remember seeing a
22  signature with Mr. Bryant's name on it, and I
23  remember seeing a signature with Ms. Gaters'
24  name on it.

Page 55

1     Q. So you were aware that both Lamont
2  Bryant and your athletic director, Dorothy
3  Gaters, had committed Marshall to play in the
4  Detroit Roundball Classic in December 2007,
5  correct?
6     A. That had been set up some time ago,
7  and I think that's correct.
8     Q. Yes.
9        So what Lamont was doing was
10  attempting to require Marshall to honor its
11  written commitment to play in the Detroit
12  Roundball Classic, isn't that true?
13    A. Rephrase that again.
14       MR. EKL: Could you read it back,
15  please.
16       (WHEREUPON, said record was
17        read back, as requested.)
18       THE WITNESS: I would say that is
19  true.
20  BY MR. EKL:
21    Q. Now did you also at some point learn
22  that some time after Dorothy Gaters and Lamont
23  Bryant had agreed in writing for Marshall to
24  play in Detroit that Dorothy Gaters then signed

Page 56

1  another agreement for Marshall to play in the
2  Proviso West Tournament in 2007? Did you find
3  that out?
4     A. Okay, okay. This is how it went
5  regarding the whole piece. Once Lamont said to
6  us, Mr. Bryant, that I am willing to stay at
7  Marshall and do whatever is asked of me for this
8  final year, that included playing in a Proviso
9  West Tournament.
10       Now my functions as a principal
11  and such, I am not bogging down in contractual
12  business and so forth. We are starting up
13  getting ready for the new school season.
14       Lamont brings to our attention,
15  Mr. Bryant, brings to our attention, well, I can
16  see that there is a small issue here. He
17  brought the contract to let me see, and I
18  just -- I mean, I didn't go through it tooth and
19  nail because frankly Mr. Foley and I both were
20  there when Lamont stopped by. And said that
21  this tournament, this Proviso West Tournament
22  will conflict with the Detroit Tournament.
23       Mr. Foley then stated, as we
24  typically do, we were there, the three of us I

Page 57

1  believe were there, hey listen, Lamont, why
2  don't you take that to Ms. Gaters and see if
3  that can be -- you know, look into that to see
4  if that is something that we are stuck to
5  because there was apparently some type of
6  withdrawal fee. I didn't know what it was at
7  the time.
8     Q. Let me stop you for a second.
9  Marshall never had to pay any type of withdrawal
10  fee for the Detroit tournament, did they?
11    A. I'm sorry?
12    Q. Marshall High School never paid any
13  type of withdrawal fee to the Detroit Roundball
14  Classic, did they?
15    A. To my knowledge, I don't think we
16  did.
17    Q. So this is a conversation you are
18  having with Lamont Bryant and with Mr. Foley?
19    A. Yes.
20    Q. And would this have been in the fall
21  of 2007, or some time before that?
22    A. I think that would be fair.
23  Somewhere late, late, late summer, early, early
24  fall, probably dating it somewhere in August. I

Page 58

1 think by that time -- yeah, the school year
2 just -- right before the kids came back to
3 school, we have a week of professional
4 development, or three days. So somewhere in
5 that timeframe I believe Mr. Bryant brought that
6 to our attention.
7    Q. Again, so we can get this in
8 perspective, late August of 2007, Lamont Bryant
9 brought to your attention that a contract had
10 been signed for Marshall to play in the Detroit
11 Roundball Classic, correct?
12    A. That's correct.
13    Q. And somebody at Marshall wanted
14 Marshall High School boys team to play in the
15 Proviso West tournament at the same time,
16 correct?
17    A. We wanted him to play at Proviso
18 West. When I say "we," administration,
19 Ms. Gaters, wanted -- athletic director, and the
20 administration wanted Marshall to play at
21 Proviso West.
22    Q. Let's talk about that. Dorothy
23 Gaters wanted the boys team to play at Proviso
24 West, correct?

Page 59

1    A. She was a supporter of the boys
2 playing at Proviso West.
3    Q. Who else from Marshall wanted the
4 team to play in the Proviso West Tournament as
5 opposed to the Detroit Roundball Classic?
6    A. So did I.
7    Q. Let's start with you. Why did you
8 want the team to play in Proviso West rather
9 than Detroit Roundball Classic?
10    A. Sure. That's Christmastime. Giving
11 parents an opportunity to see their kids
12 showcase during the holiday season, a lot of
13 people working, people are on vacation, you get
14 a chance to see it.
15       The year before I went up to
16 Detroit myself to watch the tournament when
17 Mr. Bryant was there. I traveled up. And
18 again, that great distance and the financial
19 parameters of a community like Marshall, parents
20 aren't able to travel. So by being here at a
21 local tournament, that would provide the
22 families and students who don't have the money
23 to travel great distances during the holidays to
24 enjoy watching our team play and to support our

Page 60

1 team.
2    Q. Did Dorothy Gaters take essentially
3 the same position? Is that why Dorothy Gaters
4 wanted the team to play in the Proviso West
5 Tournament?
6    A. I can't speak for Ms. Gaters.
7    Q. Did you have ever ask Dorothy Gaters
8 why it was that she signed a contract for the
9 boys team to play up in Detroit?
10    A. I never asked her that.
11    Q. Did Dorothy Gaters ever deny to you
12 that she ever had signed an agreement to play in
13 that tournament?
14    A. That was a nonissue.
15    Q. Why was it a nonissue?
16    A. That was not brought to me in that
17 process. The only time the contract was brought
18 to me is when Mr. Bryant realized in August that
19 there was a conflict. Well, let me just say I
20 don't know when he realized it, but it was
21 brought to my attention for the first time that
22 the Proviso West Tournament and the Detroit
23 Country Day Tournament were being played at the
24 same.

Page 61

1    Q. Do you know at that point whether a
2 written agreement had been executed for Marshall
3 to play in the Proviso West Tournament?
4    A. That I don't recall.
5    Q. Well, did it concern you at all that
6 Marshall had a written agreement to play in the
7 Detroit Roundball Classic and that Proviso West
8 conflicted with that commitment?
9    A. Well, that was already an
10 understanding and agreement. Lamont again --
11 Mr. Bryant did say, Mr. Gardner, during his
12 final year, I am willing to, you know, do what
13 is asked of me this year, including playing at
14 the Proviso West Tournament.
15       But again, I never saw a contract
16 until Mr. Bryant came in. And at that point, I
17 never really viewed it. I believe he held it in
18 his hand, and Mr. Foley and I then directed him
19 to go touch bases with Ms. -- and I believe it
20 may have been Mr. Foley, but I can't -- I can't
21 be 100 percent accurate, for him to go and see
22 the athletic director to see if she can
23 negotiate us getting out of the Detroit Country
24 Day Tournament.

Page 62

1    Q. To your knowledge, did Mr. Bryant do
2 that?
3    A. Yes.
4    Q. So pursuant to your direction, you
5 told him --
6    A. Mr. Foley and I at that time.
7    Q. You told Lamont Bryant to go to
8 Dorothy Gaters to see if she could negotiate
9 their way out of the conflict between the two
10 tournaments?
11    A. Correct, the financial end of it,
12 correct.
13    Q. Lamont Bryant did that, right?
14    A. Yes.
15    Q. And then you get an email from
16 Mr. Keener somewhere down the road which leads
17 you to believe that Lamont Bryant was trying to
18 do something behind your back to require
19 Marshall to go to the Detroit Tournament?
20    A. Actually there was a phone call
21 before the email. Ms. Gaters brought to my
22 attention that per Mr. Keener she had
23 conversation with him regarding the fact that
24 Lamont wanted to, and I don't remember the

Page 63

1 gentleman's name, but there is someone who works
2 along with Mr. Keener, who knows Mr. Bryant,
3 that he wanted him to use his influence. His
4 name may have been Mal Parker, but I can't be
5 sure. That may have been his name, but
6 certainly to go to the officials in Detroit to
7 hold Marshall to paying the full amount for the
8 withdrawal fee. That went against the wishes
9 that we had and expectations of him for this
10 year.
11       Ms. Gaters then thus informing me
12 of that, I had direct phone conversation with
13 Kurt Keener and Detroit Country Day. After the
14 phone conversation, he followed up with a --
15 communicated via email expressing it, and I am
16 sure it's somewhere.
17    Q. Yes. That was the email that went
18 over to you, right?
19    A. That's correct.
20    Q. So if I have this straight, and you
21 tell me if I am wrong, this conversation that
22 Dorothy Gaters had with Keener followed up with
23 an email was what got the ball rolling in terms
24 of your position that Mr. Bryant should be

Page 64

1 terminated as basketball coach; is that correct?
2    A. There were, again, several incidents
3 that occurred leading up to that. And anyone
4 who knows me, and certainly not you guys in this
5 room, knows I have tremendous heart for people.
6 It would have taken some things, and more than
7 one thing that would have led up to me saying
8 enough is enough. And that's when we got to
9 that.
10       The precipitating factors, as
11 discussed previously, the letters, the phone
12 conversation, the email, and even still there
13 are some things that we have yet to discuss
14 that let up to that. Some parent issues and a
15 meeting that took place in my office in the
16 spring of the past school year, one of the ball
17 players. I am sure that will come up later.
18    Q. Yes. Let's try to, if we can, if you
19 can try to limit yourself to answering my
20 questions, this is going to move a lot quicker,
21 Mr. Gardner. I know you are trying to answer
22 the questions fully. If you could limit your
23 answers to the question I asked you, it will
24 actually move a little quicker.

Page 65

1       This situation with Detroit
2 Roundball Classic, am I correct that based upon
3 what you learned about what Lamont Bryant had
4 allegedly done behind your back, Lamont Bryant
5 supposedly talked with Mal Parker, right?
6    A. Supposedly.
7    Q. And made some statements to Mal
8 Parker about Marshall's participation in the
9 Roundball Classic, right?
10    A. That's correct.
11    Q. And then Mal Parker talked to Kurt
12 Keener, right?
13    A. That's my understanding.
14    Q. And then Kurt Keener talked to
15 Dorothy Gaters, right?
16    A. Correct.
17    Q. And then Dorothy Gaters talked to you
18 about what it is that Lamont Bryant supposedly
19 said to Mal Parker, right?
20    A. So, yes.
21    Q. That's how it went?
22    A. And given that, that's when I wanted
23 to know for myself to talk to Kurt Keener
24 directly.

