

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **LAMONT BRYANT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 07 C 5909** |
| **v.** | ) | |
| | ) | **Judge Ruben Castillo** |
| **JUAN GARDNER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Lamont Bryant ("Plaintiff") brings this civil rights suit challenging his termination as the boys' varsity basketball coach at John Marshall High School ("Marshall") in Chicago, Illinois. He raises claims against Marshall's interim principal, Juan Gardner ("Gardner"); Marshall's athletic director Dorothy Gaters ("Gaters"); and the Board of Education of the City of Chicago ("the Board") (collectively "Defendants"). (R. 92, Pl.'s Sec. Am. Compl.) Presently before the Court are Defendants' separately filed motions for summary judgment. (R. 152, Board's Mot. for Summ J.; R. 155, Gardner's Mot. for Summ. J.; R. 158, Gaters' Mot. for Summ. J.) For the following reasons, the motions are granted in part and denied in part.

## RELEVANT FACTS[1]

Plaintiff is a tenured teacher within the Chicago public school system who formerly worked at Marshall as a gym teacher and basketball coach. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 1.) Gardner is the interim principal at Marshall and has been in this position since August 2006.

---

[1] These facts are derived from the parties' statements of facts and exhibits filed in support thereof pursuant to Local Rule 56.1. Unless otherwise indicated, the facts contained herein are undisputed.

(*Id.* ¶ 2.) Gaters has been the athletic director at Mashall since 2004. (*Id.* ¶ 3.) In this position, she in charge of all sports programs at Marshall, including boys' basketball. (*Id.* ¶ 124.) Gaters is also head coach of the girls' basketball team, and has held this position since 1975. (*Id.* ¶ 3.) Gaters is also the executive director of the MLK Foundation, an Illinois non-profit corporation formed for charitable and educational purposes, including operating an annual basketball tournament known as the "MLK Classic." (R. 169, Defs.' Resp. to Pl.'s Facts ¶¶ 30-31.)

In 2003, Plaintiff was recruited by former Marshall athletic director Luther Bedford ("Bedford") and former principal Dr. Donald Pittman ("Pittman") to coach the struggling Marshall boys' basketball program, which had won only three games in the previous season. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 2.) Plaintiff coached the team for the next four seasons, and the team's record improved dramatically: The team posted records of twenty-four wins and six losses in the 2003-04 season; twenty-seven wins and seven losses in the 2004-05 season; thirty-two wins and three losses in the 2005-06 season, with a third-place finish in the state tournament; and twenty-five wins and seven losses in the 2006-07 season, with another third place finish in the state tournament. (*Id.* ¶ 4.) During Plaintiff's four years at Marshall, the girls' basketball team did not compete in a state tournament, reach a super-sectional game, or win a Chicago public league or sectional championship. (*Id.* ¶ 5.)

Plaintiff did not have a good relationship with Gaters from the outset. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 29.) After Gardner became principal in the fall of 2006, Plaintiff complained to him approximately three or four times a month about problems he perceived with Gaters, including that she: made the boys' team travel on substandard buses; refused to provide expense money for the team; refused to allow the boys' team equivalent access to practice

2

facilities; failed to attend the boys' away games; and generally failed to support the boys' program.[2] (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 6; R. 166, Pl.'s Resp. to Defs.' Facts ¶ 85.)

In the spring of 2006, Plaintiff wore sweat suits at two or three games during a state tournament. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 42.) Gaters received a call from either Pittman or the sports administration advising her that the coaching staff should not be wearing athletic apparel on the bench. (*Id.*) When Gaters conveyed this request to Plaintiff, he responded that he would "wear whatever he wants to as long as he's clean." (*Id.*)

Plaintiff missed a mandatory press conference following a semi-final game in either 2006 or 2007. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 43.) Gaters received a call from the Illinois High School Association ("IHSA") urging her to let Plaintiff know that they would like his attendance at press conferences in the future. (*Id.*)

Following the state tournament in 2007, Gaters was informed by the bus company used by Marshall that Plaintiff had cursed at one of its drivers. (*Id.* ¶ 44.) Plaintiff admits there is a "great possibility" that he cursed at the driver. (*Id.*) Gaters was also informed by the school's cheerleading sponsor that Plaintiff cursed at the cheerleaders when they were placed on the same floor of the hotel as his players. (*Id.*) Following another basketball tournament in 2007, Gardner received a formal complaint from the IHSA regarding Plaintiff's conduct toward an official at the tournament. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 48.) At some point during these events Gaters told Plaintiff that he needed to "tone down his style," and that "a high profile coach should act like one." (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 105.)

---

[2] Defendants dispute the validity of Plaintiff's complaints, but do not dispute that the complaints were made. (*See* R. 169, Defs.' Resp. to Pl.'s Facts ¶ 6.)

In the spring of 2007, following the completion of the 2006-07 basketball season, Plaintiff was considering several offers to coach basketball at various universities and high schools for the 2007-08 season. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 7.) In March 2007, during spring break, Plaintiff and Gardner spoke about Plaintiff's intentions. (*Id.* ¶ 8.) During their conversation, Plaintiff complained about Gaters, and Gardner assured Plaintiff that if he would remain at Marshall, Gardner would smooth things over with Gaters. (*Id.* ¶ 9.) Gardner agreed that Plaintiff could let him know after spring break if he would be returning for the 2007-08 season. (*Id.*) In the proceeding weeks, Gardner interviewed potential candidates to replace Plaintiff as boys' basketball coach for the upcoming year. (*Id.* ¶ 10.) Gaters was involved in the interview process. (*Id.* ¶ 11.)

Upon learning of these interviews, Plaintiff contacted Pittman, who in turn contacted Gardner. (*Id.* ¶ 12.) After speaking with Pittman, Gardner met with Plaintiff sometime in April 2007. (*Id.* ¶ 13.) At this meeting, Plaintiff agreed to various conditions set by Gardner in return for Gardner's commitment that Plaintiff would coach one final season at Marshall. (*Id.* ¶ 14.) These conditions were memorialized in written form in a document prepared by Gardner and signed by Plaintiff. (*Id.* ¶ 15.) Among the conditions were that Plaintiff would honor Marshall's obligation for the boys' team to play in the MLK Classic. (*Id.* ¶ 18.) When they discussed this condition, Plaintiff told Gardner that he did not want to play in the tournament because he felt "Miss Gaters was getting all the benefit from the tournament" and that Marshall "wasn't receiving anything." (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 19; R. 149, Defs.' Facts, Ex. C, Bryant Dep. Tr. at 182.) When Gardner responded that the tournament was benefitting the school, Plaintiff complained that Gaters only offered $100 to feed the boys' team after they played in the

4

tournament. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 20.) Plaintiff nevertheless agreed to play in the tournament. (*Id.* ¶ 21.) Other conditions Plaintiff agreed to included wearing a shirt and tie at "high profile" games; allowing basketball players to participate in other sports; not demeaning other coaches; making certain all assistant coaches were board certified, which included having them submit to background checks; and fulfilling Marshall's obligation to play in the "Proviso West Christmas Tournament," scheduled during the winter break. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 60.)

After the meeting with Gardner, Plaintiff went on to coach the boys' team in the spring and summer leagues. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 17.) In April or May 2007, Plaintiff purchased jackets for the boys' basketball team to honor their accomplishment of going to the state tournament. (*Id.* ¶ 22.) Plaintiff bought the jackets with money from an account dedicated to the boys' basketball team, which had been approved by Luther Bedford, the school's former athletic director. (*Id.* ¶ 23.) Gaters and Gardner subsequently called Plaintiff to a meeting where Gardner stated that he was unaware the boys' team had its own account; he stated that individuals could not maintain accounts, and that all monies had to go into the school's general fund. (*Id.* ¶ 26.) Plaintiff responded that Gaters had her own account, to which Gaters responded that she was the athletic director. (*Id.* ¶ 27.) Plaintiff then brought up the MLK Classic, complaining that the school had not received any money from the tournament. (*Id.* ¶ 28.) Gaters responded that the finances of the MLK Classic were "none of Plaintiff's business." (*Id.* ¶ 29.)