Page 66

1 Q. And then somebody asked Kurt Keener
2 to contact you, right?
3 A. I don't remember how that went
4 either. I called Kurt, or he called me. I
5 don't recall the order, but I did have
6 conversation with Kurt Keener.
7 Q. Before the email with Kurt Keener,
8 either -- you had a phone conversation with him,
9 right?
10 A. Correct, that's correct.
11 Q. And either you called him or he
12 called you?
13 A. Right.
14 Q. Right. But there was no way he knew
15 to call you, was there?
16 A. That's correct.
17 Q. So you likely called him, right?
18 A. I don't remember how the contact
19 went. But he and I talked on the telephone.
20 Whether he called me first or I called him, I
21 don't remember.
22 Q. But this conversation that you had
23 with Kurt Keener was after Dorothy Gaters first
24 spoke with him, correct?

Page 67

1 A. That's correct.
2 Q. And what Kurt Keener told you both
3 orally and in the email was his understanding of
4 what Lamont Bryant had said to Mal Parker,
5 right?
6 A. That's correct.
7 Q. Did you accept that as true?
8 A. That's correct.
9 Q. Did you accept what Kurt Keener told
10 you was his understanding of what Lamont Bryant
11 told Mal Parker to be accurate?
12 A. He was an athletic director. I had
13 no reason to doubt him.
14 Q. Well, did you ever hear of a person
15 making mistakes because they try to relate
16 conversations with people? Have you ever heard
17 of that happening?
18 A. I am sure perhaps that happens, but I
19 was convinced that Mr. Keener was telling me the
20 truth.
21 Q. Did you ever try to call Mal Parker
22 and talk to him directly about what his
23 conversation was with Lamont Bryant?
24 A. No.

Page 68

1 Q. Did you think that would have been a
2 good idea?
3 A. Perhaps that's your take on it. I
4 follow the course that I thought was the best.
5 Q. Would it have made any difference to
6 you when you were deciding to terminate Lamont
7 Bryant on October 2nd, 2007 if Mal Parker said
8 that what Kurt Keener understood to have been
9 Mal Parker's conversation with Lamont Bryant was
10 not accurate? Would that have made any
11 difference in your decision to terminate him as
12 basketball coach?
13 MS. WU: Objection; calls for
14 speculation.
15 MR. EKL: You can go ahead and
16 answer.
17 MS. WU: You can answer the question
18 if you understand it.
19 THE WITNESS: I can't say that that
20 would have totally changed my mind. Remember,
21 there were several things going on preceding
22 that. But given the nature of your question, I
23 would still -- I would still stand pat to the
24 fact that my decision would have -- again

Page 69

1 honoring Mr. Keener's perception of his
2 conversation with Mr. Parker for that to have
3 been true.
4 Now if they both were in the same
5 room together, I am sure there would have
6 been -- we would have been able to get to the
7 bottom of it, but that didn't happen, sir.
8 Q. Because you didn't try to contact Mal
9 Parker, did you?
10 A. No.
11 Q. You didn't think you needed to do
12 that, right?
13 A. That's correct.
14 Q. Now, you recall signing what was
15 called a declaration in connection with the
16 request for an injunction that was issued in
17 this case? Do you remember doing that, sir?
18 A. Yes.
19 MR. EKL: I am going to ask this be
20 marked as Exhibit Number 1.
21 (WHEREUPON, a document was marked
22 Gardner Deposition Exhibit Number
23 1 for identification as of
24 01/15/08.)

**Page 70**

1 BY MR. EKL:
2    Q. Do you recognize Exhibit Number 1,
3 Mr. Gardner, to be a declaration which you
4 signed in connection with this case?
5    A. I am not quite sure I understand.
6 When you say Exhibit 1, are we talking about
7 this document?
8    Q. Yes, sir. It's got Exhibit Number 1.
9    A. Okay. I'm sorry. I don't have my
10 glasses today.
11    Q. Do you need some? Would you like a
12 pair of reading glasses? Would it help you out?
13    A. Yes, I recognize the document.
14    Q. And it bears your signature on the
15 third page, right?
16    A. That's correct.
17    Q. And I would take it, sir, that what
18 you put in this document was true and accurate,
19 correct?
20    A. To the best of my knowledge, yes.
21    Q. Let's take a look at Paragraph 3
22 together. Paragraph 3 states, "When I began as
23 interim principal at Marshall, Lamont Bryant was
24 the returning head coach for the boys varsity

**Page 71**

1 basketball team. In March 2007, Mr. Bryant
2 informed me that he was uncertain about
3 returning to Marshall, that he was exploring the
4 offers he had received from other schools to
5 coach at their school." Correct?
6    A. Correct.
7    Q. So that's a statement Mr. Bryant made
8 to you back in March of '07, right?
9    A. Right.
10    Q. "In response I told Mr. Bryant that I
11 would have to start looking for a potential
12 replacement for the 2007-2008 school year. In
13 April '07, I conducted interviews of four
14 candidates, including Courtney Hartgrays."
15      In April of 2007, which candidates
16 did you interview for that position other than
17 Courtney Hartgrays?
18    A. To the best of my recollection,
19 Mr. Dillard, D-i-l-l-a-r-d.
20    Q. Where was he coaching at?
21    A. He was not. He was a teacher at
22 Crane High School.
23    Q. Who did you get his name from?
24    A. Oh, I received his name from

**Page 72**

1 Mr. Pittman and Ms. Gaters.
2    Q. Who else did you interview?
3    A. I interviewed, of course,
4 Mr. Hartgrays.
5    Q. Had anyone suggested or recommended
6 Mr. Hartgrays to you?
7    A. Mr. Hartgrays upon being a part of
8 the school fabric asked for an interview.
9    Q. At the time of his interview was he
10 the assistant girls basketball coach?
11    A. Yes, that's true.
12    Q. Did Dorothy Gaters recommend him for
13 the position?
14    A. She recommended that he be
15 interviewed. But at that time, not for the
16 position, no.
17    Q. Who else did you interview?
18    A. I am trying to remember, and I just
19 can't right now.
20    MR. SOTOS: Chris Head.
21    THE WITNESS: Chris Head, yes, Chris
22 Head.
23    MR. EKL: Would you be quiet back
24 there.

**Page 73**

1    MR. SOTOS: I apologize.
2 BY MR. EKL:
3    Q. Chris Head?
4    A. Yes.
5    Q. Where was Chris teaching or coaching?
6    A. Chris was a security guard at Collins
7 High School.
8    Q. And had someone recommended him for
9 the position?
10    A. I don't remember how that went. I
11 really don't. I have known Chris over the
12 years. I know of his coaching success in past
13 years, and I think he is the current coach of
14 Gwendolyn Brooks, and I can't recall that fourth
15 name right now. I just can't remember.
16    Q. Was the fourth individual a gentleman
17 by the name of Little?
18    A. Oh, yes. Yes, yes. Danny Little.
19    Q. Danny Little. Thank you, Mr. Sotos.
20    MR. SOTOS: My pleasure.
21 BY MR. EKL:
22    Q. Where did you get Danny Little's
23 name?
24    A. Danny Little's name came from

Page 74

1 Ms. Gaters.
2    Q. Where was Danny Little coaching or
3 working at the time of your interview?
4    A. He was under Mr. Bryant's coaching
5 staff. I believe he is a truant outreach
6 officer at the school.
7    Q. A truant officer?
8    A. A truant outreach of such. We used
9 to call them truant in the days, but it's a
10 different position title for it now. I can't
11 recall.
12    Q. He was an assistant on Mr. Bryant's
13 staff?
14    A. He worked on Mr. Bryant's coaching
15 staff.
16    Q. The next sentence of Paragraph 3 you
17 state, "Dorothy Gaters, the Marshall athletic
18 director, also made preparation for the boys
19 varsity basketball team by registering the team
20 for the Proviso West Tournament in Hillside on
21 December 26th through 29th of 2007."
22       How did you learn that fact?
23    A. I am certain at this point that I
24 didn't know anything about the exact timeframe

Page 75

1 of her until after this lawsuit began.
2 Micromanaging in the athletic department had not
3 been something I do. I trust my people. They
4 do what they are supposed to do.
5       So to answer your question about
6 when the tournament was scheduled, sometime -- I
7 had knowledge of it sometime in the summer,
8 fall-ish of last year.
9    Q. Well, it's in your declaration, and
10 it indicates in April 2007, I conducted four
11 interviews of candidates, including Courtney
12 Hartgrays. Dorothy Gaters also made
13 preparations by registering the team for this
14 tournament.
15       Is it your understanding that
16 Dorothy Gaters registered the boys team for the
17 Proviso West Tournament some time in the spring
18 of 2007?
19    A. Now even though, like I said, my
20 knowledge of that actually pinning down happened
21 because -- of being pinned out happened in that
22 frame because at that point, Lamont talked about
23 not coming back to Marshall. In fact, there had
24 been some time throughout his tenure at

Page 76

1 Marshall, from what I understand, him always
2 saying at the end of the year that he is not
3 coming back.
4       So I believe Ms. Gaters took it
5 upon herself being athletic director to attempt
6 to get the boys registered in the Proviso West
7 Tournament.
8    Q. Mr. Gardner, is there some
9 relationship between Lamont not coming back and
10 Dorothy Gaters registering the team for the
11 Proviso West Tournament, to your understanding?
12    A. Well, to my understanding, that's
13 what the athletic director does if it's
14 speculated or thought, not speculated, but
15 perhaps thought that the head coach may not be
16 coming back, to start planning to put the next
17 year's season together.
18    Q. Well, isn't that the athletic
19 director's responsibility regardless of whether
20 the head coach is coming back or not, to your
21 understanding?
22    A. To my understanding, yes.
23    Q. So regardless of whether Lamont
24 Bryant came back or not, Marshall was going to

Page 77

1 play in a tournament over Christmas of 2007,
2 right?
3    A. That's correct.
4    Q. So it wouldn't have made any
5 difference whether Lamont Bryant was coming back
6 or not, Dorothy Gaters still would have had to
7 have placed the team in a tournament for that
8 time period, isn't that right?
9    A. Correct.
10    Q. As you sit here right now, you now
11 know that Marshall was already committed to play
12 in the Detroit Roundball Classic as of the
13 spring of 2007, you know that, don't you?
14    A. I didn't know that until Lamont
15 brought that to my attention. I didn't
16 understand that there were -- there were
17 conflicts with the dates. I wasn't paying full
18 attention of the Proviso West Tournament and the
19 Detroit Country Day Tournament as conflicting
20 until it really was brought to attention by
21 Lamont Bryant back in August of '07 that we
22 can't possibly play two tournaments at the same
23 time. I was thinking -- well, I am not going to
24 tell you what I was thinking.