The brochures for the MLK Classic are prepared and copied by Marshall employees during work hours. (*Id.* ¶ 32.) Marshall is not reimbursed for labor and materials. (*Id.*) Gaters has an account on Marshall's books that is designated for the MLK Classic, but is described as

"friends of girls' basketball." (*Id.* ¶ 33.) The Board paid more than $5,000 to Whitney Young High School for the rental of their gym for the 2006 MLK Classic. (*Id.* ¶ 34.) In 2006, MLK's initial tax return to the Internal Revenue Service ("IRS") was rejected for failing to include a schedule detailing the corporation's revenues and expenses. (*Id.* ¶ 36.) The parties dispute whether MLK's amended tax return failed to report at least $12,700 in revenue it received from the Board. (*See id.* ¶ 37.) In 2006, Gaters did not make any cash deposits to the MLK account, reflecting revenue from ticket sales, concessions, or apparel sales. (*Id.* ¶ 39.) Gaters instead kept the cash to reimburse herself for expenses but does not know where any supporting records are. (*Id.*) In 2007, Gaters deposited MLK checks of at least $8,500 into her personal bank account. (*Id.* ¶ 40.) The parties dispute whether this was to reimburse her for equivalent sums in expenses she had paid out of her own pocket. (*See id.*)

In late August 2007, a dispute arose between Plaintiff and Gardner regarding "open gym" for the boys' basketball players. (*Id.* ¶¶ 49-50.) Open gym is an after-school activity sanctioned by the IHSA by-laws, which allows students to gather to play basketball during the fall, prior to the onset of official practice in November. (*Id.* ¶ 41.) Open gym also allows coaches to keep tabs on players in a structured environment, and keeps players off the streets. (*Id.* ¶ 46.) Open gym also provides student athletes access to college scouts, who visit open gym to evaluate players. (*Id.* ¶ 48.) Marshall has offered open gym to its students for at least 30 years. (*Id.* ¶ 43.)

On August 31, 2007, at the end of the first week of the fall semester, Gardner informed Plaintiff that there would be "no more open gym." (*Id.* ¶ 49.) At the time, the boys had already participated in three days of open gym. (*Id.*) Plaintiff questioned Gardner about the reason for his decision, and Gardner initially responded, "Because I said so." (*Id.* ¶ 50.) After further

6

discussion, Gardner stated that he "just wanted the kids to study." (*Id.*) Plaintiff expressed his view that open gym was necessary to keep players off the streets and to give them an opportunity to be viewed by college scouts. (*Id.*) Gardner stated that he would get back to Plaintiff on the issue, but he never did. (*Id.* ¶ 51.)

On September 4, 2007, Plaintiff saw certain members of the girls' basketball team running drills outside, and the following day he saw team members doing drills in the gym. (*Id.* ¶ 54.) The next day, Plaintiff complained to his union delegate, Rosalind Lewis ("Lewis"), that he felt slighted because the girls were having open gym while the boys were being denied that same opportunity. (*Id.* ¶ 55.) Lewis spoke with an assistant principal about the matter, asking, "How come the girls can practice and the boys cannot?" (*Id.* ¶ 56.) The assistant principal in turn spoke with Gardner and told him that Plaintiff had complained to Lewis about the fact that the girls were still participating in open gym. (*Id.* ¶¶ 57-58.) The following week, Plaintiff again saw members of the girls' basketball team playing basketball in the gym on two occasions. (*Id.* ¶ 60.) On September 13, 2007, he emailed Gardner to ask when open gym would be reinstated. (*Id.* ¶ 61.) Gardner never responded to this email. (*Id.* ¶ 62.)

Gardner believes Plaintiff did a good job of enforcing academic requirements for his players, and he was not aware that the male basketballs players had any more academic issues than the female players or the rest of the Marshall student body. (*Id.* ¶ 52.) Gaters did not question Gardner about cancelling open gym because she felt it did not concern her. (*Id.* ¶ 69.) Gaters had members of the girls' basketball team participate in cross-country running, which occurs during the fall. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 88.) The parties dispute whether the girls Plaintiff saw in the gym were practicing cross-country our basketball. (*See* R. 166, Pl.'s

7

Resp. to Defs.' Facts ¶¶ 79.)

Sometime around September 26, 2007, one of Plaintiff's volunteer assistant coaches, James Williams ("Williams"), approached Gardner about the cancellation of open gym. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 70.) Williams expressed concerns about a talented basketball player with a troubled past who Williams felt was in need of constant mentoring and structure.[3] (*Id.*) Williams subsequently told Plaintiff about his conversation with Gardner. (*Id.* ¶ 72.) Plaintiff asked Williams to document the conversation, and Williams did, preparing a statement and providing copies to Plaintiff and Gardner. (*Id.* ¶¶ 73-74.)

On September 27, 2007, Gardner was contacted by Kurt Keener ("Keener"), the athletic director of the Detroit Country Day School in Michigan. (R. 166, Pl.'s Resp. to Defs.' Facts ¶¶ 110, 114.) Keener was also the director of an annual basketball tournament held in December known as the "Motor City Roundball Classic" ("Roundball Classic"). (*Id.* ¶ 110.) In 2007, the Roundball Classic was being held at the same time as the Proviso West Tournament, which is played in Bellwood, Illinois. (*Id.* ¶ 111.) Gardner wanted Marshall to play at the Proviso West Tournament rather than the Roundball Classic so that the players could be closer to their families during the holidays. (*Id.* ¶ 112.) Marshall had a two-year contract to play in the Roundball Classic, but based on a request from Gaters, Keener had agreed to let Marshall out of its obligation to play without penalty. (*Id.* ¶¶ 113, 115-16.)

Keener called Gardner on September 27, 2007, to inform him of conduct by Plaintiff that made him uncomfortable. (*Id.* ¶ 114.) Keener stated that after talking to Gaters and agreeing to

---

[3] In late October 2007, this student was arrested for attempted murder. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 79.)

let Marshall out of its obligation to play, he received a call from another Roundball Classic organizer, Mal Parker ("Parker"), who stated that he had spoken to Plaintiff, and that Plaintiff wanted the Marshall team to play in the Roundball Classic. (*Id.* ¶ 117.) Keener's interpretation of the conversation between Parker and Plaintiff was that Plaintiff wanted Keener to try to hold Marshall to its contractual obligation as "leverage" to force Marshall to play in the Roundball Classic. (*Id.* ¶ 118.) After imparting the information about Plaintiff's conduct to Gardner, Keener sent Gardner an email summarizing the same information. (*Id.* ¶ 119.) Gardner did not attempt to contact Parker to determine what Plaintiff had said to him. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 86.) Plaintiff disputes that he made this statement or that he was attempting to "leverage" anyone about playing in the Roundball Classic. (*Id.* ¶ 87.)

Sometime during this period, Gardner spoke to the mother of a basketball player who expressed concern that Plaintiff would reduce her son's playing time if he participated in other sports. (R. 166, Pl.'s Resp. to Def.'s Facts ¶ 122.) The parties dispute whether this conversation occurred on September 29, since Gardner testified at his deposition that he could not recall exactly when and where the conversation occurred. (*See id.*) Plaintiff disputes that he ever told this student or his mother that the student should not play another sport, or that there would be negative consequences if he did so. (R. 167, Pl.'s Facts, Ex. 1, Bryant Decl. ¶ 17.)

Also during this period, Gardner was approached by Marshall's football coach, William Gray ("Coach Gray"), who complained that Plaintiff was not allowing his basketball players to participate in football, and that he had witnessed Plaintiff making threats to bench a student if the student visited a college without Plaintiff's permission. (*Id.* ¶¶ 120-21.) Although the parties agree that Coach Gray spoke with Gardner on these issues, Plaintiff disputes that the

9

conversation occurred prior to his termination. (*See id.*) Defendants have submitted a copy of a letter to Gardner from Coach Gray dated September 27, 2007, in which he outlines his concerns, but Plaintiff uncovered evidence during the course of this litigation indicating that this letter was created and printed from Gardner's own computer after Plaintiff was terminated and filed this lawsuit. (*See id.* ¶ 120; R. 167, Pl.'s Facts, Group Ex. 19.)

On October 2, 2007, Gardner, along with other school officials, met with Plaintiff. (*Id.* ¶ 106.) Gardner informed Plaintiff that he would no longer coach the boys' basketball team at Marshall. (*Id.*) As principal, Gardner had the authority to remove Plaintiff as coach under the Chicago public high schools' Athletic Association Executive Committee by-laws. (*Id.* ¶ 104.)