Page 78

1  Q. I take it, Dorothy Gaters never
2 brought to your attention that the team was
3 already committed to play in another tournament
4 over Christmas of 2007, correct?
5  A. In terms of timelines and frames, I
6 can't recall.
7  Q. You learned for the first time that
8 Marshall was committed to play in Detroit over
9 Christmas of 2007 when Lamont brought it to your
10 attention in August of 2007, isn't that right?
11  A. That's correct, yes.
12  Q. And that's the first time you learned
13 that the team now is committed to playing in two
14 separate tournaments that conflicted with each
15 other, right?
16  A. That conflicted with each other to
17 the best of my recollection.
18  Q. Dorothy Gaters never brought that
19 conflict to your attention, did she?
20  A. Not that I can recall right now.
21  Q. Had anybody ever sent to you copies
22 of the contracts that were signed by both Lamont
23 Bryant and Dorothy Gaters for the team to play
24 in the Detroit Roundball Classic?

Page 79

1  A. Not until this became an issue.
2  Q. So you didn't know that as of August
3 of 2007, did you?
4  A. That's right. It was the first time
5 I saw the contract.
6  Q. Have you ever asked Dorothy Gaters
7 why it was that she signed the team up to play
8 in Proviso West to conflict with a tournament
9 that she had already committed the team to play
10 with? Have you ever brought that to her
11 attention?
12    MR. TRENT: Object to the form of the
13 question.
14    MR. EKL: You can go ahead and
15 answer.
16    THE WITNESS: No, I can't recall.
17 BY MR. EKL:
18  Q. Don't you think that would be an
19 important thing to do for the functioning of the
20 school to make sure that kind of thing doesn't
21 happen in the future?
22  A. Again, the athletic director's
23 responsibility is to set up schedules and such.
24 I have enormous responsibilities in other ways,

Page 80

1 and again not micromanaging in this matter with
2 what the AD does. I am taking care of other
3 functions in the building.
4  Q. Well, sure, you can't micromanage
5 everything. You got to rely upon people to do
6 their job, right?
7  A. Right.
8  Q. But don't you think it would have
9 been a good idea to sit down with Dorothy Gaters
10 and tell her you committed us to playing in two
11 tournaments at the same time, don't let that
12 happen again? Have you ever done anything like
13 that?
14  A. Okay, well, when this was brought to
15 my attention in August, it was certainly an
16 understanding this is something that we did not
17 want to have a repeat of. But the issue at that
18 time was to make sure that the financial
19 obligation that Marshall had to the Detroit
20 Country Day was looked into. And that's -- you
21 know, we've discussed that already.
22  Q. In fact, Marshall was actually being
23 paid to play in that tournament, weren't they,
24 in the Detroit Country Day Tournament, weren't

Page 81

1 they?
2  A. There was some money attached to
3 that.
4  Q. So it was money that was going from
5 the tournament to get Marshall to play because
6 they were a high profile team, right?
7  A. Well, I can't be that -- I can't say
8 with certainty that that's the case. We have a
9 successful program. I can't speak to what
10 Detroit saw us as.
11  Q. Do you know how much Marshall was
12 paid to play in that tournament in 2006?
13  A. I don't remember.
14  Q. In fact, Marshall was paid to play in
15 the tournament and all of their expenses were
16 paid by the tournament, isn't that true?
17  A. That's correct.
18  Q. So playing in the Detroit Country Day
19 Tournament generated money for Marshall, didn't
20 it, sir?
21  A. That's correct.
22  Q. And by not playing in 2007, you lost
23 that money, didn't you?
24  A. That's correct.

Page 82

1    Q. Now in the Proviso West Tournament in
2 2007 was Marshall paid, you know, a showup fee
3 to play in that tournament?
4    A. Sir, I can't -- Can you explain what
5 showup fee means?
6    Q. Was Marshall paid money to
7 participate in the tournament?
8    A. Yes.
9    Q. How much were they paid?
10    A. I don't recall.
11    Q. Who would know that?
12    A. Ms. Gaters.
13    Q. Did she handle the finances for the
14 tournament?
15    A. Yes.
16    Q. Do you have an approximation of how
17 much money was paid to Marshall to play in
18 Proviso West?
19    A. No, I can't.
20    Q. Do you know if it was more or less
21 than they were being paid to play in Detroit?
22    A. I don't know.
23    Q. Do you think that would have been an
24 important fact to learn as you were deciding

Page 83

1 which of the two tournaments to play in?
2    A. Perhaps.
3    Q. For example, in Detroit if you were
4 being paid $5,000 to play in that tournament,
5 and you were being paid $500 to play in Proviso
6 West, that would be a nice additional sum of
7 money for the school to have played in Detroit,
8 isn't that true?
9    A. That could very well be true.
10    Q. But you didn't look into that, did
11 you?
12    A. The concern was that of allowing from
13 my standpoint parents, school body to be
14 logistically closer during a time when there is
15 no school for there to be easier access for the
16 entire Marshall community to watch basketball
17 games.
18    Q. Was that a problem in 2006 when the
19 team did play in Detroit?
20    A. That was my perception of it, as I
21 attended in Detroit and there were, obviously a
22 handful of Marshall fans there.
23    Q. Did anybody complain to you, parents
24 or fans, that it was too far to go to play in

Page 84

1 Detroit?
2    A. No.
3    Q. So the decision not to play in
4 Detroit because of its lack of proximity to fans
5 was a perception that you had from 2006?
6    A. That was my perception.
7    Q. But no one else complained about it,
8 right?
9    A. No.
10    Q. Dorothy Gaters complain about it?
11    A. About the Detroit tournament?
12    Q. Yes.
13    A. Only inasmuch as she wanted the kids
14 to participate in Proviso West Tournament.
15    Q. For all of these basketball
16 tournaments, the teams that Marshall plays in
17 from year to year, is the athletic director,
18 Dorothy Gaters, always the person who handles
19 the finances for those tournaments on behalf of
20 Marshall?
21    A. Well, again we have a business
22 operations manager. And inasmuch as how
23 contracts are negotiated and such, there is a
24 relationship between the business manager and

Page 85

1 athletic director, and the two of them handle
2 those affairs.
3    Q. Do you oversee what's going on
4 between them?
5    A. Yes.
6    Q. Do you check and make sure that the
7 amount of money that came into Marshall was
8 accurate and the expenses paid out were all
9 accurate and fair?
10    A. Again, that's something I did not
11 look into.
12    Q. Is that part of your duties as
13 principal?
14    A. Overall duties, yes. But given the
15 structure of our school, and there is a level of
16 trust one must have with the business manager,
17 there is an understanding that that's taken care
18 of, that the business manager and the athletic
19 director are working in good faith, and that
20 those funds are being deposited into the
21 athletic department.
22    Q. So if money is given to the athletic
23 director, you trust the athletic director to
24 make sure the money --

Page 86

1    A.  To in turn give it to the business
2  manager, and she in turn places it into the
3  account in which athletics are spend on.
4    Q.  In any of money that comes into
5  Marshall through the basketball program is cash
6  ever involved?
7    A.  To my knowledge, cash is involved at
8  like home basketball games.  And when the kids
9  are -- paying fans are paying, that money goes
10  on a pay sheet, I believe that's the process
11  when they are turned into the business
12  manager -- business operations manager.
13    Q.  If you would, sir, look at Paragraph
14  4, it's on Page 2 of your declaration.  And in
15  Paragraph 4 you state, "On or about June 5th,
16  2007, Mr. Bryant informed me that he wanted to
17  return for another season."
18        How is it that you recall that it
19  was June the 5th that you had that conversation
20  with Lamont Bryant?
21    A.  It could have been in my notes.  As I
22  go back during the course of a day or year, you
23  go back and put it at around or about that date.
24  I can't be -- right now looking at this, I don't

Page 87

1  know if I looked back at my notes and so forth
2  to see where I had a --
3    Q.  Do you maintain notes or a calendar
4  or anything like that which helps you recall
5  when events took place?
6    A.  Yes, I do.
7    Q.  Do you still have those for the year
8  2007?
9    A.  That which I have, I do still have in
10  my possession, yes.
11    Q.  You still have them?
12    A.  But in terms of pinpointing, I say on
13  or about, I thought that to be about correct.
14    Q.  When you meet with people, do you
15  typically jot it down in a calendar in some way
16  to indicate that you are meeting with or have an
17  appointment with someone?
18    A.  Most of the time, yes.
19    Q.  So most of your appointments that you
20  had in the year 2007 would be reflected in your
21  calendar?
22    A.  Or my memo book.
23    Q.  So memo book and a calendar.  Do you
24  keep the calendar, a hard copy, or do you keep

Page 88

1  that electronically on your computer?
2    A.  No.  I am going to state that what I
3  have in my possession is my small memo book.
4  That's where I take notes on a daily.
5    Q.  And that's something you maintain?
6  You haven't thrown it away or anything?
7    A.  That's correct.
8    Q.  Then the second sentence that you
9  have in Paragraph 4 is, "On June the 12th, 2007,
10  I met with Mr. Bryant to discuss his plans for
11  the next season.  Several conditions were agreed
12  upon, including mandatory play in the Proviso
13  West Tournament in December 2007.  I also
14  reiterated to him that all players and coaches
15  must be treated with integrity, respect and
16  fairness and all players should be given the
17  opportunity to play multiple sports."
18        Now in this June the 12th meeting
19  with Lamont Bryant, those were the conditions
20  you set down for his continued continuance as
21  the head basketball coach, correct?
22    A.  That would be correct.  But
23  Mr. Bryant missed a meeting that we had the day
24  before, that we had with all coaches and clubs.