On the day of Plaintiff's termination, Gaters stated publicly that Marshall has a "code of conduct for all of our coaches" and that "Coach Bryant had breached that agreement." (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 106.) The following day, Gaters stated publicly that Plaintiff's termination had nothing to do with Plaintiff wanting to play in a Christmas tournament in Detroit. (*Id.* ¶ 107.) Sometime before October 15, 2007, Gaters prepared a document entitled, "Case Against Lamont Bryant," which criticized Plaintiff on several issues, including, among other things: threatening players; failing to submit volunteer assistant coaches for background checks; failing to prohibit a person with three felony convictions and seven arrests for possession and distribution of drugs from serving as a volunteer assistant coach; threatening players; failing to meet with Gardner and a student's parents; failing to follow guidelines established by the principal; and knowingly playing ineligible players. (*Id.* ¶ 108.) On October 15, 2007, Gaters publicly discussed these accusations at a meeting of Marshall students, athletes, and parents. (*Id.* ¶ 109.) This meeting occurred two days before Plaintiff spoke at a press conference announcing

10

the filing of this lawsuit. (*Id.* ¶ 110.) On October 18, 2007, Gaters called Plaintiff a "liar" to the media in regards to his allegation that the boys' team had traveled on substandard buses. (*Id.* ¶ 111.)

Plaintiff continued to work as a gym teacher at Marshall until March 2008. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 14.) Plaintiff did not search for a new coaching position until the end of the 2007-08 basketball season in March 2008 because in the coaching profession, vacancies emerge after the completion of the season. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 112.) Since the completion of the 2007-08 basketball season, Plaintiff has applied for coaching positions at Kennedy-King College, University of South Florida, Chicago State University, and Thornridge High School. (*Id.* ¶ 113.) He is also pursuing a coaching position at his alma mater, South Shore High School.[4] (*Id.* ¶ 114.)

In March 2008, Marshall won both the girls' and boys' state basketball championships. (*Id.* ¶ 115.)

## PROCEDURAL HISTORY

On October 18, 2007, Plaintiff filed this action. (R. 1, Compl.) This Court subsequently denied Gaters' motion to dismiss. *Bryant v. Gardner*, 545 F. Supp. 791 (N.D. Ill. 2008). On March 18, 2008, Plaintiff filed his Second Amended Complaint ("SAC"), raising seven claims: in Count I, Plaintiff alleges that Gaters and Gardner retaliated against him in violation of the First Amendment based on his complaints about open gym and Gaters' alleged mismanagement of the MLK Foundation; in Count II, Plaintiff alleges that the Board violated Title IX of the Education

---

[4] Following briefing on the motions for summary judgment, Gaters submitted evidence that Plaintiff did obtain the position with South Shore High School. (R. 176, Gaters' Mot. for Leave to Amend Reply, Ex. A.) This issue is addressed in more detail in Section I(C) below.

Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, by retaliating against him based on his complaints of unequal treatment of male and female athletes; in Count III, Plaintiff alleges that Gaters violated his 14th Amendment due process right to occupational liberty by publicly and falsely accusing him of misconduct; in Count IV, Plaintiff alleges a state law breach of contract claim against Gardner and the Board based on their alleged violation of the agreement permitting him to serve as coach for one final year; in Count V, Plaintiff raises a promissory estoppel claim against Gardner and the Board based on the same conduct; in Count VI, Plaintiff raises a claim against Gaters for tortious interference with contract based on her alleged interference with his agreement with Gardner and the Board; and in Count VII, Plaintiff raises a state law defamation claim against Gaters based on her public statements accusing him of misconduct. (R. 92, SAC ¶¶ 1-114.)

Defendants separately move for summary judgment. (R. 152, Board's Mot. for Summ J.; R. 155, Gardner's Mot. for Summ. J.; R. 158, Gaters' Mot. for Summ. J.) The Board moves for summary judgment on Counts II, IV, and V. (R. 152, Board's Mot. for Summ J. at 1.) Gardner moves for summary judgment on Counts I, IV, and V. (R. 155, Gardner's Mot. for Summ. J. at 1.) Gaters moves for summary judgment on Counts I, III, VI, and VII. (R. 158, Gaters' Mot. for Summ. J. at 1.)

Also before the Court is Plaintiff's motion to compel or, alternatively, for default judgment against Defendants on the contract-related claims---Counts IV, V, and VI---based on their alleged spoliation of evidence. (R. 163, Pl.'s Mot. to Compel & For Entry of Default ("Pl.'s Mot. to Compel") at 1.) Specifically, Plaintiff asserts that Gardner and the Board failed in their duty to preserve evidence contained on Gardner's school laptop; that Defendants actively

12

destroyed evidence contained on the laptop; and that Gardner submitted a fraudulent declaration to this Court pertaining to a letter he received from Coach Gray, which a forensic evaluation revealed was created on Gardner's own computer after this action was filed. (*Id.* at 2-4.)

## LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). Summary judgment is not appropriate if there are disputed issues of fact remaining, or if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). "The choice between reasonable inferences from facts is a function of a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.*

## ANALYSIS

### I. Federal Claims

The Court first considers Plaintiff's federal claims. Plaintiff alleges that his termination violated the First Amendment, Title IX, and the Fourteenth Amendment Due Process Clause. (R. 92, SAC ¶¶ 71-87.)

## A. First Amendment Retaliation

In Count I, Plaintiff alleges that Gaters and Gardner retaliated against him in violation of the First Amendment because of his complaints about open gym and Gaters' alleged mismanagement of the MLK Foundation. (R. 92, SAC ¶¶ 71-75.) To establish a *prima facie* case of First Amendment retaliation, a public employee must show that: (1) his speech is constitutionally protected; (2) he suffered a deprivation likely to deter free speech; and (3) his speech was a substantial or motivating factor in the retaliation. *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008). If the employee establishes these three elements, the burden shifts to the employer to prove that it would have taken the same action in the absence of any protected speech. *Id.* If the employer carries that burden, the employee must show that the employer's proffered reasons were pretext and that retaliatory animus was the real reason for the termination. *Id.*

Defendants first argue that Plaintiff's speech is not protected because he spoke pursuant to his official duties as basketball coach rather than as a private citizen. (R. 156, Gardner's Mem. in Supp. of Mot. for Summ. J. ("Gardner's Mem.") at 3-4; R. 159, Gaters' Mem. in Supp. of Mot. for Summ. J. ("Gaters' Mem.") at 2-5.) The First Amendment protects a public employee's right to speak as a citizen about matters of public concern, and an employer may not retaliate against an employee for engaging in protected speech. *Sigsworth v. City of Aurora*, 487 F.3d 506, 508-09 (7th Cir. 2007). Conversely, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Whether speech is protected is a

14

question of law. *Davis v. Cook County*, 534 F.3d 650, 653 (7th Cir. 2008).

Plaintiff concedes that his complaints to Gardner about the cancellation of open gym are not protected under *Garcetti*, since he made these complaints in connection with his official duties as coach. (R. 168, Pl.'s Mem. in Opp. to Defs.' Mots. for Summ. J. ("Pl.'s Mem.") at 27.) He nevertheless argues that once he "stepped outside the chain of command" and expressed his concerns about open gym to his union delegate, "the application of *Garcetti* became much less clear." (*Id.*) He also contends that his statements to his assistant coach, Williams, in which he asked Williams to memorialize his conversation with Gardner about open gym, are protected. (*Id.* at 28.) This Court disagrees. All of Plaintiff's statements to school personnel about open gym were made pursuant to his official duties as coach of the boys' basketball team. Part of Plaintiff's duties was to make sure that his team members practiced, stayed conditioned, and were recruited by colleges. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 72.) Plaintiff viewed open gym as an important component of his players' training, as well as their exposure to college scouts. (*Id.* ¶ 63.) Plaintiff's speech was directed at trying to get Gardner to reverse his decision about the cancellation of open gym so as to benefit his players.