Page 89

1  And these conditions were specified that all
2  coaches participate in these conditions as
3  Mr. Foley and I drafted them together prior to
4  the meeting; the meeting that Mr. Bryant missed.
5        I took the liberty on the 12th, I
6  believe that was the 12th, to go over that
7  because I knew Lamont missed the meeting, and I
8  wanted to make sure he was clear of what was
9  expected of him.
10    Q.  I appreciate that.  What I am talking
11  about now is not the meeting he missed, but the
12  meeting you had with him.
13    A.  At the meeting I had with him?
14    Q.  And what you said to him, and what he
15  said back to you, okay.
16    A.  Yes.
17    Q.  So on June 12th, you had a meeting
18  with him, and you set certain conditions down
19  that he needed to satisfy for him to continue as
20  basketball coach, correct?
21    A.  Yes.
22    Q.  And present at that meeting, was
23  there anybody else besides yourself and
24  Mr. Bryant?

Page 90

1    A. No, just Mr. Bryant and myself.
2    Q. As you indicate in your declaration,
3 the conditions you agreed upon included
4 mandatory play in the Proviso West Tournament in
5 December of '07, and No. 2, all players and
6 coaches must be treated with integrity, respect
7 and fairness; and 3, that all players should be
8 given the opportunity to play multiple sports.
9 Correct?
10    A. That's right.
11    Q. So these were the conditions you set,
12 and Mr. Bryant agreed to those?
13    A. That Mr. Foley and I set. It
14 encompassed all clubs and organizations.
15    Q. Let's back it up. These conditions
16 were conditions that were set by you and Foley?
17    A. Right.
18    Q. Right? And you conveyed those three
19 conditions to Lamont Bryant on June the 12th,
20 2007, correct?
21    A. That is correct.
22    Q. And he agreed to abide by those,
23 correct?
24    A. That's correct.

Page 91

1    Q. Now when you discussed mandatory play
2 in the Proviso West Tournament in December 2007,
3 during that meeting, on June the 12th, didn't
4 Lamont Bryant tell you that the team was already
5 committed to play in the Detroit Roundball
6 Classic?
7    A. I don't remember that to be true.
8    Q. He may have said that, but you don't
9 recall at this time, correct?
10    A. I don't recall that to be true.
11    Q. Well, certainly as you sit here
12 today, you know that as of June 12th, 2007,
13 there was a written contract for Marshall to
14 play in the Detroit Roundball Classic? You know
15 that, right?
16    A. I know that now. But at that time I
17 was not aware of the conflict between Proviso
18 West Tournament and Detroit Country Day
19 Tournament that the -- for example, during the
20 Christmas holiday, the boys' team played in two
21 tournaments. So it could be possible -- it
22 could have been possible that both tournaments
23 at that time, to my knowledge, may have been
24 able to be played for the two weeks the kids

Page 92

1 were out of school.
2        At that point in time on June the
3 12th, it wasn't that of my mind-set that the
4 tournaments might conflict.
5    Q. Sure. You didn't know the two
6 tournaments might be a conflict? And to your
7 knowledge, Lamont Bryant didn't know that there
8 was a conflict at that point either, did he?
9    A. I can't answer for Lamont. I can
10 answer for myself.
11    Q. So --
12    A. I didn't know.
13    Q. You didn't know. And it's entirely
14 possible that Lamont Bryant didn't know there
15 was a conflict at that point either, correct?
16    A. I can't say what Lamont would know.
17    Q. But Lamont Bryant, to your knowledge,
18 didn't bring it to your attention, and you were
19 unaware of a conflict as of that point.
20 Correct?
21    A. That's correct.
22    Q. And what Lamont Bryant told you was
23 that he had absolutely no problem with the team
24 playing in a Proviso West Tournament in December

Page 93

1 of 2007, correct?
2    A. That's right.
3    Q. And you didn't specify to him,
4 obviously, what the exact dates of that
5 tournament were, did you?
6    A. No, I did not.
7    Q. All right. The second condition you
8 mentioned to us, "All players and coaches be
9 treated with integrity, respect, and fairness."
10 Right?
11    A. That's correct.
12    Q. And that was the same condition that
13 had been conveyed to all of the other coaches in
14 all of the other sports the day before in the
15 meeting with yourself and Mr. Foley, correct?
16    A. That's correct.
17    Q. It was not based on anything specific
18 that Lamont Bryant had done in the past; is that
19 right?
20    A. Well, there was a meeting with some
21 parents in my office back in February of '07
22 whereby parents were having complaints about
23 what was going on in Mr. Bryant's program.
24 There was a kid who --

Page 94

1    Q. Could I stop you, sir.
2    A. Yes.
3    Q. What parents were present at that
4  meeting, first of all?
5    A. I want to say it was the parents of
6  E███ H████. Without having my notes, I
7  can't -- I can't be sure. But I met with, seems
8  to me, the S██████, parents' last name was
9  S██████, a mother and a father.
10    Q. So Mr. and Mrs. S██████?
11    A. Right.
12    Q. And then E███ H████s' parents?
13    A. Sir, again, I can't remember
14  precisely. But this is what I can tell you I
15  remember, Mr. Bryant, as I was out of the
16  meeting the day before, contacted me, let me
17  know there was a parent -- there were some
18  parents that wanted to talk with me regarding
19  some discipline of a -- one of the coaches, one
20  of his coaches, and he wanted to come in with
21  the parents and get things squared, get things
22  clear.
23       We had an assembly or something
24  going on, and Mr. Bryant had my secretary get

Page 95

1  ahold of me. I came over for the meeting that
2  was not exactly on the schedule, but I am trying
3  to be flexible with Mr. Bryant. We got parents.
4  We drop what we are doing and sit down and talk
5  to parents.
6    Q. Could I stop you again so that --
7  again I am getting a little bit confused, and I
8  apologize. But was this Mr. Bryant telling you
9  that the parent of one of the players had a
10  problem with something one of the assistant
11  coaches had done? Is that what the meeting was
12  about?
13    A. That's how it started.
14    Q. Was it the parents of E███ H████?
15    A. I can't remember. I know the last
16  name was S██████. I can't remember which one of
17  his players it was.
18    Q. It was one player and one set of
19  parents, correct?
20    A. Yes. There are some players on the
21  team who are cousins, and they are related so
22  that's why there is a little confusion for me
23  right now.
24       So in sitting down in the meeting,

Page 96

1  the meeting started with the complaint of one of
2  the parents -- I'm sorry, one of the coaches
3  having harsh words of disciplining one of the
4  players. It evolved to the parents making
5  comments that Mr. Bryant was really harsh on the
6  players and accused him -- this is what really
7  stands out for me, of corporal punishment called
8  hazing to one of the players.
9       So I then turned to Mr. Bryant,
10  and I asked him to address that. And Mr. Bryant
11  became very irate and made some comment around
12  that of administration doesn't support me, I
13  don't have to take this and he was ready to
14  storm out of the room. And I said no, Lamont,
15  Mr. Bryant, you are not going to leave the room.
16  We are going to finish this conversation.
17    Q. Was this in front of the parents?
18    A. This was in front of the parents.
19    Q. So Lamont told you the parents wanted
20  a meeting with you about an assistant coach, and
21  in that meeting it comes out that he is
22  allegedly being too harsh with the players?
23    A. Yes. The spotlight moved away from
24  the assistant coach at that time. And then the

Page 97

1  parents zeroed in on the kid allegedly being
2  hazed or paddled, as they put it, with wood and
3  the kid being catatonic at home and just really
4  just not himself because of being under
5  Mr. Bryant's program.
6    Q. Did the parents tell you in the
7  presence of Lamont Bryant that their son had
8  been paddled by Lamont Bryant?
9    A. They asserted to some form of hazing.
10    Q. Did they tell you what form of
11  hazing?
12    A. To the best of my recollection, the
13  best of my recollection that of paddling,
14  synonymous with like hazing when you are
15  pledging.
16    Q. Did the parents tell you that Lamont
17  Bryant had paddled the player or other players
18  had done it?
19    A. The parent claimed that the son said
20  that Mr. Bryant was doing it.
21    Q. And when that accusation was made,
22  Lamont Bryant became angry?
23    A. That's right.
24    Q. He denied that, didn't he?

Page 98

1    A. Mr. Bryant could not believe it. I
2 certainly did not want to believe it. And I was
3 waiting for Mr. Bryant to just clear the deal up
4 and let the parents know that this accusation is
5 ridiculous.
6         But the way he reacted to it and
7 did not want to continue on with the
8 conversation made me say well, gosh, Lamont, why
9 would you react that way if somebody is not
10 telling the truth on you, just let them know
11 what the whole story was. Because I believe in
12 allowing parents to vent and say what they have
13 to say, let the coach or the teacher say what
14 they have to say in terms of mediation so we can
15 move on from this.
16         But when that occurred, and the
17 way that Mr. Bryant reacted to it, it really
18 startled me and caught me off guard.
19    Q. Fair statement when the parents made
20 the accusation, you didn't believe it, correct?
21    A. It was disturbing, it was troubling.
22 Let me just say, I didn't want to believe it.
23    Q. Did it seem credible to you?
24    A. At the time, I have two parents

Page 99

1 sitting there talking about their child. I had
2 to listen to it. It's credible that that's what
3 the parent says their child told them.
4    Q. Because the parents said it happened,
5 did you assume it was true?
6    A. No, I didn't assume that it was true.
7 I was waiting to hear from a coach. And then,
8 of course, the kid wasn't present there to speak
9 for himself. The parents -- as kids do, they
10 tell their parents things.
11    Q. Did you ever bring the kid in and
12 talk to him and find out what had happened?
13    A. Not on that day.
14    Q. Did you do it on some other date?
15    A. I don't recall if we did.
16    Q. Did you feel it was not credible
17 enough to bring the student in and ask him, did
18 your teacher beat you, or did your coach beat
19 you?
20    A. No, we didn't do that. Because
21 again, at that time, I am still seeing
22 Mr. Bryant as my head coach and one in which I
23 support. I frankly didn't want to believe it.
24 And over time the season continued on, and

Page 100

1 pretty much that was the end. After that, the
2 parents opened up and talked more about -- they
3 may not have said this around Mr. Bryant, but
4 they talked more about how they have noticed a
5 change in their son, and how he's quite
6 withdrawn and within. And they felt strongly it
7 had everything to do with Mr. Bryant's influence
8 over their son.
9    Q. And the parents said that was an
10 adverse effect on their son?
11    A. Say that again.
12    Q. Were the parents contending that
13 Lamont Bryant was having a bad influence on
14 their son?
15    A. That Mr. Bryant was having some type
16 of influence over their son.
17    Q. Now as principal of this high school,
18 if you had credible evidence that a teacher or a
19 coach was beating a student, aren't you supposed
20 to bring that student in and ask them if it's
21 true?
22    A. That could have very well been what I
23 should have done, but I didn't.
24    Q. You didn't?