The mere fact that Plaintiff repeated his complaints to his union delegate does not mean he was speaking as a private citizen. The cases cited by Plaintiff involved retaliation on account of union association. *See Wright v. Village of Franklin Park*, No. 05-3696, 2008 WL 820560 (N.D. Ill. Mar. 25, 2007) (police officer suffered retaliation for union activities, including serving as union president, advocating grievances, chairing union meetings, and organizing letter-writing campaign on behalf of union); *Glass v. Snellbaker*, No. 05-1971, 2007 WL 1723472 (D. N.J. Jun. 14, 2007) (plaintiff suffered retaliation because of union activities). Here, by contrast, there is

15

nothing to indicate that Plaintiff was fired on account of any union activities, nor is there any indication that his complaint about open gym was even a union-related grievance.

Plaintiff cites no case law to explain why his statements to his assistant coach about open gym were made as a private citizen, rather than as boys' basketball coach, nor can the Court discern any basis to reach such a conclusion. Merely making complaints outside the chain of command does not mean that one is speaking as a private citizen. *See, e.g., Trigillo v. Snyder*, --- F.3d---, 2008 WL 4755789, at *3-*4 (7th Cir. 2008) (department of corrections employee did not speak as private citizen even though she "went beyond her normal day-to-day duties" to report misconduct to Illinois Attorney General, since her actions were a "means to fulfill [her] obligation to oversee the department's procurement transactions"); *Vose v. Kliment*, 506 F.3d 565, 570-71 (7th Cir. 2007) (police officer's report about misconduct in a different unit, while "above and beyond his routine duties," was still within his general duties as an officer and thus was not protected speech), *cert. denied*, 128 S. Ct. 2500 (2008). All of Plaintiff's statements to school personnel were made in furtherance of his official duties as boys' basketball coach, and accordingly, his speech is not protected.

Also unavailing is Plaintiff's suggestion that he spoke as a private citizen because the cancellation of open gym had safety ramifications for his players. (R. 168, Pl.'s Mem. at 28-29.) Even where speech relates to matters "of the utmost concern to the public," it will not be afforded constitutional protection if it was made as "part of the tasks that [the plaintiff] was employed to perform." *Sigsworth*, 487 F.3d at 511. As the Supreme Court has explained, "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti,*

16

547 U.S. at 421-22. Here, Plaintiff's complaints about the cancellation of open gym were made in the context of fulfilling his duties as boys' basketball coach. For these reasons, Plaintiff's speech is not protected by the First Amendment.

Plaintiff next argues that his criticism of Gaters' alleged mismanagement of the MLK Foundation was protected speech. (R. 168, Pl.'s Mem. at 29-30.) He argues at length that this speech pertained to a matter of public concern, but the threshold issue under *Garcetti* is whether Plaintiff made these statements in his capacity as a private citizen or in connection with his official duties as coach. *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008) (only if plaintiff spoke as private citizen does Court consider whether speech touched on a matter of public concern). Again, the Court finds that Plaintiff's statements were made in connection with his duties as coach and not as a private citizen. Plaintiff's complaints to Gardner pertained to basketball expenditures and resource allocation, and part of his duties involved procuring resources and merchandise for the boys' basketball team. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 73.) In Plaintiff's view, the funds from the MLK Classic were not being appropriated in a manner that adequately benefitted the boys' basketball team. *See Renken*, 541 F.3d at 774 (university professor did not speak as private citizen when complaining about misuse of grant funds, since administration of grants was part of his general responsibilities). Because Plaintiff spoke pursuant to his official duties in complaining about the MLK Classic, his statements are not afforded First Amendment protection.

For these reasons, Plaintiff did not engage in protected speech, and his First Amendment claim therefore fails. Because the claim fails on this threshold issue, the Court does not reach Defendants' other arguments for granting summary judgment on this claim.

17

## B.    Title IX

In Count II, Plaintiff alleges that the Board, through their agent Gardner, violated Title IX by retaliating against him for his complaints about unequal treatment of male and female athletes. (R. 92, SAC ¶¶ 76-82.) Title IX prohibits gender discrimination by recipients of federal funding in the administration of any educational program or activity. 20 U.S.C. § 1681. Title IX also prohibits retaliation against a person who has complained of sex discrimination in an educational program or activity. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 399 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008).

As an initial matter, Defendants devote a portion of their brief to arguing that Plaintiff has failed to show that there were inequities in the boys' and girls' basketball programs substantial enough to violate Title IX. (R. 153, Board's Mem. at 1-6.) Plaintiff responds that he is not raising a substantive violation of Title IX in his complaint, but only a retaliation claim.[5] (R. 168, Pl.'s Mem. at 13.) The Court agrees with Defendants that there is some ambiguity in the SAC, but Plaintiff's response puts to rest any question as to whether he is raising a substantive violation of Title IX in Count II. Since he is not raising such a claim, the Court turns to his retaliation claim.

Title IX prohibits retaliation against a person for complaining about sex discrimination in the operation of a federally funded educational program or activity. *Jackson*, 544 U.S. at 173-74.

---

[5] In a retaliation claim, the conduct complained of need not violate the statute, as long as the employee had a reasonable, good-faith basis for believing that it did. *Tate v. Exec. Mgmt. Servs., Inc.*, ---F.3d---, 2008 WL 4527707, at *3 (7th Cir. 2008); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002).

18

Courts look to cases decided under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, to inform their analysis under Title IX. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 74-75 (1992); *Smith v. Metro. Sch. Dist. Perry Tp.*, 128 F.3d 1014, 1024 (7th Cir. 1997); *see also Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66-67 (1st Cir. 2002) (Title VII jurisprudence supplies applicable legal framework for a Title IX retaliation claim); *Howell v. N. Cent. Coll.*, 320 F. Supp. 2d 717 (N.D. Ill. 2004) (same). To prove a claim of retaliation, the plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between the two. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). The plaintiff can rely on either direct or circumstantial evidence to prove his claim. *Lewis v. School Dist. # 70*, 523 F.3d 730, 742 (7th Cir. 2008). Direct evidence is evidence "which (if believed by the trier of fact) will prove the fact in question without reliance upon inference or presumption," such as an admission by the decision maker demonstrating retaliatory intent. *Id.* Because direct evidence of discriminatory intent is rare, a plaintiff can also rely on circumstantial evidence, which "allows the trier of fact to infer intentional discrimination by the decision maker." *Id.*

The Board asserts that Plaintiff has insufficient evidence on the causation element.[6] (*See* R. 153, Board's Mem. at 8.) Plaintiff responds that he has created an issue of material fact on causation based on the suspicious timing of his termination, which came right after his repeated complaints about unequal treatment of the boys' and girls' team. (R. 168, Pl.'s Mem. at 18-19.) A causal link may be shown where an adverse employment action occurred "closely on the heels" of protected activity. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007). Here, Plaintiff was terminated on October 2, 2007, shortly after his repeated complaints to Gardner and other school personnel about the cancellation of open gym during the month of September. The temporal proximity of these events creates an inference of retaliation. Nevertheless, suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial. *Amrehein v. Health Care Serv. Corp.*, ---F.3d---, 2008 WL 4613877, at *3 (7th Cir. 2008). As Plaintiff argues, however, there is evidence in the record that belies Defendants' stated reasons for cancelling open gym and for terminating him, thus raising an inference of retaliatory motive. (R. 168, Pl.'s Mem. at 16-19.)

---

[6] In this section, the Board "adopts and incorporates" Gardner's arguments regarding Plaintiff's First Amendment claim. (R. 153, Board's Mem. at 8.) Although this created some confusion for the Court, given that the First Amendment and Title IX analyses are not identical, the Board clarifies in its reply that it is referring to Gardner's causation arguments. (*See* R. 172, Board's Reply at 3.) To the extent the Board suggests in its reply that Plaintiff did not engage in protected activity for purposes of Title IX, the Board has failed to develop this argument and it is therefore waived. *See De La Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 688 (7th Cir 2008) ("Unsupported and undeveloped arguments are waived."). Even if the argument were not waived, Plaintiff only needs to show that he had a reasonable, good faith belief that he was complaining about conduct prohibited by the statute. *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). His complaints about perceived unequal treatment between the boys' and girls' basketball teams would satisfy this requirement. *See Jackson*, 544 U.S. at 174-75.