Page 101

1    A. Not that I can recall right now, sir.
2    Q. Is there anything else the parents
3 said to you during that meeting that you haven't
4 told us about already?
5    A. Not that I can recall.
6    Q. Was there anything else specific to
7 Lamont Bryant that caused you to tell all the
8 coaches they had to treat players and coaches
9 with integrity, respect and fairness?
10    A. Yes. There was, you know,
11 observations on my own during games. For a long
12 time I used to sit behind the bench during games
13 that Mr. Bryant coached, and there was a great
14 deal of profanity going on. But that was part
15 of his coaching style that had been something
16 that I thought was going to change over time
17 with -- I mean, the professionalism of cursing
18 kids out during a game, the behavior with
19 officials.
20         And going back to an IHSA event,
21 IHSA complaint about conduct at a game during
22 the Martin Luther game tournament last year in
23 which there were words going back and forth
24 between him and an official after the game. I

Page 102

1 spoke to Mr. Bryant about it, called him in,
2 showed him the formal complaint. Mr. Bryant
3 said, yes, this conversation did -- there was
4 conversation between he and the official, and he
5 denied that he was using language. And he being
6 my head coach, I supported him at that time.
7        I wrote a letter, and gave him
8 what was called at that point a verbal
9 reprimand. I could have chosen to give him a
10 written reprimand. But as per my style with
11 Mr. Bryant, it was always that of trying to talk
12 with him to resolve issues as they came up.
13       So I responded back to IHSA in
14 writing after the season because there were
15 several notices sent out to see what the school
16 had done to remediate that problem.
17   Q. And to your knowledge, Illinois High
18 School Association was satisfied with the way
19 you handled the incident?
20   A. That's correct.
21   Q. Anything else particular to Lamont
22 Bryant as it pertained to how he treated players
23 and coaches that gave you concern as of June of
24 2007?

Page 103

1   A. Yes.
2   Q. What was that?
3   A. The way that he treated his coaches,
4 in particular Tommy West in Detroit. There
5 was -- I would imagine Mr. West questioned
6 something that Mr. Bryant -- I think Mr. Bryant
7 was arguing about a call, an official's call
8 that he disagreed with the call. And Mr. West
9 approached him so that he wouldn't get a
10 technical foul.
11       And Mr. Bryant went on to say to
12 him that you have to shut up talking, nobody
13 tells me how to run my m-f program, sit your
14 butt down, et cetera.
15       It was to me a demeaning act to a
16 coach, and to be done in such a way that while
17 at the game, I had my family with me, including
18 my children, who they could clearly hear it. It
19 was that loud.
20   Q. Did you discuss -- did Tommy West
21 ever complain to you about being mistreated by
22 Coach Bryant?
23   A. Mr. West didn't.
24   Q. He did not?

Page 104

1   A. I approached Mr. West after the game.
2 And I said, Mr. West, there has to be a dignity
3 level. I know that's your coach, and I know
4 Lamont to be very passionate, Mr. Bryant, about
5 the game, and he has a -- the kind of
6 personality that away from him being in the heat
7 of the moment, just being a really nice guy.
8 One in which is very passionate about coaching
9 and about basketball, his love for the game and
10 his team. That sometimes he would come back and
11 say I really perhaps wish I hadn't reacted in
12 that way.
13       But I can't say that, you know,
14 Mr. West came to me to complain. No, he didn't.
15   Q. You have noticed Lamont Bryant is
16 very passionate about the boys he coaches, isn't
17 he?
18   A. Passionate about the game, passionate
19 about the boys playing hard.
20   Q. He is also passionate about their
21 academics, isn't he?
22   A. He is an educational instructor. I
23 would assume he is passionate about their
24 well-being.

Page 105

1   Q. He is very passionate and concerned
2 about making sure the boys do well academically,
3 isn't he?
4   A. You would have to ask him that.
5   Q. Do you see any difference between the
6 grades of the basketball players and the overall
7 grades at Marshall High School?
8   A. Well, in order for kids to play, they
9 have to fulfill the minimum requirements for
10 playing for Chicago Public Schools.
11   Q. Sure. And before Lamont Bryant
12 became coach, there were a lot of boys that were
13 ineligible to play, weren't there?
14   A. I can't answer that because I don't
15 know.
16   Q. Since Lamont Bryant has been
17 coaching, have any of his kids been ineligible
18 to play because of poor grades?
19   A. Not that I know of at this time.
20   Q. That's a pretty incredible record at
21 Marshall, isn't it, Mr. Gardner?
22   A. It is an expectation that all kids
23 are eligible to play, not just at Marshall. For
24 me, it should be an expectation of any principal

1 that coaches monitor and follow-up that their
2 players, boys or girls, are academically
3 eligible to play.
4　Q. Lamont Bryant does an excellent job
5 of monitoring the academics of his basketball
6 players, doesn't he?
7　A. I would say that he does what is
8 required, as any head coach should do.
9　Q. Well, he does what you would want a
10 head coach to do, doesn't he?
11　A. In what regards, sir?
12　Q. In fulfilling the academics and
13 making sure the boys do well academically.
14　A. That is an expectation that I would
15 have, yes.
16　Q. How about discipline, he is pretty
17 passionate about his basketball players
18 exhibiting discipline, isn't he?
19　A. Discipline on the court, no doubt.
20　Q. How about discipline in the way they
21 act, behavior in school?
22　A. Mr. Bryant certainly would follow-up
23 in the dean's office if any of his boys were
24 involved. And on some occasions, if his boys

1 were involved in something, he would make sure
2 to take care of that.
3　　When I say take care of that, he
4 would approach the kid, or they would deal with
5 it in practice. I don't know if that required
6 extra laps or whatever, but he was a stern
7 disciplinarian, no doubt.
8　Q. And his being a stern disciplinarian
9 translated into a successful basketball program,
10 correct? Is that true?
11　A. He's had a successful program, no
12 doubt about it.
13　Q. He's had a very successful program?
14　A. Sir, he's has a successful program.
15 Those are your words. I say he's had a
16 successful program.
17　Q. He's run a program where the boys
18 have done well academically compared with the
19 rest of the students at your school, isn't that
20 true?
21　A. Comparatively speaking, I can't say
22 comparatively speaking as in terms of what? In
23 terms of what body are you looking at? Are you
24 looking at --

1　Q. Let me ask the question. I am asking
2 you to compare his basketball players and how
3 they do academically versus Marshall, which is
4 on academic probation, and has been so for ten
5 years. His basketball players are doing a heck
6 of a lot better academically then the school as
7 a whole, isn't that true?
8　A. Sir, we would have to look at that
9 data.
10　Q. I am asking you.
11　A. By not having data, he's had success
12 with his kids, and he's done well.
13　Q. He's done more than well academically
14 with his students, hasn't he, his basketball
15 players, hasn't he?
16　A. Sir, he has done well and what is
17 expected of a head basketball coach.
18　Q. So in terms of his players doing well
19 academically, staying out of trouble, and
20 showing signs of discipline, he has done what is
21 expected of him as a basketball coach, isn't
22 that true?
23　A. Yes, that's true.
24　Q. So none of those areas were of

1 concern to you when you decided to fire him, is
2 that true?
3　A. That is correct.
4　　(WHEREUPON, a document was marked
5　　Gardner Deposition Exhibit Number
6　　2 for identification as of
7　　01/15/08.)
8 BY MR. EKL:
9　Q. Sir, I am showing you what we have
10 marked as Gardner Exhibit Number 2 for
11 identification. At the top of this document it
12 says 2007-2008 Boys Basketball Agreement. It
13 contains six numbered sentences, and at the
14 bottom it has a signature line for Lamont Bryant
15 with a signature on it.
16　　Have you ever seen this document
17 before?
18　A. Yes, I have.
19　Q. When was the first time you saw it?
20　A. When Attorney Wu showed it to me in
21 her office.
22　Q. I'm sorry?
23　A. When my attorney, Miss Wu, Jennifer
24 Wu.