First, there is evidence undermining Gardner's stated reasons for cancelling open gym. Gardner stated that he cancelled open gym because he wanted the boys to study, but he was not aware of anything to suggest that the boys had more academic problems than the girls. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 52.) Gardner also believed Plaintiff did a good job of enforcing academic requirements for his players. (*Id.*) Gardner also suggests that he cancelled open gym for everyone and not just the boys, but Plaintiff claims to have seen members of the girls' basketball team playing basketball in the gym on multiple occasions during the month of September. (*Id.* ¶¶ 54, 60.) Gardner also claims that his decision to cancel open gym was based in part on a discussion with the cross-country coach, Danny Little, about the need to encourage participation in that sport, but Little testified that his conversation with Gardner did not occur until late September, a few weeks *after* Gardner made the decision to cancel open gym. (*See* R. 167, Pl.'s Facts, Ex. 13, Little Dep. Tr. at 39-40.)

There are also factual disputes surrounding the stated reasons for Plaintiff's termination. According to Gardner, one reason for Plaintiff's termination was Plaintiff's "demeaning" conduct toward his assistant coach, Williams, in forcing Williams to document his conversation with Gardner. (R. 169, Defs.' Resp. to Pl.'s Facts ¶¶ 70-78.) Plaintiff denies that he mistreated Williams, and Williams testified that Plaintiff did not apply any pressure on him in this regard but merely asked him to document the discussion, and that he did so because he thought it was the "right thing to do." (R. 149, Defs.' Facts, Ex. K, Williams Dep. Tr. at 57.) Gardner also stated that he terminated Plaintiff because of his conduct in connection with the Roundball Classic, but following Plaintiff's termination, Gaters publicly stated that Plaintiff's termination had nothing to do with him wanting to play in that tournament. (R. 169, Defs.' Resp. to Pl.'s

Facts ¶ 107.) Additionally, Gardner stated that prior to Plaintiff's termination he spoke with a mother who expressed concerns about Plaintiff reducing her son's playing time if he participated in another sport. (R. 166, Pl.'s Resp. to Def.'s Facts ¶ 122.) However, at his deposition Gardner could not remember precisely where or when this conversation occurred. (R. 167, Pl.'s Facts, Ex 10, Gardner Dep. Tr. at 211-12.) Although Defendants have submitted a note allegedly written by the student's mother, the note is not dated, and it is also difficult to understand exactly what she is complaining about.[7] (R. 149, Defs.' Facts, Ex. S.) Plaintiff denies that he prevented his players from participating in other sports, and in fact, six of Plaintiff's players participated in football in the fall of 2007. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 100.)

Finally, there is Gardner's assertion that his decision to terminate Plaintiff was based on a discussion with Coach Gray, in which Coach Gray accused Plaintiff of misconduct toward his players. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 120.) Gardner submitted a copy of a letter dated September 28, 2007, from Coach Gray outlining his concerns, along with a sworn declaration that he received the letter from Coach Gray on that date. (R. 167, Pl.'s Facts, Ex. 18, Gardner Decl. ¶ 18.) However, Plaintiff has submitted compelling evidence from a jointly retained forensic computer examiner, who attests that this document was actually created and printed from Gardner's own computer on October 18, 2007, *after* Plaintiff was terminated and filed this action. (R. 167, Pl.'s Facts, Group Ex. 19; R. 163, Pl.'s Mot. to Compel, Ex. 7.) In his deposition, Coach Gray acknowledged that he spoke with Gardner about problems he perceived with Plaintiff, but was equivocal about when this conversation occurred; at one point he

_____

[7] The note states in part, "Coach Bryant told me D--- don't supose to not play for another team because he might get hurt, and he also told me you saw I done snowball last year so I take that a threat. I like Coach Bryant but that was personly to me." (R. 149, Defs.' Facts, Ex. S.)

indicated that the conversation occurred after Plaintiff had been terminated from his coaching position. (R. 149, Defs.' Facts, Ex. J, Gray Dep. Tr. at 62.)

Also in dispute is whether Gaters played any role in the decision to terminate Plaintiff. Although Gardner claims that he made the decision entirely on his own, Plaintiff points to evidence suggesting that it would be highly unusual for Gaters, as athletic director, not to be involved in a decision of this magnitude involving Marshall athletics. (*See* R. 169, Defs.' Resp. to Pl.'s Facts ¶ 67.) For instance, at her deposition Gaters could recall only one other time Gardner made a decision that affected Marshall athletics without consulting her, and that involved the purchase of some football equipment on an emergency basis. (*Id.*) When Gaters learned about the purchase, she asked the football coach why he had not come to her first. (*Id.* ¶ 68.) Moreover, it was Gaters, not Gardner, who spoke out publicly regarding the reasons for Plaintiff's termination, which included preparing a document entitled, "Case Against Lamont Bryant." (*See* R. 168, Defs.' Resp. to Pl.'s Facts ¶¶ 105-11.) Gaters' efforts to cover up her involvement in Plaintiff's termination, if true, could raise an inference of retaliatory motive.

In determining pretext, the question is not whether the employer's stated non-discriminatory ground for termination was correct, "but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006). As recounted above, there is evidence in the record from which a reasonable jury could infer that the stated reasons for Plaintiff's termination were pretextual and that the real reason Plaintiff was terminated was in retaliation for his complaints about perceived unequal treatment between the boys' and girls' basketball teams. It is not the role of this Court to resolve factual disputes or

23

choose between the competing inferences arising from the evidence; these are tasks for the jury. *Id.*; *Harley-Davidson Motor Co., Inc.*, 319 F.3d at 989. Accordingly, summary judgment is not appropriate on the Title IX retaliation claim.

## C. Fourteenth Amendment Occupational Liberty

In Count III, Plaintiff claims that Gaters violated his Fourteenth Amendment due process right to occupational liberty by publicly and falsely accusing him of misconduct, thus undermining his ability to pursue other coaching opportunities. (R. 92, SAC ¶¶ 83-87.) To prevail on a claim for a deprivation of occupational liberty, the plaintiff must come forward with evidence showing that: (1) the employer made stigmatizing comments; (2) the comments were publicly disclosed; and (3) as a result of the comments the employee suffered a tangible loss of employment opportunities. *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001).

In her motion for summary judgment, Gaters argues that Plaintiff failed to come forward with evidence that he suffered a tangible loss of employment opportunities because he did not diligently search for a new position after he was terminated. (R. 159, Gaters' Mem. at 7-8.) In his opposition, Plaintiff contests this argument, asserting that "[s]ince the completion of the 2007-08 basketball season, Plaintiff has been diligently searching for a coaching position." (R. 168, Pl.'s Mem. at 35.) In particular, Plaintiff states that he is "currently in discussions with Chicago's South Shore High School, and is attempting to land a teaching and coaching position there for the 2008-09 school year." (*Id.* at 36.) Plaintiff further states that if he obtains this position "he will withdraw his liberty interest claim." (*Id.*)

Following briefing on the summary judgment motions, Gaters submitted evidence that Plaintiff has since obtained the position with South Shore High School. (R. 176, Gaters' Mot.

for Leave to Amend Reply, Ex. A.)  More than a month has passed since Gaters submitted this evidence to the Court, and Plaintiff has not responded to Gaters' submission or otherwise disputed that he has obtained the position with South Shore High School.  The Court presumes that Plaintiff intends to stand by his representation to this Court that he would withdraw his occupational liberty claim if he obtained the position at South Shore High School, and therefore considers this claim withdrawn.  Count III is dismissed with prejudice, and Gaters' motion for summary judgment on this claim is denied as moot.

## II.    State Law Claims

Next, Plaintiff alleges state law claims for breach of contract, promissory estoppel, tortious interference with contract, and defamation.  Before turning to the merits of these claims, the Court must address Plaintiff's motion to compel or for default judgment on the contract claims (Counts IV-VI) based on Defendants' alleged spoliation of evidence.  (R. 163, Pl.'s Mot. to Compel.)