Page 110

1    Q.  That's the first time you ever saw
2 this document?
3    A.  That's the first time I have seen
4 this document.
5    Q.  So this was not a document,
6 obviously, that you prepared or had Lamont
7 Bryant sign, right?
8    A.  That is correct.
9    Q.  And as far as how this document got
10 prepared, you had no involvement at all,
11 correct?
12    A.  That is correct.
13    Q.  Now in Paragraph 5 of your
14 declaration, you indicate that on August 31st,
15 2007, I gave Lamont Bryant a copy of the
16 expectations I had developed for him entitled
17 Varsity Head Coaching Conditions 2007-8 must be
18 met by Lamont Bryant.  If you would look at the
19 declaration which is Gardner's Exhibit Number 1,
20 which would be Page 4.
21    A.  Yes.
22    Q.  Would I be correct that these are the
23 conditions that you stated or you have set forth
24 for Lamont Bryant to meet, and these are the

Page 111

1 conditions that you presented to him on August
2 31st of 2007?
3    A.  That's correct.
4    Q.  Was there any particular reason why
5 you waited from June 12th, when you presented
6 conditions to Lamont Bryant, to August 31st to
7 present Lamont Bryant with these written
8 conditions?
9    A.  Basically over the summer there was a
10 lot of activity going on getting ready for the
11 upcoming school year, and I really wasn't able
12 to focus in on this letter.  I was out of the
13 country in China.  And so before we began
14 another year, I just wanted to make sure that we
15 had the record straight as we entered into our
16 final year agreement, you know, for him to come
17 back and coach.
18    Q.  So Lamont Bryant hadn't done anything
19 from June the 12th to August 31st that caused
20 you to feel like you needed to put this in
21 writing, correct?
22    A.  No, other than my wanting to be very
23 clear, so we would have some specific time --
24 I'm sorry, specific structures about what would

Page 112

1 be expected for the final year.
2    Q.  The conditions you set forth on this
3 written piece of paper are broader than the
4 conditions you conveyed to Lamont Bryant when
5 you spoke to him on June the 12th?
6    A.  Right.
7    Q.  Was there anything that Lamont Bryant
8 had done between June 12th and August 31st to
9 cause you to add these additional conditions?
10    A.  Simply that of reflecting the events
11 had transpired earlier in the year between
12 things I observed in Detroit Country Day with
13 Mr. West.  I spoke to you about that.  The piece
14 with the parent back in March when we spoke --
15 February, I'm sorry, February when we had the
16 meeting in our office, and the conduct with what
17 wasn't going on when we were down in Peoria, the
18 dress code not being in place, I just wanted to
19 be very, very, very clear as we went into our
20 final year that there would not be any
21 misunderstanding about what the expectations
22 were.
23    Q.  My question is:  Did Lamont Bryant do
24 something between June 12th and August 31st to

Page 113

1 cause you to add these additional conditions,
2 and I believe you told us the answer to that is
3 no?
4    A.  That's correct, that's correct, I'm
5 sorry.
6    Q.  Now, why did you add a condition that
7 Lamont Bryant was supposed to make sure that all
8 assistant coaches pass criminal background
9 checks?  Did you include that?
10    A.  Because that was something that was
11 not done the year before.  All the coaches that
12 coached with him last year, the background
13 checks had not been submitted for the '06-'07
14 year.  So I wanted to make sure in us dealing
15 with kids that individuals who are nonChicago
16 Public School employees, they have to go through
17 the criminal background check so that we have
18 got people who are not employed by CPS
19 legitimately working with kids as coaches when
20 they don't work for CPS.  That is something that
21 we have to be very strict and clear on.
22    Q.  How was it that Lamont Bryant was
23 supposed to run criminal background checks on
24 his assistant coaches?

Page 114

1    A. It's his responsibility to turn in
2 the -- to have his coaches go through the
3 process. There is a process, and it's incumbent
4 upon him to make sure that having those guys
5 going through the background checks and cleared
6 before they start working with kids.
7    Q. So was Lamont Bryant supposed to make
8 sure his assistants turned in some paperwork to
9 somebody? Is that what he was supposed to do?
10   A. Prior to them having contact with the
11 children.
12   Q. He wasn't supposed to run the
13 background checks himself?
14   A. Not at all. I mean, it's a process
15 for CPS that they go through. It's a protocol.
16 And upon that being done, the assistant
17 principal -- I'm sorry, the assistant coaches
18 would then make sure that Mr. Bryant has a copy,
19 and he forwards it on to me.
20       But again, coaches have the luxury
21 of hiring their coaches as they see fit, and
22 that's what Mr. Bryant had.
23   Q. All right. And then with Paragraph
24 2, wear proper attire as prescribed by CPS

Page 115

1 sports administration, quarter finals beyond,
2 ties are required.
3        Was there a problem down in Peoria
4 in the spring of 2007 that he was not dressed
5 appropriately?
6    A. Yes. Mr. Bryant, although he wore --
7 did have like leisure clothes on, he didn't have
8 a -- what is it I am saying? The running suit,
9 the jogging suit. But I did have an expectation
10 of wearing a tie. He did not wear a tie down at
11 the tournament on the side lines. And that
12 was -- that was not what I expected of him.
13   Q. Did you tell him that?
14   A. To the best of my recollection, I
15 did.
16   Q. When did you tell him that you
17 expected him to wear a tie during the quarter
18 finals down in Peoria?
19   A. Prior to going down to Peoria. I
20 can't put a date on.
21   Q. Was anybody else present when you
22 made that statement to him?
23   A. Not to my knowledge.
24   Q. What did he tell you when you told

Page 116

1 him that?
2    A. No problem. He would comply.
3    Q. And then when he went down to Peoria,
4 you say he didn't wear a tie?
5    A. Right.
6    Q. And did you raise that issue with him
7 later?
8    A. I did after season. I was a little
9 disappointed that did not happen because we
10 wanted to represent the City. We wanted to
11 represent the Marshall community in a nice
12 professional way.
13       (WHEREUPON, the proceedings in
14       the above-entitled matter were
15       recessed for lunch from 12:15
16       until 1:00 p.m. of the same
17       day.)
18
19
20
21
22
23
24

Page 117

1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION
3
4 LAMONT BRYANT,              )
5        Plaintiff,           )
                              )
6     vs.                     )   No. 07 C 5909
7 JUAN GARDNER, DOROTHY GATERS, )
  JOHN MARSHALL HIGH SCHOOL,  )
8 and BOARD OF EDUCATION OF   )
  THE CITY OF CHICAGO,        )
9                             )
        Defendants.           )
10
11
12        January 15, 2008
13           1:00 p.m.
14
15     The continued deposition of
16 JUAN GARDNER, resumed pursuant to recess at
17 Suite 400, 115 West 55th Street, Clarendon
18 Hills, Illinois.
19
20 PRESENT:
21
22     (Same as heretofore noted.)
23
24

Page 118

1        JUAN GARDNER,
2 called as a witness herein on behalf of the
3 Plaintiff, having been previously duly sworn,
4 resumed the stand and testified as follows:
5        CONTINUED DIRECT EXAMINATION
6                BY
7        MR. EKL:
8     Q. Mr. Gardner, the Attachment 1 to your
9 declaration, which is the conditions for head
10 coach in 2007-08 that must be met by Lamont
11 Bryant. Did you ask Lamont Bryant to sign that
12 acknowledging receipt of the document?
13    A. No, sir.
14    Q. Why was that?
15    A. I did not ask him to sign it. This
16 was not a contract. These were conditions that
17 we wanted to outline and be very clear about.
18    Q. You didn't think it was necessary for
19 him to sign acknowledging that he had received
20 it?
21    A. No, I did not.
22    Q. Why is that?
23    A. Again, I go back saying I just wanted
24 clarity. While Lamont at that time was

Page 119

1 considered a friend, I just wanted to be very
2 clear what we were expecting for the upcoming
3 year. And I did not ask him to sign, nor did I
4 find it necessary for him to put a signature on
5 it.
6     Q. Now, the document itself, the
7 conditions, who typed that document up?
8     A. I did.
9     Q. And where did you type it up?
10    A. I think I typed it up at school on my
11 computer at school.
12    Q. Did you have a desktop or laptop?
13    A. Both.
14    Q. Was it typed up on your desktop or
15 your laptop?
16    A. I think it was on my desktop.
17    Q. Do you typically use your desktop for
18 school-related matters?
19    A. Yes.
20    Q. And since this was a school-related
21 matter, it's likely that you typed it on your
22 desktop; is that a fair statement?
23    A. That is true.
24    Q. When was this document typed up?

Page 120

1     A. I can't remember.
2     Q. Well, if you presented it to Lamont
3 Bryant on approximately August 31st, 2007, does
4 that help you or refresh your recollection as to
5 when you would have typed the document up?
6     A. No question that this would have been
7 typed prior to our meeting, no doubt. So some
8 time in August I would ascertain, if I had to
9 bank a month on it. I can't tell you date.
10    Q. Well, do you know whether you typed
11 it up in August or not?
12    A. I don't remember.
13    Q. So you have really no recollection of
14 when you typed this document up; is that a fair
15 statement?
16    A. I do know that I typed it, but I
17 can't be exactly sure the date of when I typed
18 it.
19    Q. And again, sir, I am not asking you
20 the date. I am asking you for some time period.
21    A. A timeframe would be realistic. If I
22 pin a month, I am going to say August.
23    Q. It's your best recollection, it was
24 sometime in August of 2007?

Page 121

1     A. To my best recollection.
2     Q. But since your recollection is not
3 perfect on this subject, may it have been longer
4 or longer prior to August 31st?
5     A. I don't believe that to be true.
6     Q. So your best estimate right now is
7 sometime in August of 2007?
8     A. Yes.
9     Q. When you presented the conditions to
10 Lamont Bryant on --
11    A. Excuse me, if I can -- if I can
12 digress just a bit here on this document.
13    Q. We are talking about the head
14 coaching conditions?
15    A. I know that I did sit down with
16 Lamont, and we went over those things that he
17 needed to do. We discussed them. I am certain
18 we discussed everything that is on this
19 document.
20        In terms of putting it in his
21 hand, I know certainly it was placed October
22 2nd. That's when I know this draft was given
23 him.
24    Q. I see.

Page 122

1     A. Now I can say that we -- when I met
2 with my assistant principals and such, they were
3 all there, we gave him a -- my assistant
4 principals, Towanna Butler, Rob Bellamy and
5 mentor principal, Keith Foley, this document was
6 given at that time.
7         But the final -- the -- gosh, I
8 know that this draft was given to him on October
9 2nd. That's why I am still trying to come to a
10 consensus date about when the origin of this
11 particular document was finalized and given to
12 him.
13    Q. Let me see if we can get as much
14 recollection as you have on it. You know that
15 Attachment 1 to your declaration was given to
16 Lamont Bryant on October 2nd, 2007?
17    A. Correct.
18    Q. Correct?
19        And when you typed it up relative
20 to that date is what you are not certain of,
21 correct?
22    A. That is correct.
23    Q. You might have typed it up in August;
24 it might have been some time in September?