### A.    Plaintiff's Motion to Compel or For Default

In his motion, Plaintiff argues that Gardner and the Board failed in their duty to preserve relevant evidence contained on Gardner's school laptop; that Defendants actively destroyed evidence contained on the laptop; and that Gardner submitted a fraudulent declaration to this Court.  (*Id.* at 2-4.)  Plaintiff requests that this Court enter an order compelling Defendants to produce any additional electronic data that exists or, alternatively, enter a default judgment against Defendants on Counts IV, V, and VI as a sanction for their "bad faith destruction of evidence."  (*Id.* at 11.)  Plaintiff also seeks costs and fees incurred in conducting a forensic evaluation of Defendants' computers and in bringing this motion.  (*Id.*)

25

Spoliation of evidence occurs when one party destroys relevant evidence. *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001). A party has a duty to preserve evidence over which it has control and reasonably knows or could foresee would be material to a potential legal action. *Wells v. Berger, Newmark & Fenchel, P.C.*, No. 07-3061, 2008 WL 4365972, at *6 (N.D. Ill. Mar. 18, 2008); *Krumweide v. Brighton Assoc., LLC*, No. 05-3003, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006). A formal discovery request is not necessary to trigger the duty to preserve evidence. *Krumweide*, 2006 WL 1308629, at *8; *Danis v. USN Comm., Inc.*, No. 98-7482, 2000 WL 1694325, at *33 (N.D. Ill. Oct. 23, 2000). "[T]he complaint itself may also alert a party that certain information is relevant and likely to be sought in discovery." *Danis*, 2000 WL 1694325, at *33. The Court has discretion to sanction a party for spoliation of evidence. *Krumweide*, 2006 WL 1308629, at *8. Sanctions include awarding reasonable expenses, attorney fees, barring evidence or arguments, permitting adverse inferences, and dismissing claims or entering default judgment. Fed. R. Civ. P. 37(b)(2)(i)-(vii); *Krumweide*, 2006 WL 1308629, at *8. Any sanction imposed must be proportionate to the circumstances. *Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997); *Krumweide*, 2006 WL 1308629, at *9.

Upon review of the evidence, the Court concludes that Gardner and the Board failed in their obligation to preserve evidence relevant to this litigation. The record shows that Gardner continued to work on his laptop from the time this action was filed in mid-October 2007 until early January 2008. He did so (and was allowed to do so by his attorneys) even though it was apparent from the beginning of this lawsuit that the laptop likely contained evidence pertinent to Plaintiff's contract claims. Specifically, in the complaint Plaintiff alleged that he entered a

26

written agreement with Gardner, which Gardner allegedly drafted, permitting him to remain as coach during the 2007-08 basketball season if he complied with certain terms. (*See* R. 1, Compl. ¶¶ 34-39.) Plaintiff attached a copy of the document to his complaint. (*Id.*, Ex. A.) Gardner's position is that he did not draft the document in question and never saw it until his attorney showed it to him after this case was filed. (R. 149, Defs.' Facts, Ex. F, Gardner Dep. Tr. at 109.) An examination of the laptop would have revealed whether Gardner drafted the document in question. However, the parties' independent computer examiner has determined that files were deleted during Gardner's use of the laptop in the months following the filing of this lawsuit. (R. 163, Pl.'s Mot. for Default, Ex. 7, Forensicon Report at 11.) Deleted files can usually be recovered, but in this case some of the deleted files were overwritten during a spike of activity occurring in late December 2007, which involved the deletion and creation of multiple files, thus making some of the deleted files permanently unrecoverable. (*Id.*)

The forensic examiner also determined that a defragmentation or "defrag" program was run on the laptop during this period, which had the capability to overwrite files and otherwise alter data; the examiner opined that running a defrag program is inconsistent with an intent to preserve evidence. (*Id.*, Ex. 10, Jones Aff. ¶¶ 21-33.) None of these events would have occurred if Gardner had stopped using the laptop, or if Defendants' attorneys had simply obtained possession of the laptop from him and made an imaging of the computer's contents, immediately after this lawsuit was filed.[8] The Court concludes that Defendants failed in their duty to preserve relevant evidence. *See Wells*, 2008 WL 4365972, at *7 (defendants failed in duty to preserve

---

[8] Although the Board suggests that doing so would have imposed an undue hardship on Gardner, there is evidence that Gardner also had a desktop computer in his office that he could have continued to use. (R. 149, Defs.' Facts, Ex. F, Gardner Dep. Tr. at 251.)

evidence by allowing employee to continue using computer after litigation began without reviewing, monitoring, or otherwise securing discoverable information on the computer).

Despite these failings, the Court finds insufficient evidence of bad faith to warrant entry of default judgment. Default judgment is a harsh sanction that may be employed in "extreme situations where there is clear and convincing evidence of willfulness, bad faith, or fault by the noncomplying party." *Krumweide*, 2006 WL 1308629, at *8; *see also Crabtree*, 261 F.3d at 721 (even though relevant documents were destroyed, no evidence they were destroyed in bad faith). Based on the evidence before the Court, this case does not meet that high standard. For instance, Plaintiff argues that Defendants used improper software to take an imaging of the computer, thus making it impossible to ensure the integrity of the data imaged. Although Plaintiff ascribes some nefarious intent on Defendants' part, the Board's information technology ("IT") specialist attests that the software used to make the imaging is the only one the Board owns. (R. 174, Defs.' Resp., Ex. F., Foster Decl. ¶ 5.) The procedures agreed to by the parties regarding the imaging of the Board's computers do not specify what type of software was to be used. (*Id.*, Ex. A, Agreed Protective Order; R. 163, Pl.'s Mot. to Compel, Ex. 5, Agreed Protocol.)

The Board's IT specialist also attests that the laptop activity occurring in December 2007 that may have caused the overwriting of files involved Gardner "surfing the internet." He explains that when a user surfs the internet, multiple temporary files are automatically created, thus potentially overwriting deleted files. (R. 173, Defs.' Resp., Ex. F, Foster Decl. ¶¶ 9-15.) He also attests that a user would not know which data is being overwritten in such a situation. (*Id.* ¶ 15.) As for the defrag program, the Board's IT consultant attests that, based on his review, the defrag program was launched automatically by the operating system as part of a housekeeping

function, and that it occurred at a time when IT personnel, not Gardner, was in possession of the laptop. (R. 174, Defs.' Resp., Ex. L, Zikmund Decl. ¶¶ 5-6.) The parties' independent computer expert has not countered any of these assertions. The Court also finds it significant that the laptop *did* contain documents that were highly damaging to Defendants and favorable to Plaintiff, including the letter from Coach Gray. Had Defendants purposefully deleted unfavorable evidence from the laptop, the Court finds it unlikely that this and other documents favorable to Plaintiff would have remained.

The Court thus finds the harsh sanction of default judgment unwarranted. The Court also considers it fruitless to order any further production by Defendants, since there is little to suggest that any additional electronic data exists, and Defendants have repeatedly asserted that they have turned over all relevant information. However, the Court concludes that the imposition of a sanction is warranted. Because of Defendants' actions, it is impossible to determine whether Gardner's laptop contained the agreement Plaintiff claims Gardner drafted. Based on Defendants' failure to preserve potentially relevant information which would have resolved this dispute, the Court finds it appropriate to preclude Defendants from arguing in this litigation that Gardner did not draft the document forming the basis for Plaintiff's contract claims. The Court further finds that Plaintiff should be awarded his costs and fees incurred in bringing this motion, and in paying the forensic examiner to examine Defendants' computers.

Finally, there is the matter of Gardner's false statement to this Court. In his declaration filed in opposition to Plaintiff's motion for preliminary injunction, Gardner declared under penalty of perjury pursuant to 28 U.S.C. § 1746 that he received the letter from Coach Gray on September 28, 2007, outlining concerns about Plaintiff's conduct toward his players. (R. 163,

Pl.'s Mot. for Default, Ex. 3, Gardner Decl. ¶ 8.) We now know this statement to be false, since the forensic examiner's investigation revealed that letter did not exist until October 18, 2007, after Plaintiff filed this lawsuit. The fact that the letter was created and printed from Gardner's own computer suggests that Gardner knew the statement in his declaration was false.[9] In the face of the serious accusations raised by Plaintiff, Gardner offers nothing in the way of explanation for the apparent falsity contained in his declaration. This Court takes very seriously the submission of materially false declarations, and will therefore require Gardner to show cause why this matter should not be referred to the U.S. Attorney for potential prosecution under 18 U.S.C. § 1623.[10]

For the reasons stated above, Plaintiff's motion to compel or alternatively for default is granted to the extent stated herein, and is denied in all other respects. With this issue resolved, the Court turns to the merits of Plaintiff's state law claims.