Page 123

1     A. I can't pin exactly when it happened.
2 But I am certain that all the pieces, including
3 the paragraph, everything here was discussed on
4 August 31st, with the understanding, and Lamont
5 made it very clear, that I am back another year.
6 He's back in the foal. I am happy he is back in
7 the foal. We are going to do everything that's
8 required of us to finish the year. And he would
9 seek other opportunities outside of Marshall
10 after this year.
11    Q. So now let's back up so we can
12 clarify your testimony as to what happened on
13 August 31st when you met with Lamont Bryant.
14 You discussed with him conditions as to his
15 remaining the basketball coach, but you didn't
16 give him anything in writing at that time, true?
17    A. I can, to the best of my
18 recollection, state that, you know, we discussed
19 all of this. And I just don't remember. I may
20 have given him this, but one thing I know for
21 certain is we discussed it. I can't say on
22 record that I put it in his hand.
23    Q. So --
24    A. Is that fair enough?

Page 124

1     Q. Yes. Just so we are clear, you know
2 you gave it to him --
3     A. On October 2nd.
4     Q. -- on October 2nd? And you discussed
5 the conditions with him on August 31st?
6     A. Right.
7     Q. You don't know whether you gave him
8 the written document on August 31st or not,
9 correct?
10    A. I know that we covered everything.
11    Q. So the answer to my question is yes?
12    A. Yes.
13    Q. You know you talked about the
14 conditions?
15    A. Yes.
16    Q. But you don't know if you gave him
17 the written document at that time?
18    A. I don't recall.
19    Q. And you don't recall whether you gave
20 him the written document between August 31st and
21 October the 2nd, correct?
22    A. I know I didn't give it to him until
23 October 2nd.
24    Q. Fair enough.

Page 125

1         Mr. Gardner, have you at any time
2 looked at your computer to determine when these
3 conditions were generated off your computer?
4     A. I am not a techy guy, so I can't
5 begin to tell you. I wouldn't know how to do
6 that.
7     Q. We will get some of these, maybe
8 Julie could do this for us. It's pretty easy to
9 check, but the bottom line is you didn't look to
10 see when it was generated, true?
11    A. That's correct.
12    Q. Do you know if anybody else has
13 checked your computer to determine when the
14 conditions, the written document, was generated?
15    A. I know that my computer has been
16 checked. All right.
17    Q. But you don't know whether it was
18 determined by someone from the school district
19 as to when that document was generated?
20    A. That information has not been shared
21 with me.
22    Q. On the Conditions of Continued
23 Employment, the written document --
24    A. Conditions of Coaching.

Page 126

1    Q. Conditions of Head Coaching.
2    A. Not to be confused with teaching.
3    Q. All right. You mention on Paragraph
4  8, operate program without inciting
5  insubordinate conduct.
6        What did you mean by that?
7    A. What I meant specifically by that is
8  that which happened with the Detroit Country Day
9  Tournament, going behind the backs of the
10 administration to make provisions to have a
11 school charged. That's what I am referring to.
12   Q. Now during a lunch break we went
13 through some documents that your attorneys
14 provided to us. We'd ask that this piece of
15 paper be marked as Exhibit Number 3, please.
16       (WHEREUPON, a document was marked
17       Gardner Deposition Exhibit Number
18       3 for identification as of
19       01/15/08.)
20 BY MR. EKL:
21   Q. Mr. Gardner, we are showing you what
22 we have marked as Gardner Exhibit Number 3.
23 It's got the word Agenda 10/2/07. Do you
24 recognize this document?

Page 127

1    A. Yes.
2    Q. What is this?
3    A. This was the meeting that we had with
4  Mr. Bryant on October 2nd.
5    Q. And it shows the names of Mr. Foley,
6  Miss Butler, Mr. Bellamy, Mr. Bryant and
7  Mr. Gardner. Are those, I take it, the people
8  who were present at this meeting?
9    A. Yes, that's correct.
10   Q. And the first bullet point, review
11 conditions for 2007-2008. I take it that's when
12 you reviewed with Mr. Bryant the written
13 document which is attached to your declaration?
14   A. Yes.
15   Q. So that's why you know you discussed
16 it with him at that time?
17   A. Yes.
18   Q. And then it says Country Day High
19 School Motor City Classic. I take it that
20 refers to a discussion of what occurred in
21 regard to that basketball tournament in Detroit?
22   A. That's correct.
23   Q. Did you make any statements to
24 Mr. Bryant about the Country Day High School

Page 128

1  Motor City Classic?
2    A. Yes. That's the time when I revealed
3  to him my discussion with Mr. Keener, and I
4  presented him a photocopy of an email sent to me
5  from Mr. Keener.
6    Q. Didn't Lamont Bryant at that time
7  tell you that what Mr. Keener stated in his
8  email as to what had Mr. Bryant and Mr. Parker
9  discussed was not accurate?
10   A. I believe that's what he said.
11   Q. And, obviously, you never went and
12 talked to Mr. Parker to determine whether --
13 what Mr. Parker's recollection of the
14 conversation was with Lamont Bryant, correct?
15   A. No, I did not.
16   Q. You were assuming that what
17 Mr. Keener reported to you was accurate,
18 correct?
19   A. Considering Mr. Keener was the
20 athletic director and Mal Parker was not,
21 Mr. Keener was in charge of the tournament, I
22 took his word, that's correct.
23   Q. But what Mr. Bryant allegedly did
24 wrong was based upon what he said to Mal Parker,

Page 129

1  right?
2    A. The information that Mr. Keener
3  shared with me was that Mr. Parker told him the
4  story, as you see it. It's in black and white.
5  I shared that from the email from Mr. Keener.
6    Q. Mr. Keener related the substance of
7  an alleged conversation between Lamont Bryant
8  and Mal Parker, didn't he?
9    A. Yes, right.
10   Q. And despite the fact that Mr. Keener
11 is an athletic director, Mal Parker is the
12 person who talked directly --
13   A. That's correct.
14   Q. -- with Lamont Bryant?
15   A. That's correct.
16   Q. So you never asked Mal Parker what it
17 was that Lamont Bryant actually said to him, did
18 you?
19   A. No, I did it not.
20   Q. You accepted Mr. Keener's version of
21 what he said Mal Parker told him that Lamont
22 Bryant told him as accurate, right?
23       MS. WU: Objection. We have already
24 been through this, and I am going to object to

Page 130

1 the form of the question.
2     MR. EKL: Would you answer the
3 question, please.
4     MS. WU: Can you answer the question
5 if you understand it?
6     THE WITNESS: Repeat the question.
7     MR. EKL: Would you read it back,
8 please.
9     (WHEREUPON, said record was
10     read back, as requested.)
11     THE WITNESS: That's correct.
12 BY MR. EKL:
13   Q. Now you have another bullet point on
14 Proviso West Tournament?
15   A. Uh-huh.
16   Q. What did you tell -- You have to say
17 yes, please.
18   A. I'm sorry, yes.
19   Q. What did you tell Lamont Bryant about
20 the Proviso West Tournament?
21   A. That as best I can recall, their
22 intention was for us to play in the Proviso West
23 Tournament, is that not correct. I believe
24 that's what I said to him. And the fact that he

Page 131

1 made the contact with Country Day to get us out
2 of playing at Country Day -- I'm sorry, getting
3 us out of playing at Proviso West because he
4 wanted to play at Country Day, I was just
5 bringing up the point, once again, that we had
6 expectations for you to play in Proviso West
7 Tournament. That's why it was a bullet point.
8   Q. And do you remember what Lamont
9 Bryant's comment back to you was at that time?
10   A. I don't remember.
11   Q. This entire meeting on October 2nd,
12 how long did it last?
13   A. Approximately ten minutes tops.
14   Q. When you spoke to Lamont Bryant on
15 October 2nd, do you know whether he knew at that
16 time that there was a conflict between Proviso
17 West Tournament and the Detroit Roundball
18 Classic?
19   A. I don't know that to be true.
20   Q. Did you know whether there was a
21 conflict at that point?
22   A. That there was a conflict between the
23 Proviso West Tournament and Country Day?
24   Q. Yes.

Page 132

1   A. Obviously so. We talked about it
2 back when we had the meeting with Mr. Foley and
3 myself and Mr. Bryant brought the contract to
4 our attention that there was apparently a
5 conflict. That's why he was sent to Ms. Gaters
6 to try to negotiate getting out of the
7 tournament because that conflict was there.
8   Q. Under the next bullet point, it says
9 documentation Kurt Carr. What does that pertain
10 to?
11   A. The Country Day. Kurt Carr, I'm
12 sorry, there is a name.
13   Q. Kurt Keener?
14   A. Kurt Keener. I confused Carr with
15 Keener.
16   Q. And James Williams, what does that
17 refer to.
18   A. James Williams, there was a letter
19 presented to me by James Williams about a
20 conversation that he and I had about a freshman
21 student who was troubled and needed some
22 guidance and Mr. Williams was outreaching to
23 everyone -- he was outreaching to the
24 administration to make sure that there was a

Page 133

1 family community wraparound on this student who
2 had tremendous talent. He likened him to
3 Michael Jordan, this kid had this type of
4 potential.
5     Mr. Williams and I ended our
6 meeting. I think he may have asked something
7 about, you know, when are the kids going to
8 participate in open gym and such because a kid
9 like him needed that.
10     And I mentioned to him, well,
11 there is no open gym at this point. The kids
12 need to focus on their studies and such.
13     Mr. Williams approached me with a
14 letter because he said that Mr. Bryant demanded
15 for him to tell him what was said, and he heard
16 he was in the building talking to me.
17 Mr. Williams said that Mr. Bryant demanded to
18 have knowledge of what transpired in the
19 meeting, and he put it in writing. Mr. Williams
20 felt that I deserved to have a copy of what
21 Mr. Bryant asked him to have.
22   Q. What did the situation with James
23 Williams have to do with the termination of
24 Lamont Bryant in your mind?