## B. Breach of Contract

In Count IV, Plaintiff alleges a state law breach of contract claim against Gardner and the Board based on their alleged violation of the "2007-08 Boys Basketball Agreement," which he claims permitted him to serve as coach for one final year if he abided by certain terms. (R. 92, SAC ¶¶ 88-92.) To prevail on a breach of contract claim under Illinois law, the plaintiff must

---

[9] Gardner admitted at his deposition that Coach Gray "may have" typed the letter on his computer, but he continued to assert that the letter was written on September 28 or September 29, prior to Plaintiff's termination. (R. 149, Defs.' Facts, Ex. F, Gardner Dep. Tr. at 240-41.)

[10] That statute provides, "Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under [28 U.S.C. § 1746]) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1623(a).

show: (1) the existence of a valid and enforceable contract; (2) his performance under the terms of the contract; (3) a breach by the defendant; and (4) damages. *Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004).

Defendants argue that Plaintiff has failed to demonstrate the existence of a valid and enforceable contract, performance by Plaintiff, or a breach by Defendants. (R. 156, Gardner's Mem. at 11-14). To be enforceable under Illinois law, a contract must be clear, definite, and supported by consideration. *Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004). Consideration consists of "some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004). In addition, there must be mutual assent, or a "meeting of the minds," as to the essential terms of the contract. *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991). The existence of a valid and enforceable contract is a question of law. *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, ---F.3d---, 2008 WL 4831760, at *5 (7th Cir. 2008); *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997).

Defendants first argue that the agreement is not valid because it is unsupported by consideration. (R. 156, Gardner's Mem. at 12.) In Defendants' view, there is no consideration for the agreement because "[t]he list of conditions does not reflect any promises made by or on behalf of Gardner, the Marshall school administration, or the Board." (*Id.*) The Court disagrees. In response to Plaintiff's statement of facts, Defendants admit that during their meeting in April 2007, "Plaintiff agreed to various conditions set by Gardner in return for Gardner's commitment that Plaintiff would coach one final season at Marshall." (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 14.) Defendants further admit that "[t]his agreement was memorialized in written form in a

31

document prepared by Gardner and signed by Plaintiff."[11] (*Id.* ¶ 15.) By entering the agreement, Plaintiff agreed to return as coach for one final season, thus foregoing other employment opportunities, and in return Gardner agreed to permit Plaintiff to return as coach for one final season, foregoing the opportunity to hire a new coach, if Plaintiff agreed to abide by certain terms. This bargained-for exchange of promises is sufficient consideration to support the agreement. *See Thomas*, 381 F.3d at 705. The Court therefore rejects Defendants' argument.

Defendants next argue that the agreement is not sufficiently clear or definite. (R. 156, Gardner's Mem. at 12.) "The principles of contract state that in order for a valid contract to be formed, an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." *Bus. Sys. Eng'g, Inc.*, 2008 WL 4831760, at *5 (citation omitted). Here, the agreement may not be a model of legal draftsmanship, but it contains the material terms of the parties' agreement. It identifies the subject matter of the agreement; the conditions with which Plaintiff was required to comply; and the applicable time period---the 2007-08 basketball season. It is signed by Plaintiff and is on the letterhead of Gardner, the person at Marshall with authority to terminate Plaintiff from his coaching position.[12] (*See* R. 166, Pl.'s Resp. to Defs.' Facts ¶ 104.)

---

[11] Although Defendants state that they are making these admissions "for purposes of Defendants' Motion for Summary Judgment only," the Court has precluded Defendants from arguing in this litigation that Gardner did not draft the agreement as a sanction for their failure to preserve relevant evidence. (*See supra* Section III(A).)

[12] The agreement need not satisfy the technical requirements of the Illinois statute of frauds since it would be completed at the end of the 2007-08 basketball season in March 2008. *See* 740 ILCS 80/1; *Trustmark Ins. Co. v. Gen. & Cologne Life Reins. of Am.*, 424 F.3d 542, 48-49 (7th Cir. 2005) (Illinois statute of frauds applies to contracts that cannot be performed within one year).

Even though the agreement does not address every aspect of Plaintiff's employment, a contract need not "provide for every collateral matter or every possible contingency which might arise." *Lankton-Ziegle-Terry & Assoc., Inc. v. Griffin*, 509 N.E.2d 785, 786 (Ill. App. Ct. 1987). Rather, "[a] contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Bus. Sys. Eng'g, Inc.*, 2008 WL 4831760, at *5; *see also Griffin*, 509 N.E.2d at 786. As stated above, the Court is able to ascertain what the parties agreed to do when they entered the 2007-08 Boys Basketball Agreement. To the extent Gardner is afforded discretion under the agreement, such as in determining when a breach has occurred, he would be required to exercise that discretion in accordance with the duty of good faith and fair dealing, implied in every contract; this duty "requires that contractual discretion be exercised reasonably and with proper motive, and not arbitrarily and capriciously." *ITQ Lata, LLC v. MB Fin. Bank, N.A.*, 317 F. Supp. 2d 844, 851 (N.D. Ill. 2004). For these reasons, the Court concludes that the agreement is sufficiently definite to be enforceable.

Defendants reliance on *Cheevers* does not change the Court's conclusion. (*See* R. 156, Gardner's Reply at 2-3.) *Cheevers* involved a publishing agreement for a book of short stories; the Court found the agreement unenforceable because it contained "major unresolved uncertainties" and failed to specify basic terms, such as the number of stories to be included, the total number of pages, the price at which the book would be sold, the length of time publication would continue, or the date of delivery. *Cheevers*, 578 N.E.2d at 983-84. Although the court noted that it is appropriate to enforce a contract even though some terms may be missing, where

the essential terms are "so uncertain that there is no basis for deciding whether the agreement has been kept or broken," there is no valid contract. *Id.* at 984. Here, by contrast, the material terms are sufficiently clear: Plaintiff would be permitted to serve as coach for one final season if he abided by the specific terms included in the agreement. Because the essential terms are sufficiently clear, the agreement is enforceable. *See Wheel Masters, Inc. v. Jiffy Metal Prods. Co.*, 955 F.2d 1126, 1129 (7th Cir. 1992) (where parties agreed on essential terms, contract was enforceable under Illinois law); *Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1240 (Ill. App. Ct. 1995) (though "inartfully drafted," agreement contained essential terms and was sufficiently concrete to be enforceable).

Defendants next argue that they did not breach the agreement in terminating Plaintiff because Plaintiff did not comply with his obligations under the agreement. (R. 156, Gardner's Mem. at 13-14.) Specifically, Defendants argue that Plaintiff breached the agreement by taking actions undermining his promise to play in the Proviso West Christmas tournament, and by making "inappropriate statements to and about his basketball players." (*Id.* at 13.) However, whether Plaintiff took these actions is hotly disputed. Plaintiff disputes that he did anything to undermine his obligation to play in the Proviso West tournament, or to force Marshall to play in the Roundball Classic. (R. 166, Pl.'s Resp. to Defs.' Facts ¶ 118; R. 169, Defs.' Resp. to Pl.'s Facts ¶¶ 87-89.) Parker's deposition testimony supports this account: Parker testified that when he contacted Plaintiff to inquire why Marshall would not be playing in the tournament, Plaintiff told him, in essence, that the matter was out of his hands and that Parker would have to contact Gaters. (R. 167, Pl.'s Facts, Ex. 16, Parker Dep. Tr. at 12-15.) The parties also dispute the timing and validity of complaints made by a student's mother and Coach Gray about Plaintiff's

34

alleged mistreatment of his players. (R. 166, Pl.'s Resp. to Defs.' Facts ¶¶ 120-23; R. 169, Defs.' Resp. to Pl.'s Facts ¶¶ 90-99.) Because of these factual disputes, summary judgment on the breach of contract claim is not appropriate.

### C.    Promissory Estoppel

In Count V, Plaintiff raises an alternative claim for promissory estoppel against Gardner and the Board based on the same conduct forming the basis for the breach of contract claim. (R. 92, SAC ¶¶ 93-102.) Under Illinois law, a claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking. *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 677 (7th Cir. 2005). Promissory estoppel is a "quasi-contractual" remedy, which is available "when one party has benefitted from the services of another under circumstances in which, according to dictates of equity and good conscience, he ought not to retain such benefit." *Cromeens, Hollman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003). A plaintiff may not pursue quasi-contractual remedies when there is an enforceable contract between the parties. *Id.* Once a valid contract is found to exist, quasi-contractual relief is no longer available. *Id.*

As stated above, this Court has determined that the agreement between Plaintiff and Gardner was adequately supported by consideration and is thus enforceable. Therefore, Plaintiff cannot also pursue his promissory estoppel claim. Accordingly, Count V is dismissed with prejudice.