Page 134

1    A.  Demeaning coaches.
2    Q.  **Who was he denying?**
3    A.  Mr. Bryant demeaned Mr. Williams in
4  his posture and in his demand per Mr. Williams
5  to put that conversation that he and I had in
6  writing.  Mr. Williams felt it necessary to come
7  and share with the principal what was going on
8  in your building.  He volunteered that
9  information.  He came to me.
10   Q.  **Did Mr. Williams tell you that he**
11 **believed Lamont Bryant had demeaned him?**
12   A.  He came to us -- he came to me, not
13 us.  He came to me and made it very clear that
14 Mr. Bryant's tone, tonality, very harsh, very
15 threatening to put this in writing.  And for a
16 grown man -- this is from Mr. Williams for a
17 grown man to go to another grown man and talk to
18 him as if he was two or three years old, again
19 shared another piece of what we were asking him
20 to treat your players and coaches in
21 nondemeaning ways.
22   Q.  **This is what Mr. Williams told you?**
23   A.  This is what Mr. Williams told me.
24   Q.  **Then he produced a letter to you**

Page 135

1  **which contained all of his objections as to**
2  **Lamont Bryant's conduct, isn't that right?**
3    A.  His piece in writing was simply that
4  of what Mr. Bryant asked him to put in writing
5  from our meeting.  I'm sorry, the conversation
6  that Mr. Williams and I had in our meeting,
7  Mr. Williams honored the head coach's directive
8  to place in writing that which Mr. Williams and
9  I discussed regarding this freshman player, and
10 also regarding his query about when open gym
11 would occur.
12         And I told him that -- well, I
13 spoke to that already about open gym was
14 suspended for the moment due to us wanting the
15 kids to focus in and being able to participate
16 in cross country.
17   Q.  **When you say "we," who are you**
18 **referring to?  You just said we were concerned,**
19 **about the kids focusing on cross country.**
20   A.  Mr. Foley when I say "we."
21   Q.  **Mr. Foley?**
22   A.  Mr. Foley and myself exclusively.
23   Q.  **Was it Mr. Foley's decision, along**
24 **with you, to close off open gym to the boys**

Page 136

1  **basketball team?**
2    A.  That is correct.  Because I turned to
3  Mr. Foley and asked, well, when does the
4  basketball season start?  I really didn't know
5  when.  And there was some discussion about it
6  being either in November 5th or 15th.  And I
7  knew it was the 15th when I played ball, but I
8  think it's more like November 5th.
9         And Mr. Foley says, well, fine.
10 You know, if we can't fill the team of cross
11 country and apparently most of the players are
12 part of -- the basketball players are part of
13 cross country, we will stop, you know, open gym
14 because that way they could have a cross country
15 team where kids are able to compete.
16   Q.  **Were there kids on the basketball**
17 **team that wanted to do cross country so that's**
18 **why you closed open gym off?**
19   A.  To allow the players at that time to
20 fill the team of cross country.  Most of -- a
21 lot of the guys that play basketball also run
22 cross country.
23   Q.  **Well, how many basketball players ran**
24 **cross country in 2006?**

Page 137

1    A.  I can't tell you that.  I don't know.
2    Q.  **You said a lot did.  I mean was it**
3  **one, two?**
4    A.  '07, I am talking about '07-'08 year,
5  sir.
6    Q.  **What I am saying, you said in the**
7  **year 2007-2008 --**
8    A.  Right.
9    Q.  **-- you closed off open gym because**
10 **you wanted to give the basketball players an**
11 **opportunity to run cross country?**
12   A.  And also --
13   Q.  **Right?**
14   A.  Yes.  And also fulfilling that
15 opportunity for kids to participate in more than
16 one sport.
17   Q.  **Now, as it relates to cross country,**
18 **you just told us that there were a lot of**
19 **basketball players who participate in cross**
20 **country.**
21         My question to you is:  In the
22 **fall of 2006, a year ago, how many basketball**
23 **players participated in cross country?**
24   A.  I don't know the answer to that

Page 138

1 question, sir.
2    Q. Well, did somebody tell you that
3 there were a lot of boys on the basketball team
4 who were cross country runners?
5    A. For 06'-'07?
6    Q. Yes.
7    A. No, sir.
8    Q. Where did you get that information
9 then?
10    A. From the cross country coach.
11    Q. Who is the cross country coach?
12    A. Danny Little.
13    Q. And Danny Little told you that a lot
14 of basketball players run cross country?
15    A. That is correct. He told Mr. Foley
16 and I.
17    Q. When was that?
18    A. I am not certain. September, right
19 beginning of the school year of '07-'08.
20    Q. And that was one of the primary
21 reasons you shut down open gym for the boys
22 basketball team, right?
23    A. So that the players could participate
24 in cross country and to -- and for those who

Page 139

1 were not participating in cross country,
2 focusing on their studies. Beginning a new
3 school year, we want to make sure the kids get
4 off to a good start academically.
5    Q. Those were the reasons open gym was
6 closed off for the boys?
7    A. Yes.
8    Q. Those two reasons?
9    A. Yes.
10    Q. Was there a problem with the
11 academics of the basketball team during
12 2006-2007?
13    A. Not to my knowledge.
14    Q. Well, did you close down open gym for
15 the girls as well in the fall of 2007?
16    A. No.
17    Q. Well, there is a girls cross country
18 team, isn't there?
19    A. Right.
20    Q. Didn't you want to provide the same
21 opportunity to the girls to run cross country in
22 the fall?
23    A. Well, sir, it was a nonissue. To our
24 knowledge, the girls were participating -- we --

Page 140

1 the concern was the cross country team being
2 closed down and not being -- not having enough
3 members to compete. That was not brought to my
4 attention about the girls.
5    To my knowledge, there was no --
6 girls cross country, that is. To my knowledge,
7 there was not an issue of there not being enough
8 girl players for the cross country team.
9    Q. Who brought to your attention there
10 were not enough boy runners for the boys cross
11 country team?
12    A. I just said Danny Little.
13    Q. Danny Little?
14    A. He is the coach for cross country.
15    Q. And Dorothy Gaters didn't bring that
16 to your attention, right?
17    A. No. Danny Little did.
18    Q. Who is the girls cross country coach?
19    A. I am not certain.
20    Q. Do you have a girls cross country
21 team?
22    A. Yes, we do.
23    Q. You probably have a coach, right?
24    A. True.

Page 141

1    Q. Did you ever go to the girls cross
2 country coach and say would it help you get
3 participation if we shut down open gym so the
4 basketball players could run cross country?
5    A. Again, that was a nonissue, in that
6 the girls cross country team wasn't threatening
7 to be canceled because it didn't have enough
8 players. That wasn't the case.
9    Q. Now, when you decided to shut down
10 open gym and give boys basketball players an
11 opportunity to run --
12    A. A decision with Mr. Foley and my
13 myself.
14    Q. I appreciate that. You made it clear
15 that the decision to shut down open gym for the
16 boys only was a decision that you made and Foley
17 made jointly, correct?
18    A. Correct.
19    Q. And you concurred in that opinion,
20 right?
21    A. Correct.
22    Q. Foley concurred in it, correct?
23    A. True.
24    Q. And one of the main reasons you did

Page 142

1 that was to provide basketball players the
2 opportunity to run cross country so you'd have
3 enough cross country runners for the fall
4 season, correct?
5    A. Right.
6    Q. How many basketball players joined
7 the cross country team when open gym was shut
8 down?
9    A. I didn't keep up with that kind of
10 data.
11    Q. Did you ask anybody?
12    A. No.
13    Q. Did you ask Mr. Little?
14    A. Only the fact that he didn't have to
15 cancel any more meets, told me that he had
16 players to compete at cross country.
17    Q. Did you ask him if any basketball
18 players had signed up to run cross country?
19    A. No, I did not.
20    Q. After open gym was shut down to the
21 boys team, people complained about that to you,
22 didn't they?
23    A. Can you repeat your question.
24    Q. After you closed down open gym to the

Page 143

1 boys basketball team only and not the girls,
2 individuals came to you complaining about that,
3 didn't they?
4    A. There were only two that came. There
5 were only two that came to me.
6    Q. Who came to you complaining?
7    A. Mr. Bryant and Mr. Williams.
8    Q. In fact, Mr. Williams came to you in
9 September of '07 complaining about the fact that
10 open gym had been closed down to boys, didn't
11 he?
12    A. Yes.
13    Q. And that was the primary reason he
14 came to speak with you, wasn't it?
15    A. I can't say that -- no. His primary
16 reason was to come talk about that young man
17 that you are reading in that letter. A kid that
18 he helped in grammar school and spent
19 a lot of time with him at the Boys Club or
20 whatever, Park District.
21    Q. What he was telling you was this boy
22 who could be the kind of individual who would
23 get in trouble on the street really needed to
24 have open gym so that he had some structure and

Page 144

1 he stayed off the street, isn't that what
2 Mr. Williams told you?
3    A. Not verbatim, but I would surmise he
4 said something as such.
5    Q. Pretty close?
6    A. Okay.
7    Q. Okay. So in September, Williams
8 comes to you, talking to you about this young
9 man, and asking you to review your position on
10 closing down open gym to the boys' basketball
11 team, correct?
12    A. Correct.
13    Q. And by that point, the cross country
14 season was well underway, wasn't it?
15    A. I can't say if cross country season
16 was well underway. But I know it was in the
17 later part of September.
18    Q. Yeah.
19    A. Okay.
20    Q. And cross country, there was no
21 cancellation of the season for them, was there?
22    A. No.
23    Q. So at that point in time, you could
24 have opened up the gym back to the boys again,

Page 145

1 couldn't you?
2    A. We elected not to.
3    Q. Who is "we"? You and Mr. Foley?
4    A. Mr. Foley and I.
5    Q. Did you discuss this with Mr. Foley?
6    A. Just that initial time but about --
7 when Mr. Little approached us about open gym and
8 such, and I also told him about Mr. Williams'
9 letter. But there was no more discussion -- I'm
10 sorry, not the letter, Mr. Williams' visit I
11 discussed with Mr. Foley, but there was no more
12 discussion about us reconsidering opening up the
13 gym.
14    Q. Let's break this down. When
15 Mr. Williams came to you asking you to
16 reconsider open gym for the boys and using the
17 example of the young man that we talked about,
18 did you go to Mr. Foley and discuss this issue
19 with him again?
20    A. At some point we did discuss the
21 letter -- I'm sorry, not the letter, but the
22 discussion with Mr. Williams. But the decision
23 about open gym was still the same.
24    Q. Why was that?