### D.    Tortious Interference With Contract

In Count VI, Plaintiff alleges a tortious interference with contract claim against Gaters based on her alleged interference with the 2007-08 Boys Basketball Agreement. (R. 92, SAC ¶¶

103-09.) Specifically, Plaintiff alleges that Gaters "undertook a measured and calculated plan of action" to discredit him, undermine his ability to perform as coach, and to induce Gardner and the Board to breach his employment agreement by terminating him. (*Id.* ¶ 107.) To prove a claim for tortious interference with contractual rights, the plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) the defendants' awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) an actual breach of the contract; and (5) resultant damages. *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989).

Gaters first adopts Gardner's arguments regarding the breach of contract claim, and asserts that the tortious interference claim fails because there was no valid and enforceable contract between Gardner and Plaintiff. (R. 159, Gaters' Mem. at 9.) For the reasons discussed in Section II(B) above, the Court rejects this argument.

Gaters next argues that she could not have interfered with the contract as a matter of law, because any actions she took were in her capacity as Plaintiff's supervisor, and that by virtue of this position she was in effect a party to the agreement. (*Id.*) Gaters is correct that a party cannot interfere with his own contract; instead the interference must come from someone who is not a party to the contract. *Lombardi v. Bd. of Trs. Hinsdale Sch. Dist. 86*, 463 F. Supp. 2d 867, 873 (N.D. Ill. 2006); *Fiumetto v. Garrett Enter., Inc.*, 749 N.E.2d 992, 1004 (Ill. App. Ct. 2001). In her position as athletic director, Gaters was an agent of the Board, and thus she cannot be sued for tortious interference with a contract existing between Plaintiff, Gardner, and the Board. In a case involving strikingly similar facts, our colleague Judge Zagel reached the same conclusion. *See Lombardi*, 463 F. Supp. 2d at 873 (plaintiff who served as gym teacher and varsity football

coach could not allege tortious interference claim against athletic director and other school personnel for interfering with agreement between teacher and school board, since individuals were agents of the school board). For these reasons, Count VI fails as a matter of law, and the Court grants summary judgment to Gaters on this claim.

### E. Defamation

Finally, in Count VII, Plaintiff alleges a defamation claim against Gaters. (R. 92, SAC ¶¶ 110-14.) Plaintiff alleges that Gaters made false public statements which discredited him with his friends and colleagues and in the national basketball community, thus undermining his ability to work in his chosen profession. (*Id.* ¶¶ 112-14.) To prove defamation under Illinois law, the plaintiff must show: (1) a false statement by defendant; (2) an unprivileged publication to a third party; and (3) resultant damages. *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 839 (Ill. 2006).

Gaters first argues that Plaintiff's defamation claim fails because the statements she made were true "under Plaintiff's own testimony." (R. 159, Gaters' Mem. at 9-10.) This Court disagrees. Although Plaintiff admits the truth of a few of the statements made by Gaters at a public meeting following his termination, he disputes many others, including that he: failed to submit non-board coaches for background checks; failed to submit contracts for her approval; failed to attend mandatory coaches' meetings held by Gaters; failed to allow his players to participate in other sports; failed to meet with Gardner and a student's parents; failed to distribute complimentary tickets to players and coaches; and threatened players. (*See* R. 166, Pl.'s Resp. to Defs.' Facts ¶¶ 32-38.) The Court cannot resolve these factual disputes on a motion for summary judgment.

37

Gaters next argues that her statements constitute "nonactionable opinion" rather than assertions of fact. (R. 159, Gaters' Mem. at 11.) Statements of opinion cannot form the basis for a defamation claim; this includes general comments made without a specific factual context, comments that lack a precise and readily understood meaning, and comments that are "too broad, conclusory, and subjective to be objectively verifiable." *Shivarelli v. CBS, Inc.*, 776 N.E.2d 693, 699 (Ill. App. Ct. 2002). For example, accusing someone of "cheating" or calling them a "crook," without a specific factual context, would not be actionable. *See id.* at 698-99; *Dubinsky v. United Airlines Master Exec. Council*, 708 N.E.2d 441, 451 (Ill. App. Ct. 1999). The statements made by Gaters during the public meeting with students and community members do not fall in this category. As described above, her statements involve specific allegations of wrong-doing by Plaintiff, made in a specific factual context, that are verifiable as true or false. Gaters also called Plaintiff a "liar" in the media in response to his public comments about the boys team having to travel on substandard buses. (R. 169, Defs.' Resp. to Pl.'s Facts ¶ 111; R. 149, Pl.'s Facts, Ex. 23.) This statement is also a specific allegation of wrongdoing involving a specific factual context, and can be verified as true or false. *See Schivarelli*, 776 N.E.2d at 697-98 (observing that statement "Jones is a liar" is actionable and not an opinion). For these reasons, Gaters' statements do not constitute nonactionable opinion.[13]

---

[13] To the extent Gaters suggests that this Court already determined that the statements were not actionable defamation, this is incorrect. In its prior ruling, this Court was called to decide solely whether Plaintiff stated a claim for deprivation of his occupational liberty under the Fourteenth Amendment. *See Bryant*, 545 F. Supp. 2d at 800-802. This is a different standard than a state law defamation claim. *See id.* at 800 ("not every remark which may arguably affect one's reputation is actionable" under the Fourteenth Amendment) (citation omitted). Moreover, the Court's ruling was based solely on the allegations in Plaintiff's complaint, not the evidence obtained in discovery.

Next, Gaters argues that summary judgment is warranted because none of her statements constitute defamation *per se*. (R. 159, Gaters' Mem. at 11-12.) Defamation *per se* involves statements that are so obviously harmful that injury to the plaintiff's reputation is presumed, and the plaintiff need not prove actual damages. *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). There are five categories of statements that are considered defamatory *per se*, including, as is relevant here, "statements imputing an inability to perform or want of integrity in performing employment duties," and similarly, "statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business." *Id.* The bulk of Gaters' statements, including that Plaintiff mismanaged contracts and tickets, played ineligible players, and threatened players, fall into this category, since they seriously impugn Plaintiff's integrity in the performance of his duties as coach. Even for statements that cannot be considered defamation *per se*, such as that Plaintiff failed to assist in clearing students from the gym after games, Plaintiff could recover if he can prove actual damages. *Tuitte*, 866 N.E.2d at 121. Thus, the Court rejects Gaters' argument.

Finally, Gaters argues that she is entitled to summary judgment pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/2-210, which provides that a "public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation." This Court again disagrees. The parties dispute whether the statements made by Gaters were true, and also whether Gaters intentionally made these false statements in an attempt to discredit Plaintiff. At this stage, the Court finds no basis in the record to conclude that the statements made by Gaters were merely negligent.

In summary, based on the numerous disputed issues of fact, summary judgment on Plaintiff's defamation claim is not appropriate.

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment (R. 152, 155, 158) are granted in part and denied in part. Summary judgment is granted to Defendants on Counts I and VI. Counts III and V are dismissed with prejudice.

Plaintiff's motion to compel or for default (R. 163) is granted to the extent stated herein and denied in all other respects. Within 14 days of the date of this opinion, Plaintiff shall submit documentation of his reasonable costs and fees incurred in bringing the motion and in retaining an expert to evaluate Defendants' computers. Also within 14 days of the date of this opinion, Juan Gardner is ordered to show cause why the matter of his false declaration submitted to this Court should not be referred to the U.S. Attorney.

The parties are directed to reevaluate their settlement positions in light of this opinion and exhaust all efforts to settle this case. Trial on the remaining claims---Counts II, IV, and VII--- shall begin on **January 20, 2009.** After receiving input from the parties, the Court will impose time limits on the length of this jury trial. The parties are ordered to appear for a status hearing on **December 11, 2008** at **9:45 a.m.**

Entered: 

**Judge Ruben Castillo**
**United States District Court**

**Dated: November 21, 2008**